UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INCARCERATED ENTERTAINMENT,
LLC,

        Plaintiff,

        vs.

WARNER BROS. ENTERTAINMENT,
INC.; WARNER BROS. PICTURES, a
division of WB STUDIO ENTERPRISES,
INC.; RATPAC-DUNE
ENTERTAINMENT, LLC; THE MARK
GORDON COMPANY, a division of
ENTERTAINMENT ONE US LP; TODD
BUNZL p/k/a TODD PHILLIPS;
BRADLEY CHARLES COOPER; 22ND
AND GREEN PRODUCTIONS; SIMON
'SHIMMY' SPIRA and ELLIOTT KAHN,

        Defendants.

_____/

Case No. _0.16 CN-732-ORL-411<RS_

**JURY TRIAL REQUESTED**

**INJUNCTIVE RELIEF REQUESTED**

## COMPLAINT FOR FEDERAL AND FLORIDA UNFAIR COMPETITION, CONVERSION, MISAPPROPRIATION OF NAME AND LIKENESS, TRESPASS TO CHATTELS, FRAUD IN THE INDUCEMENT, AND BREACH OF CONTRACT

Plaintiff INCARCERATED ENTERTAINMENT, LLC ("IE" or "Plaintiff") hereby files

its nine-count Complaint against WARNER BROS. ENTERTAINMENT, INC. ("Warner

Bros."), its subsidiary WARNER BROS. PICTURES, a division of WB STUDIO

ENTERPRISES, INC. ("WBS"), RATPAC-DUNE ENTERTAINMENT, LLC ("RatPac"), THE

MARK GORDON COMPANY, a division of ENTERTAINMENT ONE US LP, ("Mark

Gordon"), TODD BUNZL p/k/a TODD PHILLIPS ("Phillips"), BRADLEY CHARLES

COOPER ("Cooper"), 22ND AND GREEN PRODUCTIONS ("22nd & Green"), SIMON

'SHIMMY' SPIRA ("Spira") and ELLIOTT KAHN ("Kahn") (Warner Bros., WBS, RatPac,

Mark Gordon, Phillips, Cooper and 22nd and Green are collectively referred to as the "Warner Defendants") (Spira and Kahn are collectively referred to as the "Spira Partners") (the Warner Defendants and the Spira Partners are collectively referred to as the "Defendants").

In support of its nine causes of action, IE alleges the following:

## NATURE OF CLAIMS

1.      This is an action under both Federal and Florida state law for damages and injunctive relief regarding unauthorized dissemination, copying and employment of IE's confidential and proprietary 360+ page manuscript *"Once a Gun Runner . . . A Memoir by Efraim Diveroli"* (the "February 2014 Manuscript") by the Spira Partners, procured through fraud in the inducement, which resulted in breach of their July 2014 executed non-disclosure agreements (resulting in additional acts of conversion), as well as the related later unauthorized and unlicensed transfer, use and/or access of the content contained within that February 2014 Manuscript (and/or the January 2012 Manuscript in which it was derived from) by the Warner Defendants (through the aide of the Spira Partners and/or optioned rights from third-party Guy Lawson) which in turn was used in writing a screenplay to film and produce the movie entitled *WAR DOGS* (formerly entitled *ARMS AND THE DUDES*) (herein the "Implicated Movie") now being marketed and promoted for release on August 19, 2016 by WBS and Warner Bros. – all of which has further resulted in additional claims sounding in Florida and Federal unfair competition (15 U.S.C. § 1125(a)), trespass to chattels, and violation of Florida Statute § 540.08.

## PARTIES, JURISDICTION AND VENUE

2.      IE is a limited liability company, formed and organized in November 2013 under the laws of the state of Florida, located at 2901 Kensington Trace, Tarpon Springs, Florida 34688. IE is a Tampa-area entertainment and media company focused on monetizing the larger-

2

than-life true story of famed gun runner and Miami native Efraim Diveroli ("Mr. Diveroli"), including through ownership of rights to his February 2014 Manuscript (as well as his prior January 2012 Manuscript from which it is derived), a related forthcoming book based on the February 2014 Manuscript entitled "*Once a Gun Runner . . . The Real Story*," the content associated with www.EfraimDiveroli.com, Mr. Diveroli's life rights and movie rights, as well as Mr. Diveroli's related name and likeness rights (as well as the associated indicia with his fame).

3.      Defendant Kahn is an individual residing at 300 South Sycamore Ave., Los Angeles, California 90036.  Kahn is a producer at Sunset Pictures (*see* **Exhibit 1**), a Hollywood production company that has produced seventeen feature films since 2009 (*see* **Exhibit 2**). Kahn's father is Sonny Kahn, a real estate investor and co-founder of Crescent Heights, Inc., and his mother is Hollywood producer Erica Kahn (who was an executive producer of the 2013 released documentary *Blackfish*).  On July 9, 2014, Kahn agreed-to (via electronic execution) an agreement entitled "Non-Disclosure Confidentiality Agreement" with IE (the "Kahn NDA") for purposes of advancing a partnership with Spira to pitch Mr. Diveroli's movie rights in Hollywood (the "Spira Partnership") (*see* **Exhibit 3**).

4.      Defendant Spira is an individual residing at 5234 West 2nd Street, Los Angeles, California 90004 (which on information and belief is his father's home).   Mr. Spira is educated as a lawyer and has a law degree.  In late July 2014, Kahn introduced Spira to IE as Kahn's business "partner" to assist in negotiating via Spira's extensive Hollywood connections a deal with a motion picture studio (or a production company) to make an authorized feature film regarding Mr. Diveroli's larger-than-life story.  Akin to Kahn, Spira executed on or about July 28, 2014 IE's "Non-Disclosure Confidentiality Agreement" (the "Spira NDA") by returning a photo of the first and second pages of the contract (*see* **Exhibit 4**).

5.      Defendant Warner Bros. is a corporation formed and organized under the laws of Delaware having its headquarters located at 3400 West Riverside Drive, Burbank, California 91522 (as well as having a facility located at 4000 Ponce De Leon Blvd, Coral Gables, Florida 33156).   Warner Bros. produces film, television and music entertainment.   Throughout the relevant timeframes herein, Warner Bros. was one of the country's three largest grossing film companies (*see* **Exhibit 5** and **Exhibit 6**).   Based upon information available via the United States Copyright Office ("Copyright Office"), Warner Bros is a co-owner (along with RatPac) of the copyright and related movie rights to the Implicated Movie.   A true and correct copy of the February 4, 2016 filed preregistration of the Implicated Movie with the Copyright Office naming Warner Bros and RatPac as co-copyright claimants is provided as **Exhibit 7** hereto.

6.      Defendant WBS (including its division Warner Bros. Pictures) is a corporation formed and organized under the laws of Delaware having its headquarters located at 4000 Warner Blvd, Burbank, California 91522. Upon information and belief, WBS is a wholly owned subsidiary of Warner Bros. whose focus is on the creation, writing, production and distribution of motion pictures.   Upon further information and belief, WBS co-produced the Implicated Movie and will be the distribution company for that motion picture.    Based on information provided in **Exhibit 7**, WBS previously owned and maintained certain ownership rights in the underlying screenplay and/or related content that formed the basis for the Implicated Movie. Upon additional information and belief, WBS primarily oversaw, controlled, and managed the creation of the storyline, screenplay, and all related permissions involving the Implicated Movie.

7.      Defendant RatPac is a limited liability company, formed and organized under the laws of the state of Nevada, having its headquarters at 4000 Warner Blvd., Room 188, Bldg. 95, Burbank, California 91522.   RatPac is a motion picture financing company (formed in a merger

4

by television and motion picture producer Brett Ratner, billionaire investor James Packer and financier Steven T. Mnuchin) whose purpose is to fund motion pictures produced by WBS and Warner Bros.   Upon information and belief, RatPac assisted in procuring at least a portion of the financing of the Implicated Movie.   Upon further information and belief, RatPac co-owns (along with Warner Bros.) the copyright and related movie rights to the Implicated Movie (*see* **Exhibit 7**).   Upon additional information and belief, at all times material to the allegations herein, RatPac was involved and played an integral role in supervising, overseeing, and financing creation of the underlying storyline, screenplay and ultimately the Implicated Movie.

8.      Defendant Mark Gordon maintains its principal place of business at 12200 West Olympic Blvd., Los Angeles, California 90064.   Mark Gordon is an executive production company for film and television projects (which is majority owned by Delaware limited partnership Entertainment One US LP headquartered at 200 Varick Street, Suite 803, New York, New York 10014).   Based upon Warner Bros. March 17, 2015 website announcement (*see* **Exhibit 8**) as well as a related press release issued that same day (*see* **Exhibit 9**), Mark Gordon is the executive producer of, as well as co-produced, the Implicated Movie.   Upon information and belief, at all times material to the allegations herein, Mark Gordon was involved and played an integral role in supervising, overseeing, and managing creation of the underlying storyline, screenplay and ultimately the Implicated Movie.

9.      Defendant Phillips is an individual working at 3400 West Riverside Drive, Burbank, California, CA 91522 who writes screenplays as well as directs a variety of motion pictures on behalf of WBS (and its parent Warner Bros.) through his production company Green Hat Films.   Upon information and belief, Phillips was the director and also one of the three co-writers of the screenplay (along with Jason Smilovic and Stephen Chin) of the Implicated Movie.

10. Defendant Cooper is an individual working at 3400 West Riverside Drive, Burbank, California, CA 91522. Cooper is an actor who appeared in *The Hangover Trilogy* (amongst other well-known films) and later has become a producer of motion pictures as well. In 2012, Cooper formed (and now owns) 22nd & Indiana Pictures for purposes of producing and/or co-producing motion pictures. Cooper is a supporting actor in the Implicated Movie.

11. Defendant 22nd & Green is a partnership, organized under the laws of the state of California, located at 3400 West Riverside Drive, Burbank, California, CA 91522. In or about May 2014, Cooper and Phillips announced that 22nd & Indiana Pictures and Green Hat Films would form a partnership to create a new production company for purposes of co-producing the Implicated Movie (amongst other planned motion pictures) for WBS and Warner Bros. A true and correct copy of the May 16, 2014 *Variety* article addressing formation of 22nd & Green is attached as **Exhibit 10** (addressing "signing a three-year first-look deal with" Warner Bros.).

12. The Spira NDA and Kahn NDA both require resolution of any disputes with IE regarding the Spira Partnership to be addressed in this Judicial District, stating:

> This Agreement shall be interpreted in accordance with Florida Law. With respect to any suit, action or proceeding relating to this Agreement, each party irrevocably submits to the exclusive jurisdiction of the United States District Court for the Middle District of Florida.

*See, e.g.,* **Exhibit 3.** In addition, Kahn maintains a home in Miami Beach, routinely travels to the State of Florida to conduct business, as well as maintains sufficient minimum contacts with this forum. Upon information and belief, Spira also routinely travels to State of Florida to conduct business, as well as maintains sufficient minimum contacts with this forum.

13. Each of the Warner Defendants separately (and often collectively) regularly conduct business in the State of Florida and this Judicial District, have committed the acts complained of herein in the State of Florida and this Judicial District, caused injury to IE in the

6

State of Florida and this Judicial District, and otherwise each have sufficient minimal contacts to meet the minimal jurisdictional requirements under the laws of Florida and the United States.

14.     Such minimum contacts have included the filming of the Implicated Movie in this Judicial District (including in the Miami area), the marketing and advertising of the Implicated Movie in this Judicial District, as well as work in the planned distribution of copies of the Implicated Movie for purposes of display in Tampa area movie theaters (on August 19, 2016).

15.     Based upon the foregoing, all of the Defendants are subject to the personal jurisdiction of this Court in accordance with the Florida Long-Arm Statute and Due Process.

16.     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§ 1331, 1332 and 1338. This action involves federal questions concerning unfair competition law, involves parties residing in different states, and involves claims that exceed the sum or value of $75,000, exclusive of interest and costs. This Court enjoys supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

17.     Venue properly lies within this judicial district and division pursuant to 28 U.S.C. §§1391 and 1400.

## GENERAL ALLEGATIONS

### The Gun Runner - Efraim Diveroli

18.     Mr. Diveroli is a thirty-year old American businessman, entrepreneur, author and former international arms dealer.   Born in Miami Beach, Florida in a Jewish orthodox family who strictly observed all Jewish traditions, Mr. Diveroli was raised as the eldest of five children in a middle class neighborhood in the "mid-Beach" section of the city.   A smart but rebellious child, Mr. Diveroli dropped out of high school his Freshman year at the young age of 14, which resulted in his mother sending him across country to Los Angeles to live and work with his uncle

who owned Botach Tactical (www.Botach.com), a domestic police supply business focusing on sales of weapons and ammunition.   Through working for his uncle, Mr. Diveroli worked 12 to 14 hours a day to immerse himself in the trade, attended trade shows, studied manuals, broke down and reassembled weapons, and read anything and everything about the weapons industry.

19.     Five years after his apprenticeship in Los Angeles, Mr. Diveroli returned to the Miami area in early January 2004 – and convinced his father to assist him in starting a small fledgling business specializing in arms, ammunition trading, and bidding on small United States Government defense contracts. Mr. Diveroli's father provided a shell company – AEY, Inc. – and with the aide of a laptop and working out of a one-room apartment, Mr. Diveroli successfully grew his business throughout that first year such that by the age of 18 he had become a self-made millionaire.   Much of that overnight success was fueled through on-line bidding on United States Government contracts, available at www.FBO.gov, to grow AEY, Inc.

20.     With his lower overhead and tolerance for risk, Mr. Diveroli continued to steadily increase his contracts over the course of the next three years to develop a track record of success in satisfying United States Government contracts for weapons and munitions.

21.     By 2007, the United States Government's war effort in Afghanistan was in full force. As part of that plan, the allied forces had decided to arm the Afghans for purposes of fighting the Taliban and Al Qaeda.   As such, the U.S. Government bid out a massive contract for purposes of arming the fledgling Afghan army (and its related police forces).   Although large contractors like Northrop Grumman and Lockheed had prepared extensive bids for the projects, ultimately the United States Government – after significant vetting – choose Mr. Diveroli (and his business AEY, Inc.) – to fulfill the massive $298 Million weapons and munitions contracts.

22.     Throughout 2007 and early 2008, Mr. Diveroli began to fulfill the massive U.S. Government contracts – where he soon found himself dealing with dubious weapons traders, crooked diplomats, and soldiers of fortune.     In addition, Mr. Diveroli worked tirelessly to negotiate deals with foreign defense ministers and worked with high-ranking United States Army officials.   Throughout this period of time, Mr. Diveroli was the sole director and owner of AEY, Inc. – and relied on a handful of lower level employees and independent contractors to implement his business affairs, including but not limited to Alexander Podrizki ("Mr. Podrizki") and David Packouz ("Mr. Packouz") – both of whom where high school acquaintances.

23.     On March 27, 2008, the United States Government suspended AEY, Inc.'s contracts based upon allegations that Mr. Diveroli's business had violated pre-existing arms embargos.   Part of those accusations were that certain ammunitions supplied to the Afghans and the United States Army were sourced from China.   By the time of the suspension of these contracts, Mr. Diveroli (through AEY, Inc.) had totaled more than $200 Million in supply contracts and weapons.

24.     Mr. Diveroli, who at the time was just 22 years old, was indicted by a Miami Federal grand jury – along with his former independent contractor Mr. Packouz and his former employee Mr. Podrizki - based upon fraud charges in connection with the provision of ammunition to the Afghans.

25.     Rather than defend the legality of his actions – in that Mr. Diveroli had been selling ammunition acquired by his third-party sources prior to the 1989 Chinese munitions embargo – Mr. Diveroli was convinced by his mother to take a four-year plea deal to plead guilty to a single count of conspiracy where in exchange the other 84 charges would be dismissed.   Mr. Diveroli was sentenced before Honorable Judge Joan A. Lenard on January 3, 2011.

26.     Shortly after entering his plea deal, Mr. Diveroli began serving his forty-eight month sentence.   Between early 2011 and October 2011, Mr. Diveroli served time in the Seminole County, Florida jail.   Mr. Diveroli served the majority of his sentence, starting in October 2011, at the Coleman Federal Corrections Complex ("Coleman") in Wildwood, Florida – a low to mid level detention facility – less than seventy miles from Tampa, Florida.

### Guy Lawson and His Fascination with Mr. Diveroli's Larger-than-Life Story

27.     After his grand jury indictment but before his sentencing, Mr. Diveroli was contacted by New York biographical author Guy Lawson ("Lawson") (for more information go to www.GuyLawson.com) regarding an interest in writing an article about Mr. Diveroli's larger-than-life story about becoming a gun runner before the age of 21.   At that point, Mr. Diveroli declined to be interviewed prior to reaching his plea deal as well as his sentencing.

28.     Lawson, whose background is actually as a lawyer, had previously helped write *The Brotherhoods: The True Story of Two Cops Who Murdered for the Mafia* with New York Police Department Officer William Oldham – which is Oldham's biographical account of how his partner Stephen Caracappa (along with another police officer) became turncoats to assist underworld mob bosses – which Oldham became a special investigator to assist the U.S. Attorney in the investigation.   Through Oldham's biographical account, Lawson published the book in 2007.   In April 2013, it was announced that Lawson and Oldham had sold Oldham's life rights (as well as both co-author's movie rights) to Warner Bros. to make a forthcoming feature film to be directed by Jose Padilha and produced by Dan Lin.

29.     In or about early 2011, after Mr. Diveroli's sentencing and while serving his time in Seminole County jail, he was again contacted - through Mr. Diveroli's counsel - by Lawson. Despite Mr Diveroli's reluctance, Lawson was insistent on conducting a jailhouse telephone

interview with Mr. Diveroli and explained his past success in writing biographical accounts of larger-than-life stories (including of Mr. Oldham's story and that book's success).  Mr. Diveroli ultimately agreed to a jailhouse telephone interview with Lawson.  Lawson represented that he could likely get the story published in *Rolling Stone* magazine and that if there was traction with the article it could turn into a book that he suggested both Lawson and Diveroli would co-author.

30.     On March 16, 2011 *Rolling Stone* published *The Stoner Arms Dealers:  How Two American Kids Became Big-Time Weapons Traders* (the *"Rolling Stone* Article").   A true and correct copy of the article is attached as **Exhibit 11** hereto. The *"Rolling Stone* Article" featured accounts of both Mr. Diveroli as well as his former independent contractor Mr. Packouz (whose sentencing was limited to just house arrest).

31.     After having been transferred to Coleman, Lawson again contacted Mr. Diveroli in late 2011 with regards to Lawson's interest in co-authoring a book based upon the original jailhouse interview as well as the *Rolling Stone* Article.   Through various exchanges via Coleman's email system (as well as through assistance of Mr. Diveroli's sister facilitating communications), Mr. Diveroli agreed to prepare a manuscript of his story for purposes of co-authorship of a book with Lawson (akin to what Lawson had written with Oldham).

32.     In or about January 2012, Mr. Diveroli authored and wrote a manuscript entitled *"Once a Gun Runner . . ."* (hereinafter the "January 2012 Manuscript").    Prior to electronically disseminating the January 2012 Manuscript, Mr. Diveroli expressed to Mr. Lawson that the content (as well as the related underlying expression) should be maintained as strictly confidential – which it was Mr. Diveroli's understanding that Lawson had agreed-to.

33.     The January 2012 Manuscript is protected through United States Copyright Registration No. TXU001985899 as issued by the Copyright Office.     The January 2012

Manuscript was transferred, via written assignment, to IE (the listed copyright claimant).

34.     From receipt of the January 2012 Manuscript until mid-2012, Lawson continued to exchange emails to solicit information from Mr. Diveroli – based upon the suggestion he was researching a book to be co-authored by both of them.     It was Mr. Diveroli's belief and understanding during that timeframe that upon his release (planned for early 2015) that Lawson and Mr. Diveroli would finalize their collaboration on the book (as Lawson's multiple requests to visit Mr. Diveroli at Coleman were consistently denied by corrections officers).

35.     In June 2014, Mr. Diveroli wrote to Lawson (through assistance from Mr. Diveroli's sister) to confirm that Lawson was - at no time since circulation of the January 2012 Manuscript – authorized to provide any factual details, written expression, or content associated with the story rights and/or movie rights in Mr. Diveroli's story.     In response, Lawson confirmed that he would not do "anything without [Mr. Diveroli's] consent, of course . . . as [Lawson's] intentions [were] good.   [As Lawson,] want[ed] to tell the truth . . ."   A true and correct copy of this exchange in the late June 2014 timeframe is attached as **Exhibit 12** hereto.

36.     Between this timeframe and June 2015, Lawson used and employed the January 2012 Manuscript without permission – as well as the various content and related expression confidentially disclosed by Mr. Diveroli throughout this timeframe to author and write *Arms and the Dudes* (the "*Arms and the Dudes* Book").   On June 9, 2015, Simon & Schuster, a division of CBS Corporation, published the *Arms and the Dudes* Book listing Lawson as the sole author. To date, the *Arms and the Dudes* Book has become an Amazon.com best seller.   A true and correct copy of the Amazon.com listing for the book is provided as **Exhibit 13** hereto.

37.     To date, Lawson (nor CBS Corporation) have recognized Mr. Diveroli's contributions to the *Arms and the Dudes* Book, his co-authorship of the underlying content, or

12

how that book is a derivative work of the January 2012 Manuscript (as well as related content supplied by Mr. Diveroli).

### Phillips and his Obsession with Mr. Diveroli's Story and the *Rolling Stone* Article

38.    In May 2011, Warner Bros. released *The Hangover II* written and directed by Phillips.  Around this time, Phillips began searching for his next project after the *The Hangover* movies.

39.    Proximate this time, Phillips expressed interest in writing a screenplay (and possibly directing) a motion picture regarding Mr. Diveroli's larger-than-life story – including based upon Lawson's March 2011 *Rolling Stone* Article.   Throughout the June and July 2011 timeframe, Phillips began and then later finalized negotiations (through assistance from New York agent Jody Hotchkiss) with Lawson to option the rights to not only the *Rolling Stone* Article but any and all associated movie rights (and any related content, materials, stories, and copyrightable works).   Attached as **Exhibit 14** is a true and correct copy of Eric Eisenberg's article dated July 25, 2011 published in *CinemaBlend.com* which addresses these negotiations. As noted in a *Variety* article by Jeff Sneider that same day (*see* **Exhibit 15**), the option of rights by Lawson included any and all "feature film rights to Guy Lawson's *Rolling Stone* [A]rticle" – which allegedly included Lawson's working notes, materials, research and thus invariably communications Lawson had exchanged with Mr. Diveroli (where intended to be in strict confidence).

40.    The next day, July 26, 2011, *The Guardian* reported that Phillips planned movie would include use of the name "Efraim Diveroli" and inferred that such movie would further include Mr. Diveroli's likeness.   A true and correct copy of Henry Barnes' *The Guardian* article is provided as **Exhibit 16** hereto.   An article that same day by *DIY* reported that Phillips would

likely write the script for that motion picture, and as well as produce and direct the movie adaptation of the *Rolling Stone* Article (and related content sourced from Lawson).   A true and correct copy of the *DIY* article dated July 26, 2011 is attached as **Exhibit 17** hereto.

41.     In a recorded interview with radio host Sam Seder, Lawson noted five days before the *Arms and the Dudes* Book was released for publication how the original *Rolling Stone* Article     was     based     on     Diveroli     talking     to     Lawson.     *See* https://www.youtube.com/watch?v=LY6ZLHk9_II (last visited April 26, 2016).  Lawson further noted in that radio interview with Mr. Seder how the underlying content regarding this larger-than-life story had never been publicly reported, and how the underlying government investigation of Mr. Diveroli was maintained by the Federal Court in Miami under seal – implying that the only way to obtain the full true story was through Mr. Diveroli himself.  As such, according to Lawson himself, Lawson's *Rolling Stone* Article (and his underling investigation) helped him secure a "movie contract" with Phillips – and how Phillips was planning at that time to shoot a movie based upon Lawson's content and expression.

42.     According to the records of the Copyright Office, on or about August 22, 2011, WBS recorded the written assignment of Lawson's rights to the *Rolling Stone* Article.  A true and correct copy of the recordation (Document No. V3607D556) of copyright is provided as **Exhibit 18** hereto.    As noted in **Exhibit 18,** the August 22, 2011 filing with the Copyright Office denoted a written "Option Agreement" which was executed by Lawson on July 20, 2011 which assigned rights to WBS (hereinafter the "Option Agreement").

43.     Based upon the foregoing, and on information and belief, between July 11, 2011 and June 2014, Lawson, as part of his obligations under the Option Agreement (**Exhibit 18**), assisted Phillips not only regarding the *Rolling Stone* Article but also through dissemination of

14

the January 2012 Manuscript authored by Mr. Diveroli while at Coleman.   Upon further information and belief, Lawson also exchanged with Phillips copies of his email exchanges with Mr. Diveroli, as well as related notes, research and other content gleaned from interviews with Mr. Diveroli – despite his prior acknowledgment that it would remain confidential.

44.     This all likely included copies of drafts of the *Arms and the Dudes* Book being finalized for publication during this timeframe – which was based upon content provided by Mr. Diveroli.   Lawson recently stated on social media that the Implicated Movie was at the very least "inspired" by the *Arms and the Dudes* Book in addition to the *Rolling Stone* Article:



**Formation of Incarcerated Entertainment, LLC to Advance Mr. Diveroli's Story**

45.     In approximately late 2011, Mr. Diveroli was introduced to Ross Reback ("Mr. Reback").   By that late 2011 and early 2012, Mr. Diveroli (while incarcerated at Coleman) had been well into discussions with Lawson regarding co-authorship of a book, and likewise had disseminated in strict confidence the January 2012 Manuscript.   Mr. Reback suggested the possibility of forming a separate entertainment company to monetize Mr. Diveroli's story,

including for purposes of negotiating the movie rights and associated rights.

46.     By early November 2013, Mr. Reback incorporated IE which lists Mr. Diveroli as a member and Mr. Reback as the managing member.   From November 2013 to June 2014, Mr. Diveroli expanded his original January 2012 Manuscript into a full draft regarding his personal accounts of gun running at AEY, Inc. By February 2014, that full draft was sufficiently complete for marketing the movie rights, including Mr. Diveroli's life rights (as previously defined as the "February 2014 Manuscript").   The cover of the February 2014 Manuscript included a prologue that encapsulated Mr. Diveroli's story of how an *"American dream became an American nightmare"*:



47.     On or about February 20, 2014, Mr. Diveroli, through the assistance of outside copyright counsel in Orlando, prepared and filed an application before the Copyright Office for

purposes of registering the February 2014 Manuscript. The Copyright Office later issued TXU001911676 (the "February 2014 Registration"). All rights and interest in the February 2014 Registration was transferred, by written assignment, to IE. A true and correct copy of the February 2014 Registration is attached as **Exhibit 19** hereto.

48.     With the February 2014 Manuscript complete (which totaled some 360+ pages) and the February 2014 Registration in place – Mr. Reback by the May 2014 timeframe had prepared a detailed list, on behalf of IE, of those producers and motion picture studios that he believed would have interest in the movie rights associated with Mr. Diveroli's life story. Ultimately that list included Phillips at Green Hat Films as well as Brett Ratner at RatPac.

**Formation of 22nd & Green and Initial Development of the Movie**

49.     Less than three months after Mr. Diveroli had filed and effectuated the February 2014 Registration based upon the completed February 2014 Manuscript – it was publicly announced in mid-May 2014 that Phillips and Cooper had agreed to form 22nd & Green for the purposes of a three-year deal to write, direct and produce movies on behalf of WBS and Warner Bros. *See* **Exhibit 10**. James White on May 17, 2014 wrote in *Empire* that the formation of 22nd & Green was specifically to begin the process of writing the script for the movie based upon the life of Mr. Diveroli, as well as the content contained in the *Rolling Stone* Article. A true and correct copy of the Empire article is provided at **Exhibit 20** hereto. White's *Empire* article in mid-May 2014 also hinted that Phillips had planned to begin a "***re-write on the movie***" – suggesting that the screenplay was far from completed (and likely to be started over again based upon new content and/or a new perspective). *See* **Exhibit 20** (emphasis added).

50.     Other media outlets, including IndieWire.com's *The Playlist*, similarly reported at that time how Phillips' planned movie would be written as a "true story" about "21 year-old

17

Efraim Diveroli, who scoured a $300 million Pentagon contract to arm allies in Afghanistan" which would be a "slight shift in direction for Phillips" due to "the underlying seriousness of the subject matter." A true and correct copy of the May 16, 2014 by Kevin Jagernauth for *The Playlist* is provided as **Exhibit 21** hereto.

51. Approximate this time, reports indicated Phillips was in talks with Jesse Eisenberg to be cast for the part of Mr. Diveroli (with Shia LaBeouf to play Mr. Packouz):

> Shia LaBeouf and Jesse Eisenberg are reported as being in talks to star in the film, which is based upon Guy Lawson's *Rolling Stone* Article . . .
>
> As *The Wrap* Reports, LaBeouf and Eisenberg are in talks to play the pair of characters inspired by real-life arms dealers David Packouz and Efraim Diveroli. No offers are currently on the table, but this pair is certainly an interesting one.

A true and correct copy of this article is attached as **Exhibit 22** hereto. Upon information and belief, such casting was done through 22nd & Green (and any associated readings) would have been based upon content sourced from Lawson that was far from being limited to the *Rolling Stone* Article – but likely included content and expression from the January 2012 Manuscript.

52. At no time between March 2011 and early July 2014 did any of the Warner Defendants make any effort to contact Mr. Reback (or alternatively IE) either directly or indirectly. Additionally, during this timeframe, none of the Warner Defendants made any efforts to contact Mr. Diveroli while in prison (nor made any attempt to schedule a prison interview). However, during this time frame, it was public knowledge (based upon the records of the State of Florida Department of State Division of Corporations) that IE had been formed as an entertainment and media company (which listed Mr. Diveroli as a member).

53. At no time between March 2011 and June 2014, did Lawson ever notify Mr. Diveroli during any of his numerous communications with Mr. Diveroli while serving his

sentence at Coleman (where Mr. Diveroli had limited access to the Internet and/or the outside world) that he had negotiated a "movie contract" regarding certain film rights regarding the story and/or that he was collaborating with the Warner Defendants to advance a feature film.

**Incarcerated Entertainment's Correspondence with Ratner, Phillips and Warner Bros.**

54.    On June 13, 2014, Mr. Reback, on behalf of IE, circulated a formal letter to Brett Ranter in Beverly Hills, who as previously mentioned herein is one of the three principal members of RatPac.   That detailed correspondence addressed how Mr. Reback was

> partners with Efraim Diveroli in an entity which owns and controls his *just* completed, and not yet published personal memoir, as well as exclusive life story rights, film, and other ancillary rights.   We have spent most of the last two years on this project, as Efraim is currently incarcerated in a federal prison.   Efraim's memoir, titled "*Once a Gunrunner . . .*" is his amazingly honest true story containing never before heard details as only he would know and is a captivating first person account of his incredible rise and fall.
>
> Knowing of your interest in this story, I would like to set up a meeting with you as soon as possible, as I'm confident you will have a great deal of enthusiasm for the importance of our material.   We would love to join forces with you on this project.

A true and correct copy of the June 13, 2014 letter to Brett Ratner on behalf of IE is provided as **Exhibit 23** hereto.   According to the UPS tracking information the letter was received by Mr. Ratner on June 14, 2014.   Neither Ratner nor anyone from RatPac responded to **Exhibit 23.**

55.    Six days after sending correspondence to Brett Ratner, Mr. Reback circulated again on behalf of IE a related letter dated June 19, 2014 to Phillips at Warner Bros.' lot in Burbank, California regarding IE's interest in addressing the "exclusive life story rights, film rights, publishing rights, and other ancillary rights" available regarding Mr. Diveroli's story.   A true and correct copy of this June 19, 2014 letter on behalf of IE is provided as **Exhibit 24** hereto.   As noted in **Exhibit 24**, Mr. Reback noted Phillips' "project currently in development based on this subject" and suggested "it would be in our mutual best interests to set up a meeting

to discuss as soon as possible" regarding Mr. Diveroli's "just completed, not yet published memoir" (*i.e.,* the February 2014 Manuscript).

56.     Approximately three weeks later, Elena Reyter, Associate General Counsel for Warner Bros. Pictures / WBS responded on July 8, 2014 to IE's "June 19, 2014 correspondence regarding Efraim Diveroli" (*i.e.,* **Exhibit 24**).     A true and correct copy of the June 8, 2014 correspondence from Elena Reyter is provided as **Exhibit 25** hereto.     Copied on that correspondence was Dan Furie, the Senior Vice President of Business Affairs at WBS as well as Jeremy Williams, who is deputy general counsel for Warner Bros.     Also referenced in **Exhibit 25** as being copied is Bruce Hughes, whose title at that time was "Vice President of Theatrical Clearance and Permissions" at Warner Bros.     Ms. Reyter confirmed that WBS and Warner Bros' legal team as well as its senior business affairs executives were "discussing the matter of [Mr. Reback's] letter internally . . . and hope to get back to [Mr. Reback] shortly."     *See id.*

57.     During the following two months, no follow up correspondence (or related communications) was received by IE from Ms. Reyter, Mr. Furie, Mr. Williams, Mr. Hughes – or anyone associated with the Warner Defendants.

**The far from coincidental timing of the Spira Partners: Elliott Kahn and Shimmy Spira**

58.     By May 2014, Mr. Diveroli (i) was awaiting release from serving his four year sentence in prison, (ii) had formed in November 2013 IE with Mr. Reback for purposes of advancing and monetizing his life rights, movie rights and related rights to his name and likeness, and (iii) had completed his 360+ page February 2014 Manuscript (which had been filed for copyright protection with the Copyright Office).

59.     In late May 2014, Mr. Diveroli's sister was approached by Hollywood motion picture producer Elliott Kahn regarding his interest to visit Mr. Diveroli while in prison. Kahn

had, for a brief time, attended the same synagogue in Miami Beach with Mr. Diveroli when they were children, and Kahn's family had relocated to Los Angeles based upon Kahn's father's significant real estate ventures, as well as his mother Erica Kahn's work in the film industry (Erica Kahn was an executive producer of 2013's *Blackfish* documentary).

60.    At that time of Kahn's interest in visiting Mr. Diveroli, Kahn had worked for over four years at Hollywood's Sunset Pictures – and held himself out as a Hollywood insider.    Mr. Kahn denoted he was visiting Miami for a period of time and wanted to meet with Mr. Diveroli for purposes of exploring a business relationship to advance Mr. Diveroli's movie rights and associated life rights based upon Kahn's contacts in the motion picture industry.

61.    While Kahn suggested a possible jailhouse visit in the June 11 – June 22 timeframe with Mr. Diveroli – Kahn abruptly cancelled that face-to-face prison meeting on June 13, 2014 due to a need to fly back from Miami to Los Angeles (for unspecified reasons).

62.    Mr. Diveroli's sister conveyed to Kahn (on Mr. Diveroli's behalf) on July 4, 2014 that with regards to any movie rights that Mr. Diveroli was working with Mr. Reback the following: "whether or not [Kahn would] do something [with Mr. Diveroli to] please keep this confidential." A true and correct copy of these exchanges is attached as **Exhibit 26** hereto.

63.    Kahn responded via email that same day how:

> Todd Phillips (*The Hangover*) optioned the [*Rolling Stone*] article and is apparently finished with the script and is close to producing the film with WB (apparently Jonah Hill is being talked to for the lead role).

*See* **Exhibit 26**. Kahn's remarks appeared to be based at least in part on insider information – as in early July 2014 publicly available information had only suggested that Jonah Hill had done informal readings with Phillips. *See* **Exhibit 20** ("Jonah Hill has been involved in table reads for the current version of the script . . . [but] that doesn't automatically mean he'll be part of the

21

final cast for the film."). *See also* **Exhibit 21** ("Jonah Hill has been doing table reads"). Rather, the media was reporting at that time how actor Jesse Eisenberg would play Mr. Diveroli's character in the movie. *See* **Exhibit 22**. Moreover, less than six weeks prior, the media was suggesting Phillips was beginning a "re-write on the movie" (*see* **Exhibit 20**).

64.     At the time of Kahn's remarks in **Exhibit 26**, Mr. Reback had already contacted Phillips (*see* **Exhibit 24**) and RatPac's Brett Ratner (*see* **Exhibit 23**) regarding Mr. Diveroli's life rights and movie rights – in addition to rights to access to the content of the February 2014 Manuscript (which was being maintained at that time as confidential).     Moreover, the remarks were during the July 4th holiday (specifically that Friday in the late afternoon) – thus proximate the date of Ms. Reyter letter dated the Tuesday upon return from the July 4th Holiday weekend.

65.     In fact, on Tuesday, July 8, 2014, upon return from the July 4th Holiday weekend (same day as Warner Bros.' letter to Mr. Reback), Kahn called IE's Ross Reback regarding Kahn's interest in pitching Mr. Diveroli's life rights and movie rights in Hollywood – based on Kahn's connections gained at Sunset Pictures, as well as relationships associated via his mother (based upon her role as an executive producer of *Blackfish* just the year prior in 2013).

66.     Mr. Reback memorialized the July 8, 2014 discussions with Kahn noting:

> I want to get you the manuscript entitled *Once a Gun Runner* . . . as soon as possible . . . due to the competitive nature of the project, I need you to execute an NDA, which I have attached.     I hope you don't mind.  Upon receipt of the signed, NDA, I will promptly forward an electronic version of the book.

A true and correct copy of this email exchange between Mr. Reback and Kahn is provided at **Exhibit 27** hereto.

67.     On July 9, 2015 (at 4:02 pm), Kahn circulated an e-signed version of the Kahn NDA.  Under the agreed-to Kahn NDA (which IE understood was reviewed by Greenberg

Traurig's Los Angeles Office, whom Kahn represented was Kahn's legal counsel), Kahn agreed

to protect certain "Confidential Information" which included information "not generally known

to the public or the [movie] industry" which "specifically refer[red] at all times without

limitation to the certain manuscript (book) known as '*Once a Gun Runner . . .' a Memoir by

Efraim Diveroli*" including but not limited to "any materials contained thereon of any kind and

of any nature whatsoever including all other parts contained therein" which Mr. Kahn agreed he

would "not disseminate to any third person any portion thereof by any means whatsoever,

whether communicated in writing, verbally, electronically, in any form of media, or by any other

means or method of any kind." *Id.*

68.    With regards to dissemination to any advisors or industry experts in the movie

industry, Kahn further agreed that

> certain additional parties may need to have access to the confidential
> documents and information provided hereunder.  [Mr. Kahn] shall have
> the right only with [IE's] prior written permission, but shall limit such
> disclosure to certain advisors and other confidential third-parties.  [Mr.
> Kahn] shall advise such advisors and other confidential third parties of the
> confidential nature of such documents and information and shall take any
> and all other necessary steps as [Mr. Kahn] so deems appropriate, to insure
> that such confidential materials information shall remain strictly
> confidential and not otherwise disclosed or disseminated except as such
> advice is rendered by such advisors and other confidential third parties.

*See* **Exhibit 3,** ¶ 12.  At no time during any of the foregoing timeframes did Kahn seek any

written permission to disclose the February 2014 Manuscript to any advisor, third-party, or

industry expert – including but not limited to anyone associated with the Warner Defendants.

69.    By the afternoon of July 9, 2014, Kahn had been made well aware by Mr.

Diveroli's sister (*see* **Exhibit 26**) that Mr. Diveroli's efforts to monetize his movie rights were

confidential – and likewise by that time Kahn was well aware the Warner Defendants were

working on a re-write of the script for their movie on the larger-than-life tail of Mr. Diveroli.

70.     Based upon the foregoing understanding, a PDF version of the 2014 February Manuscript was circulated to Kahn electronically by Mr. Reback for purposes of exploring whether Mr. Diveroli's life rights and movie rights could be monetized into a Hollywood movie.

71.     For the next twenty days in July 2014, very little exchanges occurred between IE and Kahn.  Mr. Reback called and left a voicemail on July 22, 2014 –and Kahn agreed to return Mr. Reback's inquiry on July 23, 2014.   A short teleconference was held on July 23, 2014 where Kahn addressed his thoughts upon review of the February 2014 Manuscript.   The next day, Mr. Reback circulated a copy of the unsigned Kahn NDA as Kahn had discussed bringing in his partner for purposes of advancing the goals discussed telephonically on July 23, 2014.

72.     On July 25, 2014, Mr. Reback wrote to Kahn about Universal Studio's potential interest in Mr. Diveroli's movie rights as well as related interest by Random House Studios:

> I also wanted to let you know that I received a call yesterday from Ron Meyer's office at Universal saying that they had interest in the project and are having the motion picture department to get back to me directly. Also, this morning I received a call from Random House/Random House Studio. We spoke at great length, and they indicated that they have a VERY high level of interest in the project and want to do a deal for both publishing and film. They said, 'This is exactly the type of project we're looking for.'

In response, Kahn wrote later that on July 25, 2014 that:

> I will reach out to some of my contacts and see how parlaying the publishing/film deal works and whether that is the better route.

73.     Three days later, on July 28, 2014, Mr. Reback received an email from Spira with regards to the "very intriguing project" involving the marketing and promotion of Mr. Diveroli's life rights and movie rights, including with regards to content associated with the February 2014 Manuscript.   A true and correct copy of this email is provided as **Exhibit 28.**   As provided in **Exhibit 28,** when introducing himself for the first time to Mr. Reback he noted he was "Elliott's

partner" – suggesting that he was also involved in either Sunset Pictures or in the movie industry.

74.     **Exhibit 28** went further to denote he had executed the NDA (the same which was previously sent to Mr. Kahn) and attached hand signed copy.   In addition, he suggested he would be flying to the Middle East later that day "for about a week and would love the chance to look at the [February 2014] manuscript on [his] travels." *Id.*

75.     In response to **Exhibit 28**, Mr. Reback later that same afternoon (July 28, 2014) on behalf of electronically circulated a PDF copy of the February 2014 Manuscript to Spira.   A true and correct copy of this electronic correspondence is provided as **Exhibit 29** hereto. Proximate the electronic dissemination of the February 2014 Manuscript, Kahn noted that Spira was his "closest friend" as well as a "stand up guy whom I trust and respect" who had "grown up in Hollywood and his connections are second to none."   At that point in time, there was no identification as to the specific basis for those Hollywood connections.

76.     By mid-August 2014, Spira had returned to Los Angeles from his travels in the Middle East.   By that time, Kahn had approximately six weeks for purposes of discussing possible interest in Hollywood in the underlying life rights and movie rights of Mr. Diveroli – including follow up on Universal and/or Random House Studio leads addressed by Mr. Reback.

77.     Mr. Reback scheduled a three-way teleconference with the Spira Partnership to address the status of any interest generated by producers or industry executives regarding the authorized story of Mr. Diveroli.    By this time, it had been over a month since Warner Bros. legal team had responded to discuss their potential interest in the February 2014 Manuscript. During that teleconference (on or about August 15, 2014), Spira denoted that Warner Bros and WBS were advancing their movie, working on the re-write of the screenplay, and finalizing their casting for the movie based upon Mr. Diveroli.   At that point, Mr. Reback questioned Spira's

sources.   In response, Spira announced (for the first time) that his father was the President of Worldwide Business Affairs at Warner Bros. Pictures / WBS.   It was also later noted that Spira lived with his father Steven S. Spira at all times material hereto.     Mr. Reback became immediately upset over the implications – as it suggested that Warner Bros / WBS now had unfettered access to copy of the February 2014 Manuscript (and thus no need to further the conversations as addressed in **Exhibit 25**).   In response, Kahn noted that "it was not his place to say" that Spira's Hollywood connections were in fact his father and his role at Warner Bros. With that, the conversation ended.   Despite the apparent role which both Kahn and Spira had been playing at all times relevant herein as essentially agents of the Warner Defendants, at no time during this mid-August 2014 conversation, or at any time subsequent, did the Spira Partners confirm their compliance with Paragraph 12 of their respective NDAs, or how they insured the February 2014 Manuscript was being maintained (despite the foregoing) as strictly confidential.

78.   In an effort to resurrect the relationship with Mr. Reback and Mr. Diveroli at IE, Kahn contacted both of them about two weeks later (in late August 2014) to suggest that Kahn had talked with Phillips while flying next to him in first class on a non-stop flight from Los Angeles to Miami. While Kahn was coy when it came to the coincidence of how he happened to be on the same flight next to Phillips that day (since Miami was a natural location for shooting of the Implicated Movie). Kahn suggested he discussed with Phillips the February 2014 Manuscript and that Phillips wanted to meet with Mr. Diveroli regarding his life rights and movie rights.   It was also suggested that Kahn would follow up with Phillips (presumably through Spira via his father Steven S. Spira).

79.   Despite the hope suggested by Kahn generated through his purportedly impromptu discussions with Phillips while flying to Miami, the meeting with Phillips (or the

ability to follow up with Phillips via Spira's contacts via his father) never materialized.

80.     Instead, on September 3, 2014, just days after the suggested discussions with Phillips (and just two weeks after Spira announced that his inside connections with the Warner Defendants where through his father being President of Worldwide Business Affairs at Warner Bros. Pictures) Mr. Reback received an email on behalf of Ms. Reyter at Warner Bros.  A true and correct copy of the forwarding email as well as the underlying letter is provided at **Exhibit 30** hereto.  In that letter, Ms. Reyter denoted that WBS and Warner Bros. "have decided not to pursue a consulting arrangement at this point in time" with IE and/or Mr. Diveroli.  *Id.*

81.     In addition to Dan Furie, Jeremy Williams, and Bruce Hughes being copied on that September 3, 2014 correspondence (who all were previously copied on the July 9, 2014 correspondence noted in **Exhibit 25**) – there was an additional person copied:   Courtney Armstrong, the Executive Vice President of Worldwide Business Affairs at Warner Bros Pictures / WBS.  Far from coincidence, Mr. Armstrong reports directly to Steven S. Spira, the President of Worldwide Business Affairs at Warner Bros. Pictures / WBS. According to LinkedIn, Mr. Armstrong "oversee[s] business and legal aspects of worldwide film acquisition, production and distribution for the studio, including supervising the negotiations of key deals with filmmakers and talent."  A true and correct copy of Mr. Armstrong's LinkedIn profile is provided as **Exhibit 31** hereto.

82.     The following day, September 4, 2014, Mr. Diveroli's sister (who was assisting in exchanging emails between Lawson and Mr. Diveroli based upon Mr. Diveroli's limited ability to send communications) received an email from Lawson denoting "please tell Efraim that I know he's got a manuscript that he's written and that he's working with Ross Reback."  Prior to this timeframe, Mr. Diveroli (nor anyone under his authority) had told Lawson regarding

27

completion of the February 2014 Manuscript (or formation of IE with Mr. Reback).  Rather, upon information and belief, it is believed Lawson received that information from the Warner Defendants as part of their investigation and/or evaluation leading up to issuance of **Exhibit 30**.

83.     Subsequent the issuance of Ms. Reyter's September 3, 2014 letter (which included copies to Steven S. Spira's next in command Mr. Armstrong) as well as Lawson's September 4, 2014 email denoting his recently acquired knowledge (likely from the Warner Defendants) about the February 2014 Manuscript – communications with the Spira Partners regarding Warner Bros. halted with Mr. Reback and Mr. Diveroli.  In early 2015, while Mr. Diveroli was attending his brother's graduation from The Hebrew Academy of Miami he saw Kahn (who was likely there to attend on behalf of a family member graduating) – but Kahn acted both cold and distant toward Mr. Diveroli, barely made eye contact and walked away after a short greeting.

84.     Future attempts by Mr. Reback to contact Kahn on his cell phone became futile and after leaving several unreturned voicemails Mr. Reback stopped his efforts at communication.

### Phillips and 22nd and Green's (Re)writing of the Screenplay prior to Filming

85.     During the five-month period spanning September 2014 and March 2015, upon information and belief, Phillips (along with the assistance of Jason Smilovic and Stephen Chin) prepared a re-write of the script for the Implicated Movie.  Upon further information and belief, that re-write was based (at least in part) to access from either (a) Mr. Diveroli's January 2012 Manuscript as sourced from Lawson as part of his "movie contract" and related participation regarding his Option Agreement, and/or (b) the February 2014 Manuscript as likely sourced by Steven S. Spira (through either his son Shimmy or his partner Kahn, *aka* the Spira Partnership).

28

86.    Moreover, upon further information and belief, the entire reason for the Warner Defendants to deny a consulting arrangement as of early September 2014 (as noted in **Exhibit 30**) was that there was no further need as the 360+ page February 2014 Manuscript was all that was needed by Phillips, Cooper and 22nd and Green for purposes of re-writing the story in order to make a true story based upon the actual occurrences.

87.    In a recent interview at CinemaCon 2016, Phillips (while being interviewed about the Implicated Movie) addressed the screen writing process:

> Well you know it's based on a true story so it's a little bit about making sure you're servicing this story, and it's one of those things where truth is truly stranger than fiction. And so we got this article, this Rolling Stone article like Bradley was saying and *__it was about doing service to this really intense, wild story__*. And some of it's comedy...some of it's drama... but *__it's really about playing to the truth of it.__*

A true and correct transcript of the interview at CinemaCon is attached as **Exhibit 32** herein.

88.    Upon information and belief, it was far from coincidental that Spira became involved in late July 2014 for purposes of creating the Spira Partnership to advance Mr. Diveroli's attempts at striking a deal regarding his life rights and movie rights in Hollywood. Rather, upon further information and belief, Spira's involvement was carefully orchestrated at the time when Phillips – along with the other Warner Defendants – were struggling over the writing of the screen play for the underlying Implicated Movie – as the information provided for by the optioned *Rolling Stone* Article as well as related information from Lawson had proven insufficient. Moreover, information supplied by the Warner Defendants' consultant Mr. Packouz proved likewise insufficient, based upon his limited role as an independent contractor (within a finite timeframe of matters involving AEY, Inc. which was limited to intermittent consulting by Mr. Packouz between early 2006 and June 2007) regarding the entire larger-than-life story of Mr. Diveroli.  Lastly, upon further information and belief, Phillips was unable to get any additional

content (separate from Lawson and Mr. Packouz) as the court files were still under seal as ordered by Judge Lenard in Miami.

89.     The reality was that Kahn and Spira were indeed who they said they were – "*partners*" – with the real purpose of the Spira Partnership to help advance them both from the shadows of their successful Hollywood parents (including their respective successes in the movie business) by assisting (likely as agents for the Warner Defendants) in retrieving the confidential 2014 February Manuscript of Mr. Diveroli to obviate the foregoing gap in content by providing Phillips with Mr. Diveroli's complete true story.

90.     Filming for the Implicated Movie began in Romania in March 2015, with filming the following month in Los Angeles. Further filming took place, on location in Miami, in May 2015.

91.     It remains interesting Phillips' selection of Romania as a shooting location as that country (while extensively mentioned in the February 2014 Manuscript) is found nowhere in Lawson's *Rolling Stone* Article.

### Preparations for the August 2016 Release of War Dogs

92.     Originally the Implicated Movie was slated for release into movie theaters for May 11, 2016 under the name *Arms and the Dudes*. However, the release date for the Implicated Movie was ultimately moved back to August 19, 2016 and renamed *War Dogs*.

93.     On January 5, 2016, Warner Bros. registered the domain name www.WarDogsTheMovie.com (the "War Dogs Website").

94.     On March 24, 2016, WBS and Warner Bros. launched the movie trailer for the Implicated Movie at http://devour.com/video/war-dogs-trailer/ as well as on YouTube https://www.youtube.com/watch?v=Rwh9c_E3dJk. As shown below, with the first month of

release on YouTube, the trailer has been viewed more than five million times:



95.   The same day the trailer was released, Warner Bros. launched its Facebook page

at https://www.facebook.com/WarDogsMovie/?fref=ts as well as posting the new release date:



96.    In various advertising and marketing of the Implicated Movie - including in a recent March 25, 2016 Rolling Stone article – Warner Bros. has opted to (or condoned and permitted) use actual images to depict the likeness of Mr. Diveroli:

**Rolling Stone**   MUSIC  POLITICS  TV  MOVIES  CULTURE  SPORTS  REVIEWS



Todd Phillips' *War Dogs* follows two 20-something Miami Beach stoners (Jonah Hill and Miles Teller) who land a $300 million deal with the U.S. government to arm the Afghan military during the Iraq War. The plot sounds implausible, but is based on a true story documented by Guy Lawson in a 2011 *Rolling Stone* profile (and his subsequent 2015 book *Arms and the Dudes*). The film's hilarious trailer outlines the basic plot, hinting at the decadence and danger awaiting the unlikely businessmen.

**SIDEBAR**

The Stoner Arms Dealers: How Two American Kids Became Big-Time Weapons Traders »

The clip opens with Hill and Teller securing their massive bid at the Pentagon in February 2007 before cutting to the partners relishing their lavish lifestyle and cruising around in fancy cars. "They call guys like us war dogs: bottom-feeders who make money off of war without ever stepping foot on the battlefield," says a voiceover. "It was meant to be derogatory, but we kind of liked it."

A true and correct copy is provided as **Exhibit 33** hereto.

93.    On or about March 28, 2016, Warner Bros. launched the War Dogs Website, which included the trailer as well as the following description of the storyline for the movie:

# STORY    

Based on a true story, "War Dogs" follows two friends in their early 20s (Hill and Teller) living in Miami Beach during the Iraq War who exploit a little-known government initiative that allows small businesses to bid on U.S. Military contracts. Starting small, they begin raking in big money and are living the high life. But the pair gets in over their heads when they land a 300 million dollar deal to arm the Afghan Military—a deal that puts them in business with some very shady people, not the least of which turns out to be the U.S. Government.

The film also stars Ana de Armas ("Knock Knock") and four-time Oscar nominee Bradley Cooper ("American Sniper," "American Hustle," "Silver Linings Playbook").

The screenplay is by Stephen Chin and Todd Phillips & Jason Smilovic, based on the Rolling Stone article titled "Arms and the Dudes," by Guy Lawson. Oscar nominees Mark Gordon ("Saving Private Ryan," "Steve Jobs"), Todd Phillips ("Borat") and Bradley Cooper ("American Sniper") are the producers, with David Siegel and Bryan Zuriff serving as executive producers.

"War Dogs" reunites Phillips with several of his collaborators from "The Hangover" trilogy, including director of photography Lawrence Sher, production designer Bill Brzeski and editor Jeff Groth. Joining the team is costume designer Michael Kaplan ("Star Trek," "Star Trek: Into Darkness"). The music is by Cliff Martinez ("Drive," "Traffic").

Warner Bros. Pictures presents a Joint Effort/Mark Gordon Company Production, a Todd Phillips movie, "War Dogs." Slated for release on August 19, 2016, the film will be distributed worldwide by Warner Bros. Pictures, a Warner Bros. Entertainment Company.

97.     Throughout these extensive advertising and marketing efforts, the Warner Defendants have not only included the term "Based on a True Story" as a feature of their promotion of the Implicated Movie but also lifted the term "An American Dream" from the prologue of the February 2014 Manuscript's phrase an *"American dream became an American nightmare"* – which is clearly illustrated by the movie poster for the film:



98.     Upon information and belief, the underlying screenplay - as well as the Implicated Movie itself - were based and sourced from content that included the February 2014 Manuscript (and/or the January 2012 Manuscript as well).   At the very least, upon further information and belief, the screenplay as well as the Implicated Movie are based in part upon content which Lawson extracted from jailhouse communications with Mr. Diveroli throughout the course of several months after Lawson executed his Option Agreement with WBS and Warner Bros.

99.     Defendants' use of the February 2014 Manuscript (and/or the January 2012 Manuscript) as well as any content or information which Lawson had received from Mr. Diveroli

(which was to be in strict confidence) has been used and/or employed by Defendants for purposes of writing the screenplay as well as ultimately the Implicated Movie – all of which has been done without the permission, authority, license or right from Mr. Diveroli and IE.

100.   The Warner Defendants' have created derivative works through coping, having access to, and/or use of content provided within the February 2014 Manuscript (and/or the January 2012 Manuscript) and have reproduced such works in the form of the Implicated Movie, which has already been displayed to movie critics, the media, as well as through trade shows like CinemaCon 2016 (amongst other industry events).

101.   The Warner Defendants' have used the name and likeness of Mr. Diveroli for commercial purposes without license or permission for the propose of creation of the Implicated Movie, and in marketing and advertising that Implicated Work have used actual images of Mr. Diveroli in conjunction (and in close proximity) with the term "Based on a True Story."

102.   The Warner Defendants have misappropriated the goodwill associated with Mr. Diveroli and his larger-than-life story for unauthorized commercial purposes and in using the term "Based on a True Story" in advertising and promoting the Implicated Movie suggesting some form of overall consent by Mr. Diveroli and/or IE, while at the same time publicly (and falsely) suggesting Mr. Diveroli's was unwilling to meet with Jonah Hill – the actor who portrayed him in the Implicated Movie – all of which results in a likelihood of confusion as to whether the Implicative Movie was endorsed and ultimately approved by Mr. Diveroli and/or IE:

34



**Film Takeout**
January 2

The Hangover director Todd Phillips fires up Jonah Hill and Miles Teller for the story of two guys and a government arms contract. What could possibly go wrong? "It is one of the craziest movies I've ever been in — in a great way," Hill says. "And it's all true."

Based on a 2011 Rolling Stone article, the film follows two young Miami men (Hill and Teller) who land a Pentagon contract to supply arms to Afghan forces. Hill's character's real-world counterpart, Efraim Diveroli — who pled guilty to conspiracy and was sentenced to four years in federal prison — declined to meet with the actor. "I'm used to it," says Hill, who has portrayed real-life figures before in such films as MoneyBall and The Wolf of Wall Street. "If a person is aggressively against me playing them, it's probably a goodsign."



👍 Like          💬 Comment          ↗ Share

On multiple occasions, including most recently in an April 24, 2016 article by Steven Zeitchik for the *Los Angeles Times*, Phillips has suggested (again falsely) that he was "able to meet with the real life Packouz but not Diveroli" – which as noted by the foregoing such opportunity was proposed by IE to the Warner Defendants (including via **Exhibit 24** directed specifically to Phillips) but ultimately such opportunity was refused by WBS and Warner Bros. legal team.   A true and correct copy of the April 24, 2016 article is provided as **Exhibit 34** hereto.

103.   As of the date of the filing of this pleading, IE has been unable to secure, on behalf of Mr. Diveroli, any agreement or business deal regarding his life rights, movie rights and/or the February 2014 Manuscript.   What is more, several Hollywood based groups who had expressed interest in the February 2014 Manuscript in the July 2014 timeframe have declined

due WBS and Warner Bros. planned launch of the Implicated Movie.

104.    The end result of the aforementioned misconduct by Defendants has already been the commercial success of the Implicated Movie – even prior to its August 2016 release.   This has included the various reviews and/or critiques by the media, articles regarding the movie, the 5 Million+ views of the trailer on YouTube, as well as the considerable social media response to the Implicated Movie - all creating pecuniary gain through the unauthorized exploitation of Mr. Diveroli's name and likeness as well IE's copyright in his February 2014 Manuscript.

105.    IE has sufficient, and shall continue to suffer, irreparable harm based upon the foregoing misconduct of Defendants.

106.    In addition, IE has sustained, and shall continue to sustain, significant monetary damages based upon Defendants' misconduct.

**COUNT I**
**BREACH OF THE JULY 2014 NON-DISCLOSURE AGREEMENTS**
(as to Spira and Kahn only)

107.    IE re-alleges and incorporates by reference the allegations pled in paragraphs 1-106 of this Complaint as if fully set forth herein.

108.    This Court I is a claim for various breaches by both Spira and Kahn independently of their July 2014 entered restrictive covenants entitled "Non-Disclosure Confidentiality Agreement" under the common law of the State of Florida.

109.    As previously addressed in detail, Kahn had first approached Mr. Diveroli (through his sister due to the limited access caused by his incarceration at Coleman) in circa May 2014 and then later approached Mr. Reback on Mr. Diveroli's behalf in early July 2014 – to express his desire to assist in advancing Mr. Diveroli's larger-than-life story through his

connections with Hollywood producers as well as movie studios. Moreover, in initial conversations with Mr. Reback at IE, Kahn expressed his experience and acumen based upon his role at Sunset Pictures, as well as how he had other Hollywood connections including through his mother's role as an executive producer of 2013's *Blackfish*. Based upon Kahn's desire to obtain a copy of the February 2014 Manuscript, which was being held in strict confidence by IE, Mr. Reback electronically circulated a detailed four page "Non-Disclosure Confidentiality Agreement" to Kahn.

110. Upon receipt of a copy of the Kahn NDA, Kahn immediately executed (through placing his electronic signature on the document) and returned it to Mr. Reback at IE on or about July 9, 2014. Upon information and belief, Kahn had the opportunity to review all of the material terms of the Kahn NDA in full – and likewise was afforded the opportunity (if he had so desired) to have counsel review the terms of the restrictive covenant prior to its execution. Upon further information and belief, Kahn was being represented at the time by Greenberg Traurig's Los Angeles office regarding the Kahn NDA and related relationship with IE.

111. Later that day, Mr. Reback sent to Kahn the 360+ page February 2014 Manuscript. The front (cover) page of the February 2014 Manuscript clearly denotes: "© **Efraim Diveroli / Incarcerated Entertainment LLC ALL RIGHTS RESERVED.**" As such, Kahn understood (or should have understood) that IE considered the February 2014 Manuscript its own and exclusive copyrighted materials, and that the content, expression and underlying materials provided within that work of authorship was to be maintained in strict confidence.

112. On or about July 23, 2014 (as well as July 24, 2014) high level conversations were held between IE (via Mr. Reback) as well as Kahn regarding review of the February 2014 Manuscript as well as the plan with regards to pitching Mr. Diveroli's life rights and related

movie rights. During those conversations, Kahn expressed a desire to bring in his partner for purposes of advancing the goals discussed with IE – and accordingly Mr. Reback circulated on July 24, 2014 another copy of "Non-Disclosure Confidentiality Agreement" for review and execution by that partier.

113. Four days later, Spira circulated via email to Mr. Reback an executed copy of the "Non-Disclosure Confidentiality Agreement" (*i.e.*, the Spira NDA). Upon information and belief, Spira had the opportunity during this time to carefully review the terms, obligations, restrictions and requirements of IE's "Non-Disclosure Confidentiality Agreement," its underlying purpose, as well as to understand the reasoning why IE desired to protect both access and related dissemination of the February 2014 Manuscript. What is more, based upon this timetable, Spira had more than sufficient time (as well as sufficient resources and access) to review the "Non-Disclosure Confidentiality Agreement" with counsel.

114. Later that same day, July 28, 2104, IE (through Mr. Reback) electronically circulated to Spira a PDF of the February 2014 Manuscript, which (akin to what was disseminated to Kahn) denoted on its first (cover) page that the materials contained therein were proprietary and owned exclusively by IE: "© **Efraim Diveroli / Incarcerated Entertainment LLC ALL RIGHTS RESERVED**."

115. Both the Spira NDA and the Kahn NDA protected certain "Confidential Information" which specifically included information "not generally known to the public or the [movie] industry" which "specifically refer[red] at all times without limitation to the certain manuscript (book) known as '*Once a Gun Runner . . .*' *a Memoir by Efraim Diveroli*" including but not limited to "any materials contained thereon of any kind and of any nature whatsoever including all other parts contained therein" which the Spira Partnership would thus "not

disseminate to any third person any portion thereof by any means whatsoever, whether communicated in writing, verbally, electronically, in any form of media, or by any other means or method of any kind."

116.    From late July 28, 2014 to mid-August, 2014, the Spira Partnership failed to materially identify their close relationship with the Warner Defendants – specifically, but not limited to the fact that Spira lived with his father – Steven S. Spira – the President of Worldwide Business Affairs at Warner Bros. Pictures / WBS. In other words, at all times materials to the allegations contained herein, the Spira Partership had knowingly withheld that they were acting as agents of the Warner Defendants. In addition, during that same time, the Spira Partnership failed to reveal that their internal sources with regards to the advancement of the Implicated Movie, and their talks with regards to having the Warner Defendants acquire IE's life rights and movie rights regarding Mr. Diveroli, were based in part on the Spira Partnership's family relationship with Steven S. Spira.

117.    Upon information and belief, Kahn disseminated directly to the Warner Defendants (and/or indirectly via Spira) content and related materials regarding Mr. Diveroli's childhood and well as information gleaned through discussions from May 2014 to August 2014 with Mr. Reback and/or Mr. Diveroli – all of which was restricted from dissemination without IE's express approval and/or consent.

118.    Upon information and belief, Kahn disseminated directly to the Warner Defendants (and/or indirectly via Spira) a copy of the February 2014 Manuscript (and/or indirectly via Spira) which was likewise prohibited under the Kahn NDA and Spira NDA without IE's express approval and/or consent.

119.    Upon information and belief, Kahn disseminated directly to the Warner

Defendants (and/or indirectly via Spira) portions of the February 2014 Manuscript either via excerpts and/or through disseminating related consent and/or expression found within that work of authorship which was likewise prohibited under the NDAs without IE's express approval and/or consent.

120. All of the foregoing constituted material breaches of both the NDAs by the both Kahn and Spira individually – as both Kahn and Spira were instead essentially acting as agents for the Warner Defendants.

121. The foregoing actions and conduct by Kahn and Spira – all of which is believed to have been orchestrated through Steven S. Spira (either directly or indirectly) has all been calculated by the Spira Partners to damage, obstruct and to impede IE's ability to monetize the life rights and movie rights regarding Mr. Diveroli's larger-than-life story – including as it is provided in the February 2014 Manuscript. Moreover, once Kahn and Spira orchestrated the dissemination of the February 2014 Manuscript, there was no need by the Warner Defendants to enter into any consulting and/or related business relationship with IE.

122. This is evident by Ms. Reyter's September 3, 2014 letter on behalf of WBS and Warner Bros. (*see* **Exhibit 30**) denoting how the Warner Defendants "have decided not to pursue a consulting arrangement at this point in time" with IE and/or Mr. Diveroli.

123. The Spira Partners have done nothing to mitigate their breaches of the Kahn NDA and the Spira NDA.

124. To date, IE has been unable to advance its business concerns regarding monetizing Mr. Diveroli's life rights and movie rights – despite the fact that prior to the involvement of the Spira Partners there had been initial interest on the parties of Universal and Random House studios.

125.    As such, IE has been substantially damaged by these material breaches of the "Non-Disclosure Confidentiality Agreement" which were directly caused by Kahn and Spira.

WHEREFORE, IE demands judgment against both Kahn and Spira for damages (including attorneys fees and costs as contemplated in Paragraph 4 of the "Non-Disclosure Confidentiality Agreement" as signed by both Kahn and Spira) based upon these acts of breach of contract as this Honorable Court may deem just under the circumstances.

**COUNT II**
**FRAUD IN THE INDUCEMENT**
(as to Spira and Kahn only)

126.    IE re-alleges and incorporates by reference the allegations pled in paragraphs 1-125 of this Complaint as if fully set forth herein.

127.    This Count II is an action under the common law of the State of Florida for fraud in the inducement against Kahn and Spira.

128.    As addressed throughout the foregoing, both Spira and Kahn, in orchestrating the Spira Partnership, concealed the true purpose, basis and reasoning for their approach and desire to enter into a relationship with IE.   As part of their pitch to IE, Kahn (and later Spira) concealed the basis and context of their touted Hollywood connections (and Spira's family connection with Steven S. Spira, the President of Worldwide Business Affairs at Warner Bros. Pictures / WBS). Moreover, both Spira and Kahn entered into NDAs with IE, under the guise of suggesting their desire to pitch and/or market the rights to the February 2014 Manuscript.

129.    However, on information and belief, the true desire of Spira and Kahn was ultimately to aide the Warner Defendants in obtaining the complete story regarding Mr. Diveroli – as at that time the Warner Defendants had limited content and materials based upon Lawson's

*Rolling Stone* Article, later content that Lawson had gleaned (in strict confidence) from jailhouse communications with Mr. Diveroli, as well as interviews with Mr. Packouz (who had a limited and finite role as an independent contractor for a short time with Mr. Diveroli's gun running escapades at AEY, Inc.).   Access to the February 2014 Manuscript afforded the perfect opportunity to do so.

130.    Both Spira and Kahn were aware at the time of their representations throughout the July 2014 timeframe that such representations to IE (including to Mr. Reback) were false.

131.    Based upon these false representations, assurances and promises to IE (including through Mr. Reback) - Spira and Kahn were able to secure a copy of the February 2014 Manuscript which provided all of the necessary and key content, expression and storyline regarding Mr. Diveroli's larger-than-life story – which was the missing piece to the Warner Defendants re-write during the summer of 2014 of the screenplay which was eventually used in filming the Implicated Movie.

132.    IE relied upon Spira and Kahn's false and fraudulent statements in entering into a relationship with the Spira Partnership - which as noted by the foregoing resulted in the unauthorized dissemination of all, excerpts, portions, or parts of the February 2014 Manuscript (or the very least access to or review of such content and materials) by the Warner Defendants.

WHEREFORE, IE requests that this Honorable Court award damages and any relief that the Court fees is just and appropriate based upon Spira and Kahn's fraud in the inducement to gain access to and to ultimately disseminate the February 2014 Manuscript.

## COUNT III
## CONVERSION OF CONFIDENTIAL AND PROPRIETARY INFORMATION
(as to all Defendants)

133.    IE re-alleges and incorporates by reference the allegations pled in paragraphs 1-125 of this Complaint as if fully set forth herein.

134.    This Count III is an action for conversion under the common law of the state of Florida regarding Defendants' carefully orchestrated and planned actions to take – without IE's authority or consent - proprietary and confidential elements of both the January 2012 Manuscript, information exchanged by Mr. Diveroli in strict confidence with Lawson from the time period of early January 2012 to late June 2014, the February 2014 Manuscript, as well as related content, materials and related information.

135.    As noted by the foregoing, throughout the mid 2011 to late June 2014 time period, Lawson was in communication with Mr. Diveroli while serving his four year plea bargained sentence.   During that time, Lawson was able to obtain the January 2012 Manuscript, as well as was able to procure from those communications unique and valuable content regarding Mr. Diveroli's larger-than-life story.   At that point in time, Lawson was able to secure such materials (which he promised Mr. Diveroli that he would maintain in strict confidence) under the guise that Lawson would co-author a book with Mr. Diveroli.    While Lawson was making such assurances, he instead negotiated and procured a July 2011 Option Agreement with WBS and Warner Bros. regarding the story rights to the *Rolling Stone* Article, as well as related rights to the movie.   Upon further information and belief, after the July 2011 agreement, Lawson exchanged certain content and expression gleaned from the January 2012 Manuscript and/or related information obtained from Mr. Diveroli – in order for the Warner Defendants to advance the screenplay and then later then filming of the Implicated Movie.

43

136.    In addition to Lawson's actions regarding this confidential and proprietary information he obtained throughout this time period from Mr. Diveroli, the Spira Partners likewise were able to obtain the February 2014 Manuscript from IE – through their entry into the Spira NDA and the Kahn NDA.  This included related information gleaned from IE regarding their goals to monetize the February 2014 Manuscript (and the underlying life rights and movie rights attributed to Mr. Diveroli's larger-than-life story).    In executing such confidentiality agreements to obtain PDF copies of the confidentially protected manuscript the Spira Partners concealed their true motives and likewise concealed the close personal and family connections to the Warner Defendants.  Thereafter, upon information and belief, the Spira Partners reproduced and/or disseminated at least one copy and/or disclosed the content, expression and materials (or least portions thereof) of the February 2014 Manuscript to the Warner Defendants – who at the time were preparing a re-write of the screenplay to serve in filming the Implicated Movie.

137.    In short, the Warner Defendants – through initially the efforts of Lawson and then subsequently through the Spira Partnership in July 2014 – did unlawfully commit at least one act (and likely several acts) of conversion with regards to Mr. Diveroli's larger-than-life story including but not limited to the January 2012 Manuscript and the February 2014 Manuscript.

138.    As illustrated by the foregoing, this was all orchestrated by Defendants with the intent to deprive IE permanently (or for an indefinite time) of its rightful possession, access to, and use of, such confidential information, and to deprive IE of the value of this information, well knowing that Defendants were committing wrongful acts.

139.    Defendants have acted knowingly, willfully, and unlawfully.

140.    As a direct and proximate result of this conduct by Defendants, IE has suffered the deprivation of its property, namely, its ability to monetize Mr. Diveroli's movie rights,

underlying life rights, as well as the underlying content provided for in the January 2012 Manuscript as well as the February 2014 Manuscript.

141.    The actions of Defendants have seriously interfered with IE's enjoyment of ownership rights over this information. Defendants have improperly exercised acts of dominion and unauthorized access over IE's intellectual property and thus have without consent created the Implicated Movie for purposes of release in August 2016 for pecuniary gain.

142.    As a direct and proximate result of the aforementioned conduct of Defendants, IE has suffered and will continue to suffer irreparable injury.

143.    As a direct and proximate result of the aforementioned conduct of Defendants, IE has also sustained monetary loss, including the loss of use of IE's property for which IE is entitled to recover compensatory and, upon authorization of the Court, punitive damages.

WHEREAS, IE seeks (i) compensatory damages equal to the lost use of IE's movie rights, life rights and related rights to Mr. Diveroli's story including but not limited to the manner in which it is expressed in the January 2012 Manuscript as well as the February 2014 Manuscript and other damages proximately caused by the misconduct of Defendants, (iii) a preliminary and thereafter permanent injunction; and (b) costs of this action and such additional relief as the Court deems appropriate or to which IE may be entitled by law.

## COUNT IV
## FLORIDA COMMON LAW TRESPASS TO CHATTELS
### (as to all Defendants)

144.    IE re-alleges and incorporates by reference the allegations pled in paragraphs 1-106 of this Complaint as if fully set forth herein.

145.    This Count IV is a claim for trespass to chattels under Florida common law

against Defendants.

146.    Throughout the timeframes addressed herein, including from mid-2011 through July 2014, Defendants knowingly, willfully, and unlawfully committed a trespass to chattels of Mr. Diveroli (and then later upon its incorporation IE) in that Defendants did, without authorization or permission, trespass upon IE's property, namely access to and review rights associated with the January 2012 Manuscript and the February 2014 Manuscript.

147.    Defendants committed the aforementioned conduct with the intent and purpose of depriving IE of the competitive advantages, benefits, and value contained within the content taken, for the purposes of gaining an unfair competitive advantage in the market.

148.    IE has suffered irreparable injury, as more particularly outlined above, and will continue to suffer irreparable injury without preliminary and permanent injunctive relief.

149.    IE has sustained monetary losses as a direct and proximate result of the aforementioned conduct of Defendants.

WHEREFORE, IE requests that this Honorable Court award damages and any relief that the Court feels is just and appropriate based upon Defendants acts of trespass to chattels.


## COUNT V
## FLORIDA COMMON LAW UNJUST ENRICHMENT
### (as to all Defendants)

150.    IE re-alleges and incorporates by reference the allegations pled in paragraphs 1-106 of this Complaint as if fully set forth herein.

151.    This Count V is an action under the common law of the State of Florida for unjust enrichment against all Defendants.

152.    Defendants have individually and collectively received and will continue to

receive unlawful gains from the misconduct enumerated above, including without limitation their taking of IE's confidential and proprietary information including as articulated in the January 2012 Manuscript and the February 2014 Manuscript, as well as conversion of IE's associated property.

153.    In addition, Defendants have received and will continue to receive unlawful gains from the misconduct enumerated above including with regards to the upcoming August 2016 release of the Implicated Movie.

154.    Defendants have acted knowingly, willfully, and unlawfully with intent to injure IE

155.    Unless prohibited from doing so by this Court, Defendants will be unjustly enriched by their illicit activities.

WHEREFORE, IE requests that this Honorable Court award damages and any relief that the Court feels is just and appropriate based upon Defendants' unjustly enriching acts.

## COUNT VI
### VIOLATION OF FLORIDA STATUTE § 540.08
(as to the Warner Defendants only)

156.    IE re-alleges and incorporates by reference the allegations pled in paragraphs 1-106 of this Complaint as if fully set forth herein.

157.    This Count VI is an action for damages and injunctive relief based on unauthorized publication of likeness in violation of Florida Statute §540.08.

158.    In advertising, marketing and promoting the Implicated Movie - including but not limited to the War Dogs Website and the underlying Facebook page and related social media posts - the Warner Defendants have published, printed, displayed and publically used the name

and likeness of Mr. Diveroli without authorization or consent of either Mr. Diveroli or IE, specifically for commercial and advertising purposes.

159.    Such use of the name and likeness of Mr. Diveroli is purely for commercial gain for the advancement of the Implicated Movie (as well as its upcoming August 2015 launch), and has not been used for (or alternatively has clearly exceeded) any bona fide newsworthy purpose (including any related presentation of a current and legitimate public interest) such as for a newspaper, magazine, and/or book in order to fall into the limited exception of § 540.08(4)(a).

160.    Mr. Diveroli (nor IE) has not consented to the Warner Defendants use of his name or likeness within such advertising, marketing and promoting – or the use of Mr. Diveroli's name or likeness within the Implicated Movie itself.

161.    The Warner Defendants, in using Mr. Diveroli's name and likeness within the Implicated Movie (as well as the underlying marketing and advertised identified herein prior to the August 2016 release) have obtained the benefit of the notoriety and goodwill of Mr. Diveroli's name and likeness and have profited (and will continue to do so) from the proceeds from the Implicated Movie.

162.    This is especially true as the Warner Defendants have pitched and marketed the Implicated Movie as "Based on a True Story" when using Mr. Diveroli's name and likeness without authorization or consent.

163.    The Warner Defendants have used Mr. Diveroli's name and likeness for the benefit of its value in light of the underlying "true story" attributed to story line upon which the Implicated Movie is based.

164.    The Warner Defendants' unauthorized use of Mr. Diveroli's name and likeness has caused injury to IE, including, without limitation, damage to goodwill, and the perception of

an affiliation with Mr. Diveroli (including that the Implicated Movie has been authorized or consented to by Mr. Diveroli).  The Warner Defendants have also been unjustly enriched and profited from the use of Mr. Diveroli's name and likeness.

WHEREFORE, IE respectfully prays that this Honorable Court enter such preliminary and final orders and judgments as are necessary to provide IE with the following relief:

a)  Enjoining the Warner Defendants from further misappropriation and public use of Mr. Diveroli's name and likeness;

b)  An award of monetary damages against the Warner Defendants, including a reasonable royalty;

c)  An award of punitive or exemplary damages;

d)  Destruction of all products and marketing bearing the name and likeness of Mr. Diveroli in the possession of the Warner Defendants together with all means of reproduction;

e)  An award of costs and reasonable attorneys' fees; and

f)  Such other and further relief as this Court deems just and proper.

## COUNT VII
## FLORIDA COMMON LAW MISAPPROPRIATION OF LIKENESS
(as to the Warner Defendants only)

165.  IE re-alleges and incorporates by reference the allegations pled in paragraphs 1-106 of this Complaint as if fully set forth herein.

166.  This Count VII is an action for damages and injunctive relief based upon misappropriation of likeness in violation of the common law of the State of Florida.

167.  The Warner Defendants – through their various efforts at marketing and

promoting the upcoming August 2016 release of the Implicated Movie – have employed and used without the authorization or consent of Mr. Diveroli (or IE) for commercial and advertising purposes, the likeness of Mr. Diveroli. Such use is likely to confuse movie-goers (and later those who view the Implicated Movie via streaming, DVD, Blu-Ray as well as related transmissions) and others who have interest in Mr. Diveroli's larger-than-life story that Mr. Diveroli is affiliated and/or has endorsed the Warner Defendants' Implicated Movie. Such risk is escalated in light of the manner in which the Warner Defendants have suggested the story line of the Implicated Movie is "Based on a True Story."

168.     Additionally, the Warner Defendants – through their distribution of the Implicated Movie (which will include distribution to the general public as of its August 2016 release) has employed and used Mr. Diveroli's likeness for a commercial purpose.

169.     Neither IE nor Mr. Diveroli have consented, authorized or approved the use of Mr. Diveroli's likeness by the Warner Defendants or in association with the use of the Implicated Movie.

170.     Neither IE nor Mr. Diveroli have consented, authorized, consented to or approved the use of Mr. Diveroli's likeness by the Warner Defendants with regards to the underlying marketing and promotion of the Implicated Movie.

171.     The Warner Defendants have obtained (and will continue to obtain) the benefit of Mr. Diveroli's notoriety and associated goodwill by falsely associating Mr. Diveroli with the Implicated Movie in a manner suggesting that it is affiliated and/or endorsed by IE (or Mr. Diveroli). The Warner Defendants used the likeness of Mr. Diveroli for the benefit of its value that would confer on the advancement of the Implicated Movie, including but not limited to its marketing and promotion prior to release.

172.    The Warner Defendants unauthorized use of Mr. Diveroli's likeness has caused injury to IE (who maintained and holds the rights to Mr. Diveroli's likeness) including, without limitation, damage to goodwill, affiliation with the Implicated Movie, and monetary loss. The Warner Defendants have also been unjustly enriched and profited from the use of Mr. Diveroli's likeness.

WHEREFORE, IE respectfully prays that this Honorable Court enter such preliminary and final orders and judgments as are necessary to provide IE with the following relief:

a)    Enjoining the Warner Defendants from further misappropriation of Mr. Diveroli's likeness;

b)    An award of monetary damages against the Warner Defendants, including actual damages and disgorgement of profits and unjust enrichment;

c)    An award of punitive or exemplary damages;

d)    Destruction of all products and marketing bearing the likeness of Mr. Diveroli in the possession of the Warner Defendants together with all means of reproduction;

e)    An award of costs and reasonable attorneys' fees; and

f)    Such other and further relief as this Court deems just and proper.

### COUNT VIII
### FEDERAL UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)
(as to the Warner Defendants only)

173.    IE re-alleges and incorporates by reference the allegations pled in paragraphs 1-106 of this Complaint as if fully set forth herein.

174.    This Count VIII is an action for damages and relief under the Federal Lanham Act, 15 U.S.C. § 1125(a) regarding the Warner Defendants acts of Federal unfair competition.

175.    Through the intense media coverage regarding Mr. Diveroli's grand jury

investigation, plea deal, as well as related articles and other public notoriety regarding his larger-than-life story – Mr. Diveroli has achieved certain source identifying characteristics regarding his name and likeness – as well as related indicia regarding his persona.   Those rights are exclusive to Mr. Diveroli and have been assigned to IE via written assignment.

176.   The various source identifying indicia of Mr. Diveroli has likewise been created not only via media coverage, but through the creation of IE, as well as its own efforts to launch the Diveroli Website, as well as other efforts to advertise and promote Mr. Diveroli's story.

177.   The Warner Defendants – through their use of Mr. Diveroli's name and likeness (as well as use of materials sourced from Mr. Diveroli including in the form of the January 2012 Manuscript and the February 2014 Manuscript) – have employed and/or used Mr. Diveroli's indicia, including combination of his name and related symbolism for purposes of advertising, marketing and promoting the Implicated Movie in interstate commerce including but not limited to under the description "Based on a True Story."

178.   Such use by the Warner Defendants, including the manner in which the indicia has been used, has been designed and employed in a manner to suggest there is some consented-to relationship between the Warner Defendants and Mr. Diveroli, including but not limited to the suggestion that the movie was "Based on a True Story."

179.   The Warner Defendants use of Mr. Diveroli's indicia is likely to cause, has caused, and will continue to cause, confusion among customers in that they will believe that the Implicated Movie is endorsed, affiliated, sponsored and/or approved by Mr. Diveroli (and thus IE).

180.   The Warner Defendants' actions are in violation of 15 U.S.C. § 1125(a) in that the Warner Defendants have used and continue to use, in relation to commercial activities, a false

designation or origin, or a false or misleading description which is likely to cause confusion, and to cause mistake, and to deceive, as to the affiliation, connection, or association of the Warner Defendants and Mr. Diveroli (and thus IE).

181.    IE has suffered, and will continue to suffer, irreparable harm resulting from the acts of unfair competition by the Warner Defendants. IE will suffer additional irreparable harm unless the Warner Defendants are enjoined by the Court from continuing those acts, which constitute unfair competition.

182.    IE has no adequate remedy at law.

183.    Upon information and belief, the Warner Defendants' acts of unfair competition are willful and this is an exceptional case within the meaning of 15 U.S.C. §1117.

**COUNT IX**
**FLORIDA COMMON LAW UNFAIR COMPETITION**
(as to the Warner Defendants only)

184.    IE re-alleges and incorporates by reference the allegations pled in paragraphs 1-106 and 185-195 of this Complaint as if fully set forth herein.

185.    This Count X is an action under the common law of the State of Florida for unfair competition against the Warner Defendants.

186.    By misappropriating not only Mr. Diveroli's name and likeness, but additionally Mr. Diveroli's proprietary works in the January 2012 Manuscript, the various information provided by Mr. Diveroli to Mr. Lawson (in strict confidence) throughout the time period of January 2012 to June 2014, the February 2014 Manuscript, as well as related information and passing off the underlying storyline, content, materials and related story as their own (including under the moniker "Based on a True Story"), the Warner Defendants have utilized unfair means

to usurp the goodwill and notoriety of IE and Mr. Diveroli's larger-than-life story and related indicia for purposes of marketing and promoting the underlying Implicated Movie.

187.   The Warner Defendants are misappropriating and falsely describing that the work is "Based on a True Story" – but at the same time discussing how the Warner Defendants were denied the opportunity to interview Mr. Diveroli or to obtain his expression and/or content (as associated in both the January 2012 Manuscript and the February 2014 Manuscript) so as to cause confusion and mistake by the consumer that the Implicated Movie is the endorsed and/or approved feature film regarding Mr. Diveroli.

188.   IE is the owner, by written assignment as to Mr. Diveroli's larger-than-life story, name and likeness, publicity rights, as well as the January 2012 Manuscript and the February 2014 Manuscript.

189.   IE has no adequate remedy at law if this Court does not enjoin the Warner Defendants' activities and IE is suffering irreparable harm and related injuries.

190.   Upon information and belief, the Warner Defendants actions are willful, wanton, intentional and malicious.

## JURY TRIAL REQUEST

Plaintiff requests a trial by jury as to all matters so triable.

Respectfully submitted April 28, 2016.

/s/Robert H. Thornburg
Robert H. Thornburg
Florida Bar No. 630829
rthornburg@addmg.com
**ALLEN, DYER, DOPPELT,**
**MILBRATH & GILCHRIST, P.A.**
1221 Brickell Ave., Suite 2400
Miami, Florida 33131
Telephone: (305) 374-8303
Facsimile:  (305) 374-8306

*Attorneys for Plaintiff*
*Incarcerated Entertainment, LLC*