# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

INCARCERATED ENTERTAINMENT, LLC,

                                          Case No:  8:16-cv-1302-T-35AAS

        Plaintiff,

v.

WARNER BROS. PICTURES, a
division of WB Studio Enterprises, Inc.,

        Defendant.

_____/

## AMENDED COMPLAINT AND
## DEMAND FOR JURY TRIAL

Plaintiff, Incarcerated Entertainment, LLC ("Incarcerated"), sues Defendant, Warner Bros. Pictures, A Division of WB Studio Enterprises, Inc. ("Warner Bros."), and alleges as follows:

### Overview of the Case

1.  Warner Bros. has grossed more than $85 million by marketing and promoting the movie *War Dogs* as the "true" story of how Efraim Diveroli ("Diveroli") tried to "hustle" his way to the "American Dream" by becoming an international arms dealer fulfilling contracts for the United States Government during the Iraq and Afghan wars.

2.  In reality, *War Dogs* is *itself* the hustle—a knowingly false portrayal of Diveroli's real story that has been misleadingly sold to consumers as the unadulterated truth, because Warner Bros. knows that audiences are drawn to true stories.

3.  As a result, Incarcerated, which owns the rights to Diveroli's real and valuable life story, has been unfairly and unlawfully deprived of its ability to compete in the marketplace.

4.     This action seeks to hold Warner Bros. accountable for its public deception and unfair competition, prevent it from being unjustly enriched, and to fully compensate Incarcerated for the substantial losses it has suffered and will continue to suffer in the future as a result of the pervasive misleading advertising campaign behind the *War Dogs* movie.

## **Parties, Jurisdiction, and Venue**

5.     Plaintiff, Incarcerated, is a Florida limited liability company that owns the rights to Diveroli's real life story, including the rights to Diveroli's February 2014 Manuscript detailing that story (as well as his prior January 2012 Manuscript from which it is derived), and the book based on the February 2014 Manuscript entitled "*Once a Gun Runner . . . The Real Story.*"

6.     Defendant, Warner Bros., is a Delaware corporation with its principal place of business located at 4000 Warner Blvd, Burbank, California 91522.  Warner Bros. engages in the creation, writing, production and distribution of motion pictures.  Warner Bros. co-produced and is the distribution company for the *War Dogs* movie.   Warner Bros. also primarily oversaw, controlled, and managed the creation of the storyline, screenplay, and all related permissions for *War Dogs*.

7.     Warner Bros. purposely availed itself of the privilege of doing business in Florida, regularly conducts business in the State of Florida and this Judicial District, has committed the acts complained of herein in the State of Florida and this Judicial District, caused injury to Incarcerated in the State of Florida and this Judicial District, and otherwise has engaged in such substantial and not isolated activities within the State of Florida such that it has sufficient minimum contacts with this state to meet the minimal jurisdictional requirements under the laws of Florida and the United States Constitution.

8.    Such minimum contacts have included the marketing and advertising of *War Dogs* in this Judicial District, the distribution of copies of *War Dogs* for purposes of display in Tampa Bay area movie theaters, and the operation and conduct of substantial and not isolated business activities within the State of Florida.

9.    Based upon the foregoing, Warner Bros. is subject to the personal jurisdiction of this Court in accordance with the Florida Long-Arm Statute and Due Process.

10.    This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§ 1331, 1332 and 1338. This action involves federal questions concerning unfair competition law, parties residing in different states, and claims that exceed the sum or value of $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

11.    Venue properly lies within this judicial district and division pursuant to 28 U.S.C. §§1391.

### Diveroli's True Story

12.    At the age of 18, Diveroli started a small business specializing in arms, ammunition trading, and bidding on small United States Government defense contracts. Using one of his father's shuttered companies, AEY, Inc. ("AEY"), Diveroli worked on a laptop out of a his one-room apartment bidding on United States Government contracts through www.FBO.gov.

13.    Diveroli steadily increased his contracts over the course of the next three years and developed a track record of success in satisfying over 100 United States Government contracts for weapons and munitions.

14.     By 2007, the United States Government's war effort in Afghanistan was in full force.  The allied forces decided to arm the Afghans for purposes of fighting the Taliban and Al Qaeda, so the U.S. Government bid out a massive contract for purposes of arming the fledgling Afghan army (and its related police forces).   Although large contractors like Northrop Grumman and Lockheed prepared extensive bids for the projects, ultimately the United States Government—after significant vetting—chose Diveroli and AEY to fulfill these massive $298 million weapons and munitions contracts.

15.     Throughout 2007 and early 2008, Diveroli was the sole director and owner of AEY, and the driving force behind its success.  He relied on a handful of lower level employees and independent contractors to assist the business, one of whom was David Packouz ("Packouz"), a neighborhood acquaintance.

16.     On March 27, 2008, the United States Government suspended AEY's contracts based upon allegations that AEY had violated pre-existing arms embargos.   Part of those accusations were that certain ammunitions supplied to the Afghans and the United States Army were sourced from China in violation of an embargo.  Diveroli, who at the time was just 22 years old, was indicted by a Miami Federal grand jury—along with Packouz and others—based upon fraud charges in connection with the provision of ammunition to the Afghans.

17.     Rather than defend the legality of his actions—in that Diveroli had been selling ammunition acquired by his third-party sources prior to the 1989 Chinese munitions embargo— Diveroli decided for various reasons to take a four-year plea deal to plead guilty to a single count of conspiracy.

18.     Shortly after entering his plea deal, Diveroli began serving his forty-eight month sentence.   Between early 2011 and October 2011, Diveroli served time in the Seminole County,

Florida jail. Diveroli served the majority of his sentence, starting in October 2011, at the Coleman Federal Corrections Complex ("Coleman") in Wildwood, Florida—a low to mid-level detention facility less than seventy miles from Tampa, Florida.

19.    After Diveroli's grand jury indictment but before his sentencing, Guy Lawson ("Lawson"), a well-known journalist, author, and former Wall Street lawyer, reached out to Diveroli and expressed an interest in writing an article about Diveroli's story. Diveroli declined to be interviewed prior to reaching his plea deal and sentencing.

20.    Lawson previously helped write *The Brotherhoods: The True Story of Two Cops Who Murdered for the Mafia* with New York Police Department Officer William Oldham— which is Oldham's biographical account of how his partner Stephen Caracappa (along with another police officer) became turncoats to assist underworld mob bosses, and Oldham became a special investigator to assist the U.S. Attorney in the investigation. Through Oldham's biographical account, Lawson published the book in 2007. In April 2013, it was announced that Lawson and Oldham had sold Oldham's life rights (as well as both co-author's movie rights) to Warner Bros. to make a forthcoming feature film.

21.    In early 2011, while Diveroli was serving his time in Orange County and Seminole County jails, Lawson again reached out to Diveroli, through Diveroli's counsel. Lawson was insistent on conducting several jailhouse telephone interviews and touted his past success in writing biographical accounts of larger-than-life stories (including Mr. Oldham's story and that book's success). Lawson also told Diveroli that he could likely get the story published in *Rolling Stone* magazine and that if there was traction with the article it could turn into a book, which Lawson and Diveroli would co-author. Ultimately, Diveroli trusted Lawson and agreed to and gave Lawson telephone interviews while incarcerated at Coleman.

22.     On March 16, 2011 *Rolling Stone* published Lawson's article titled, *The Stoner Arms Dealers: How Two American Kids Became Big-Time Weapons Traders* (the *"Rolling Stone* Article"). The *"Rolling Stone* Article" featured accounts of both Diveroli and Packouz (whose sentencing was limited to just house arrest).

23.     Almost immediately thereafter, but without Diveroli's knowledge, Todd Phillips ("Phillips") reached out to Lawson about writing a screenplay and possibly directing a motion picture regarding Diveroli's story. Throughout the June and July 2011 timeframe, Phillips finalized negotiations with Lawson to option the rights to Lawson's *Rolling Stone* Article and any and all associated movie rights (including any related content, materials, stories, and copyrightable works). Optioning articles was becoming big business in Hollywood, because it is an inexpensive way to produce "true" life motion pictures that audiences crave.

24.     After reaching an agreement with Lawson, Phillips (through his production company) moved forward with developing a movie portraying Diveroli's story through a production deal with Warner Bros. On or about August 22, 2011, Warner Bros. recorded the written assignment of Lawson's rights to the *Rolling Stone* Article. The August 22, 2011 filing with the Copyright Office denoted a written "Option Agreement" which was executed by Lawson on July 20, 2011 which assigned rights to Warner Bros. (hereinafter the "Option Agreement").

25.     In late 2011, having just assigned these movie rights, but *without* telling Diveroli about the agreements he had already reached with Phillips and Warner Bros., Lawson again contacted Diveroli about co-authoring a book. Diveroli agreed to prepare a manuscript of his story for purposes of co-authorship of a book with Lawson (akin to what Lawson had written

with Oldham).  Lawson also engendered Diveroli's trust by telling him that he wanted Diveroli's true story to be told, and for the public to know the truth about how Diveroli ended up in jail.

26.     In January 2012, Diveroli authored and wrote his manuscript entitled "*Once a Gun Runner . . .*" (hereinafter the "January 2012 Manuscript"). The January 2012 Manuscript is protected through United States Copyright Registration No. TXU001985899 as issued by the Copyright Office on April 5, 2016.    The January 2012 Manuscript was transferred, via written assignment, to Incarcerated (the listed copyright claimant).

27.     After Diveroli shared the January 2012 Manuscript with Lawson, Lawson continued to exchange emails to solicit information from Diveroli, while continuing to represent that he was researching the book to be co-authored by both of them.  It was Diveroli's belief and understanding during that timeframe that, upon his release from prison (planned for early 2015), Lawson and Diveroli would finalize their collaboration on the book.

28.     In early November 2013, Diveroli's business partner Ross Reback organized Incarcerated for the purpose of monetizing Diveroli's story, including negotiating book, movie and associated rights.

29.     From November 2013 to June 2014, Diveroli expanded his original January 2012 Manuscript into a full draft. By February 2014, that full draft was sufficiently complete for marketing the movie rights, including Diveroli's life rights (as previously defined as the "February 2014 Manuscript").

30.     On February 20, 2014, Diveroli, through the assistance of outside copyright counsel in Orlando, prepared and filed an application before the Copyright Office for purposes of registering the February 2014 Manuscript.  The Copyright Office later issued TXU001911676

(the "February 2014 Registration").  All rights and interest in the February 2014 Registration was transferred, by written assignment, to Incarcerated.

31.  By May 2014, with the February 2014 Manuscript complete (which totaled some 360+ pages) and the February 2014 Registration in place, Reback had prepared a detailed list of producers and motion picture studios that he believed would have interest in the movie rights associated with Diveroli's life story.  That list included multiple people and entities, including Todd Phillips (the director of *War Dogs*), Brett Ratner (who is associated with RatPac-Dune Entertainment, a Warner Bros. affiliated-entity), and Warner Bros. itself, who was ultimately responsible for the *War Dogs* movie.

32.  On June 13, 2014, Reback sent a formal letter to Mr. Ratner in Beverly Hills, which detailed how Reback was:

> partners with Efraim Diveroli in an entity which owns and controls his *just* completed, and not yet published personal memoir, as well as exclusive life story rights, film, and other ancillary rights.  We have spent most of the last two years on this project, as Efraim is currently incarcerated in a federal prison.  Efraim's memoir, titled "*Once a Gunrunner . . .*" is his amazingly honest true story containing never before heard details as only he would know and is a captivating first person account of his incredible rise and fall.
>
> Knowing of your interest in this story, I would like to set up a meeting with you as soon as possible, as I'm confident you will have a great deal of enthusiasm for the importance of our material. We would love to join forces with you on this project.

A true and correct copy of the June 13, 2014 letter to Mr. Ratner on behalf of Incarcerated is attached as **Exhibit A**.

33.  Reback circulated a similar letter, dated June 19, 2014, to Phillips at Warner Bros.' lot in Burbank, California, in which Reback explained Incarcerated's interest in addressing the "exclusive life story rights, film rights, publishing rights, and other ancillary

rights" available regarding Diveroli's story. A true and correct copy of this June 19, 2014 letter is attached as **Exhibit B**. Reback noted his understanding that Phillips was working on a "project currently in development based on this subject" and suggested "it would be in our mutual best interests to set up a meeting to discuss as soon as possible" regarding Diveroli's "just completed, not yet published memoir" (i.e., the February 2014 Manuscript).

34.     On July 8, 2014, Elena Reyter, Associate General Counsel for Warner Bros. responded to Incarcerated's "June 19, 2014 correspondence regarding Efraim Diveroli" (i.e., Exhibit B). A true and correct copy of Ms. Reyter's July 8, 2014 correspondence is attached as **Exhibit C**. Ms. Reyter confirmed that Warner Bros' legal team as well as its senior business affairs executives were "discussing the matter of [Reback's] letter internally . . . and hope to get back to [Reback] shortly."

35.     On September 3, 2014, Reback received an email on behalf of Ms. Reyter at Warner Bros. stating that Warner Bros. "have decided not to pursue a consulting arrangement at this point in time" with Incarcerated. A true and correct copy of the forwarding email as well as the underlying letter is attached as **Exhibit D**.

36.     Between March 2011 and early July 2014, Warner Bros. made no effort to contact Reback or Incarcerated either directly or indirectly, and made no effort to contact Diveroli while in prison (nor made any attempt to schedule a prison interview) to investigate or verify the accuracy of the film it was creating.

### Guy Lawson, Packouz, and Warner Bros.' Access to the Truth

37.     While Warner Bros. was writing, filming and editing *War Dogs*, Diveroli made himself available to provide a true and accurate account of his story.

38.     Warner Bros. also had other resources available to obtain truthful information about Diveroli's and AEY's rise-and-fall.

39.     While promoting *War Dogs*, Warner Bros. even touted its access to individuals who knew Diveroli's true story.  In fact, as described below, Warner Bros. bombarded the public with its professed intention to tell the "true story."

40.     During the five-month period spanning September 2014 and March 2015, Phillips (along with the assistance of Jason Smilovic and Stephen Chin) prepared a re-write of the *War Dogs* script.

41.     During that time, Lawson, who is credited as a producer of the movie and was working with and as an agent of Warner Bros., had access to the January 2012 Manuscript.

42.     Lawson also had engaged in substantial research and investigative journalism to expand his *Rolling Stone* article into a book titled *Arms and the Dudes.*

43.     Warner Bros. also retained Packouz to act as a consultant on the movie.

44.     Warner Bros. later emphasized the "truth" of *War Dogs* to the public by highlighting the retention of Packouz as a consultant and Lawson as a producer—two people the public equates to knowing Diveroli's true story.

45.     In their capacity as agents of Warner Bros., both Lawson and Packouz had actual knowledge that *War Dogs* is not a "true story."

46.     Thus, even though Warner Bros. purposefully avoided obtaining the truth from Diveroli, Warner Bros. still had access to a substantial amount of material to tell an accurate story.   Certainly, Warner Bros. had knowledge of sufficient information to realize that its portrayal of Diveroli in *War Dogs* was not true or the real story.

47.     Nevertheless, throughout filming, Warner Bros. still did not ask to speak with or interview Diveroli to verify the accuracy of Jonah Hill's portrayal of Diveroli or the story itself.

48.     Despite having multiple avenues available to have portrayed an actual "true" story, Warner Bros. decided to make a fictional movie which it then marketed and promoted as "true" in order to make more money.

**The False Advertising of *War Dogs***

49.     On June 9, 2015, Simon & Schuster, a division of CBS Corporation, published *Arms and the Dudes.* This book would later become yet another marketing tool for Warner Bros. to proclaim the truth of its story by linking the movie to a piece of investigative journalism.

50.     Beginning in March 2016, Warner Bros. engaged in a media blitz to promote *War Dogs* as a "true story." As part of their contractually obligated marketing for the movie, Phillips, Jonah Hill, Miles Teller, and Bradley Cooper appeared on dozens of television and radio shows and gave numerous interviews to the press.

51.     On March 24, 2016, Warner Bros. launched the movie trailer for *War Dogs* at http://devour.com/video/war-dogs-trailer/ as well as on YouTube at https://www.youtube.com more /watch?v=Rwh9c_E3dJk. Since its release on YouTube, the trailer has been viewed over 8 million times. Another *War Dogs* trailer, found at https://www.youtube.com/watch?v=KWs5qnZnhfo, has been viewed more than 5.5 million times.

52.     The same day the first trailer was released, Warner Bros. also launched its Facebook page at https://www.facebook.com/WarDogsMovie/?fref=ts. To date, the Facebook page has nearly 200,000 followers. On or about March 28, 2016, Warner Bros. also launched the movie's website.

53.    In addition to representing to consumers that *War Dogs* is true, the trailers feature Diveroli's real name:



54.    In various advertising and marketing of *War Dogs* - including in a March 25, 2016 Rolling Stone article – Warner Bros. also used actual pictures of Diveroli to promote its film:

*Rolling Stone* MUSIC POLITICS TV MOVIES CULTURE SPORTS REVIEWS

Todd Phillips' *War Dogs* follows two 20-something Miami Beach stoners (Jonah Hill and Miles Teller) who land a $300 million deal with the U.S. government to arm the Afghan military during the Iraq War. The plot sounds implausible, but is based on a true story documented by Guy Lawson in a 2011 *Rolling Stone* profile (and his subsequent 2015 book *Arms and the Dudes*). The film's hilarious trailer outlines the basic plot, hinting at the decadence and danger awaiting the unlikely businessmen.

**SIDEBAR**



The Stoner Arms Dealers: How Two American Kids Became Big-Time Weapons Traders »

The clip opens with Hill and Teller securing their massive bid at the Pentagon in February 2007 before cutting to the partners relishing their lavish lifestyle and cruising around in fancy cars. "They call guys like us war dogs: bottom-feeders who make money off of war without ever stepping foot on the battlefield," says a voiceover. "It was meant to be derogatory, but we kind of liked it."

55.     On March 29, 2016, Lawson, while acting as an agent of Warner Bros.,

announced that the *War Dogs* movie is inspired by his *Arms and the Dudes* book:



56.     Throughout its extensive advertising and marketing efforts, Warner Bros., as a

feature of their promotion of *War Dogs*, lifted the term "An American Dream" from the *Once a*

*Gun Runner* book and Incarcerated's related promotional materials; which is illustrated by the

movie poster for the film:



57. Far from limiting its promotion of *War Dogs* as being a dramatized version of reality and merely "based" on a true story, Warner Bros. continuously promoted, and continues to promote, the movie as ***the*** true story about real-life events and real people.

58. Nearly all of the marketing materials and interviews about the movie emphasize the fact that this story actually happened, underscoring Warner Bros.' chief marketing mantra— Go see *War Dogs* because it's a true story.

59. On multiple occasions, Miles Teller (who plays the role of Packouz) told interviewers that "*these are real people*," and that Packouz and Diveroli are "*real guys who are still alive.*"

60. On May 12, 2016, Lawson described *War Dogs* as "*amazingly close to the real truth of the story.*"



61.     Adding further confusion, Lawson changed the name of *Arms and the Dudes* to *War Dogs* in June, 2016, changed the cover of the book to the *War Dogs* poster and proclaimed that his book told "the true story." The *War Dogs* book, in capitalizing on the overall promotion of the movie, has become an Amazon.com best seller:



62.    In August, 2016, *War Dogs* screenwriter Stephen Chin added to Warner Bros.

misleading promotion of the film:

I think more than many studio writers, I'm very interested in finding the ***real story***. You talked about the journalistic thing. *When you come to something that's a **true story**. First of all, you have that responsibility*. I was motivated to do this in large measure because *I saw these guys, Efraim and David, as a real way to tell an accessible story* — as a way into the story about the war, about the economics of war, about the gigantic military industrial business that rose up around the war. *So I wanted to be **deeply true to their story***. I was also very interested in the procedural. *I thought audiences would also be really interested*. How does somebody who's a 19-year-old kid, not just work the internet and get the contract, how does he actually pull it off? (Emphasis added).

63.    Packouz even described the movie as being "exactly how it happened:"



64. On September 1, 2016, Warner Bros. used its own social media to entice the public to go see *War Dogs* by inviting them to "meet the history of Efraim Diveroli and David Packouz:"



65. As recently as September 8, 2016, Phillips promoted *War Dogs* by stating that "*truth is stranger than fiction*," and "*it was really the reality, the idea that it was a true story that appealed to me*," and "*we certainly tried to follow what happened as closely as possible I think. If you know the story at all, we pretty much stick to the facts as much as we can*."

66. Phillips further emphasized the truth of the movie during his promotional tour by stating:

Well you know it's based on a true story so it's a little bit about making sure you're servicing this story, and it's one of those things where truth is truly stranger than fiction. And so we got this article, this Rolling Stone article like Bradley was saying and *it was about doing service to this really intense, wild story*. And some of its comedy…some of its drama… but *it's really about playing to the truth of it.* (Emphasis added).

67. Jonah Hill, during his promotion of the film, removed any doubt as to Warner Bros.' decision to market *War Dogs* as a completely true portrayal by describing the film as "*just a story that's so crazy you can't believe it actually happened*" and "one of the craziest movies I've ever been in – in a great way. ***And it's all true.***" (Emphasis added).

68. Warner Bros. placed a substantial importance on representing *War Dogs* as a true story to the public because it knew that such representations induce consumers to go see movies. In fact, Phillips even stated that "the idea that this was a true story was for me *the most interesting part about it*."

69. Similarly, Miles Teller recognized that: "I love the words 'based on a true story' at the beginning of a film…it buys you so much with an audience."

70. In another interview, Phillips relayed the results of test screening the movie, which involve surveying real consumers about their opinions about the film, by stating: "I think one of the things that really attracts people to it when we test screen the movie, what did you like about the movie, I think one of the main things is that it was based on a real story."

71. Stated simply, Warner Bros. knew it would make more money by marketing *War Dogs* as a true story instead of the work of fiction that it actually is.

### ***War Dogs* Impedes Incarcerated's Ability to Compete**

72. Prior to releasing the film, Warner Bros. saturated the market with statements that *War Dogs* told the "true story" of Diveroli which, combined with the celebrity of Jonah Hill,

Bradley Cooper and Todd Phillips, and Warner Bros.' resources, enabled it to essentially shut Incarcerated out of the competitive marketplace.

73.     Several Hollywood based groups who had expressed interest in the February 2014 Manuscript declined to move forward due to the Warner Bros. launch of *War Dogs*.

74.     A Google® search of "true story of War Dogs" results in the official Warner Bros. trailer and numerous links to articles about the "crazy" and "unimaginable" true story supposedly told by the movie.

75.     Accordingly, consumers who desire to learn the true story are most likely to purchase a ticket to the movie, after being bombarded with promotional material, rather than purchasing Diveroli's memoir.

76.     *War Dogs* opened in theaters in the United States on August 19, 2016.

77.     Any reasonable consumer would believe based on the Warner Defendants' marketing that *War Dogs* intended to and did depict the real-life Diveroli, and not a fictional character engaged in made-up behavior.

78.     In reality, the movie centers upon a false portrayal of Diveroli and includes scenes depicting events that never occurred.

79.     Warner Bros.' promotion of its retention of Packouz, his cameo appearance in the movie, and its commission of the *Rolling Stone* article, combined with the use of Packouz's and Diveroli's real names in the movie and the re-naming of the *War Dogs* book, create the false implication that Warner Bros. is privy to facts about Diveroli's real-life story that are unknown to the general public and create the impression that Warner Bros. checked its sources to ensure the truth of the movie.

80.    This is particularly true with regard to the *War Dogs* scene during which Diveroli tears up a written agreement to avoid paying Packouz for services performed. A reasonable viewer would believe, given Packouz's involvement with the film and the Warner Defendants' trumpeting of the "true story," that Diveroli and Packouz actually had a written agreement and that Diveroli is an unethical business-person who cheats his partners out of their hard-earned pay.[1]

81.    Warner Bros. knew this scene was false. Even the *Rolling Stone* article on which the movie is supposedly based clearly states that Diveroli and Packouz did not have a written contract.

82.    Similarly, *War Dogs* includes a prominent scene in which Diveroli refuses to pay an Albanian businessperson AEY hired to repackage ammunition. Again, Warner Bros. knew this scene was false. The *Rolling Stone* article describes how the Albanian mafia cut this man out of the deal—not Diveroli.

*83.*    *War Dogs* also includes scenes, featured in the trailers, in which Diveroli engages in exceedingly reckless and deadly behavior. In *War Dogs*, Diveroli fires a machine gun in public and later drives himself and others through the "Triangle of Death" to deliver a load of guns, while being fired upon by two truckloads of combatants. Warner Bros. knew that these scenes were false and never occurred; the latter being admittedly based on an incident supposedly experienced by one of the screenwriters, rather than by Diveroli.

84.    Warner Bros. also placed Packouz in integral roles involving false implications, thereby creating the impression that the scenes enjoyed the *imprimatur* of Packouz.

---

[1] Despite War Dogs' characterization of Diveroli and Packouz as partners, Packouz was neither a partner nor an employee of AEY.

85. Packouz, as Warner Bros.' agent, perpetuated the false and misleading perception that Warner Bros. hired him to ensure the truth of the movie by appearing on numerous media outlets to promote the movie and emphasize the truth of the story. Packouz even stated that he was "actually very pleasantly surprised by how accurate the overall arc of the story and many of the small details were."

86. Similarly, Lawson knew that the movie, including the depiction of Diveroli, is false. At a minimum, Lawson's actual knowledge, which must be imputed to Warner Bros. given his role as a producer, gave rise to an obvious need for Warner Bros. to investigate and verify the truthfulness of the movie that Warner Bros. was telling the public was "true."

87. Ultimately, Warner Bros. knew or should have known, directly or through its agents, that *War Dogs* is not a true depiction of Diveroli's story, contrary to what its advertising, marketing and promotion of the film led the public to believe.

88. Incarcerated has retained counsel to pursue its claims and is obligated to pay a reasonable fee for their services.

89. All conditions precedent to the filing of this Amended Complaint have been satisfied, have occurred, or have been waived.

## COUNT I: VIOLATION OF SECTION 43(a) of the LANHAM ACT
### (Injunctive Relief)

90. Incarcerated realleges paragraphs 1 through 89.

91. Warner Bros., in connection with the marketing and sale of *War Dogs*, has made and continues to make false and/or misleading representations of fact in commercial advertising used in interstate commerce.

92. Warner Bros.' representations described above are false and misleading, and deceive or are likely to deceive consumers.

93.     Warner Bros.' conduct constitutes false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B).

94.     Warner Bros.' representations have caused and are likely to continue causing Incarcerated competitive or commercial injury.

95.     Incarcerated will be irreparably harmed if Warner Bros. is not enjoined from advertising or promoting *War Dogs* as Diveroli's true story.

96.     Incarcerated does not have an adequate remedy at law.

97.     Incarcerated is substantially likely to succeed on the merits of its claims.

98.     Entry of an injunction will serve the public interest and prevent further deception.

WHEREFORE, Plaintiff, Incarcerated Entertainment, LLC, respectfully requests that the Court enter an Order:

(a)     permanently enjoining Warner Bros. and all those acting in concert with Warner Bros., including its officers, servants, employees, attorneys, affiliates, subsidiaries, agents or representatives, from advertising or promoting *War Dogs* as a "true story;"

(b)     requiring Warner Bros. to take corrective action to disabuse the public of the false notion that *War Dogs* is a true story; and

(c)     awarding such further relief the Court deems just and proper.

### COUNT II:  VIOLATION OF FLORIDA'S
### <u>DECEPTIVE AND UNFAIR TRADE PRACTICES ACT</u>
### (Injunctive Relief)

99.     Incarcerated realleges paragraphs 1 through 89.

100.    Incarcerated is an Interested Party as defined in Fla. Stat. § 501.203(6).

101.    Warner Bros. is engaged in "Trade" or "Commerce" as defined in Section 501.203(8), Florida Statutes.

102.     Warner Bros.' conduct described above is deceptive and unfair and likely to mislead consumers.

103.     Section 501.203(8), Florida Statutes permits injunctive relief against a party who has violated, is violating, or is otherwise likely to violate Chapter 501, Florida Statutes.

104.     Incarcerated will be irreparably harmed if Warner Bros. is not enjoined from advertising or promoting *War Dogs* as Diveroli's true story.

105.     Incarcerated does not have an adequate remedy at law.

106.     Incarcerated is substantially likely to succeed on the merits of its claims.

107.     Entry of an injunction will serve the public interest and prevent further deception.

WHEREFORE, Plaintiff, Incarcerated Entertainment, LLC, respectfully requests that the Court enter an Order awarding Incarcerated its attorneys' fees and permanently enjoining Warner Bros. and all those acting in concert with Warner Bros., or as its officers, servants, employees, attorneys, affiliates, subsidiaries, agents or representatives from:

(a)     advertising or promoting *War Dogs* as a "true story;" and

(b)     for such further relief the Court deems just and proper.

### COUNT III:  VIOLATION OF SECTION 43(a) of the LANHAM ACT
**(Damages)**

108.     Incarcerated realleges paragraphs 1 through 89.

109.     Incarcerated and Warner Bros. are competitors for purposes of marketing Diveroli's story.   Incarcerated tells the true story in *Once a Gunrunner,* while Warner Bros. purports to tell the true story in *War Dogs*.

110.     Warner Bros., in connection with the marketing and sale of *War Dogs*, has made and continues to make false and/or misleading representations of fact in commercial advertising used in interstate commerce.

111.     Warner Bros.' representations deceive or are likely to deceive consumers.

112.     Warner Bros.' conduct constitutes false advertising in violation of Section 43(a)(1)(B) of the Lanham Act, codified at 15 U.S.C. § 1125(a)(1)(B).

113.     Warner Bros.' representations have caused and are likely to continue causing Incarcerated competitive or commercial injury, including, but not limited to, loss of goodwill and loss of sales.

WHEREFORE, Plaintiff, Incarcerated Entertainment, LLC, demands judgment against Warner Bros. for damages, special damages including lost profits, treble damages, recovery of Warner Bros.' profits, interest, costs, attorneys' fees pursuant to 15 U.S.C. § 1117, and for such further relief the Court deems just and proper.

## COUNT IV:  UNFAIR COMPETITION
### (Damages)

114.     Incarcerated realleges paragraphs 1 through 89.

115.     Incarcerated and Warner Bros. are competitors for purposes of marketing Diveroli's story—they compete for a common pool of customers.  Incarcerated tells the true story in *Once a Gunrunner,* while Warner Bros. purports to tell the true story in *War Dogs*.

116.     Warner Bros.' conduct, as set forth above, is used in commercial advertising or promotion of false and/or misleading representations of fact.

117.     These false and/or misleading descriptions of fact actually deceived or tended to deceive a substantial number of consumers and were material to consumers' purchasing decisions.  In addition, these false and/or misleading representations of fact continue to actually deceive or tend to deceive a substantial number of consumers and continue to be material to consumers' purchasing decisions.

118.    Warner Bros.' acts of false advertising were intended to cause and did in fact cause deception of the public, misleading prospective purchasers as to the truth of the story presented in *War Dogs*.

119.    As a result of Warner Bros.' false advertising and unfair competition, Incarcerated has suffered damages, including, but not limited to, loss of goodwill and loss of sales.

WHEREFORE, Plaintiff, Incarcerated Entertainment, LLC, demands judgment against Warner Bros. for damages, special damages including lost profits, recovery of Warner Bros.' profits, interest, costs, attorneys' fees pursuant to applicable law, and for such further relief the Court deems just and proper.

Respectfully submitted,

*/s/ Brad F. Barrios*
Kenneth G. Turkel, Esq.,
**Trial Counsel**
Florida Bar No. 867233
kturkel@bajocuva.com
Shane B. Vogt, Esq.
Florida Bar No. 257620
svogt@bajocuva.com
Brad F. Barrios, Esq.
Florida Bar No. 0035293
bbarrios@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Phone:  (813) 443-2199
Fax:  (813) 443-2193

Richard E. Fee, Esq.
Florida Bar No. 813680
FEE & JEFFRIES, P.A.
1227 N. Franklin Street
Tampa, Florida 33602
(813) 229-8008 - Telephone
(813) 229-0046 - Facsimile
rfee@feejeffries.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on November 3, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system.

*/s/ Brad F. Barrios*
Attorney
