UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA,
TAMPA DIVISION

| | |
|---|---|
| INCARCERATED ENTERTAINMENT, LLC, | |
| Plaintiff, | Case No.: 8:16-cv-1302-T-35UA (ICG) |
| v. | DISPOSITIVE MOTION |
| WARNER BROS. PICTURES, a Division of WB STUDIOS ENTERPRISES INC., | |
| Defendants. | |

**WARNER BROS. PICTURES' MOTION TO DISMISS PLAINTIFF'S FIRST
AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW**

Defendant Warner Bros. Pictures ("Warner") respectfully moves for entry of an order

dismissing Incarcerated Entertainment, LLC's ("IE") First Amended Complaint, *see* Dkt. No.78

("FAC"), because it fails to state a claim, *see* FED. R. CIV. P. 12(b)(6).  The FAC should be

dismissed with prejudice because this is the second time that IE has failed to state a claim, *see*

Dkt. No. 40, and because further amendment would be futile, especially in light of the First

Amendment infirmities in IE's claims.

Warner also seeks its fees and costs in defending this suit pursuant to Florida's anti-

SLAPP statute.  *See* FLA. STAT. ANN. § 768.295.  Florida amended the statute in 2015 to make it

"easier and cheaper" for moviemaker defendants like Warner to dismiss lawsuits of this sort at

an "early stage[]" and to recover their litigation expenses.  Samuel Morley, *Florida's Expanded

Anti-SLAPP Law: More Protection for Targeted Speakers*, 90 FLA. B.J. 17-18 (Nov. 2016).

Warner's expenses in this case are substantial given the scope and changing nature of IE's case.

This Motion is based on the following Memorandum of Law and Declaration of Dimitri

Portnoi, Notice of Filing, and Request that Court Consider Sources all filed herewith.

## I.      Introduction

The movie *War Dogs* dramatizes a true story—condemned by Congress and recounted in various news sources—of how several young men secured a $300 million contract to supply arms in aid of a U.S. war, only to be convicted of fraud.  While darkly comedic and told from the perspective of one of the young men (David Packouz), the movie tackles many important issues of the day: including greed, war profiteering, and contemporary U.S. foreign policy.

Motion pictures generally, and especially those that dramatize front-page news events, are shielded by the First Amendment and Florida's anti-SLAPP laws.  No one owns the historical facts recounted in such movies, and moviemakers have broad artistic license to dramatize stories "based on" true events—in order to reach audiences, to tell a compelling story, and to convey a message.  Dkt. No. 40 at 1, 9-10, 16-19.  These freedoms of speech extend to advertisements for movies, and the First Amendment bars causes of action challenging such speech.  *Id*.

Efraim Diveroli (through his company, IE) has now filed a second complaint seeking to hold Warner liable for creating and promoting *War Dogs*.  Initially, IE alleged that Warner conspired to steal Diveroli's true-crime story and misappropriated his personality rights to promote the film.  Warner moved to dismiss the complaint, showing that no story theft occurred and that all of IE's claims were barred by Eleventh Circuit and Florida law.  *Id.*

Rather than oppose the motion, IE hired new counsel and withdrew its complaint.  IE's latest complaint drops six defendants and all of its prior claims, but it is still without merit.  The FAC's gravamen is that in marketing *War Dogs*, Warner sold the film as "the 'true story' of [] Efraim Diveroli" and as the "unadulterated truth."  FAC ¶¶ 1, 2.  IE contends that such alleged promotions were misleading and hurt its ability to sell Diveroli's memoir to other buyers.

IE's claims cannot survive a motion to dismiss.  To begin, IE's complaint attacks free speech, including artists talking about their creative process.  Such speech may not be regulated.

Even if such speech could be challenged (and it cannot), IE's conclusory claims about what Warner said are contradicted by the sources that IE incorporated by reference in the FAC. As examples, *War Dogs*' trailers explicitly state that the movie is "Based On A True Story." This tagline makes plain that parts of the movie are fiction (*not* the "unadulterated truth"), as does a prominent disclaimer in the film.  In promoting the movie, the creators of *War Dogs* also said that parts of it were fictional.  IE only selectively quotes from these statements in the FAC, but established law requires that the Court consider the *full* interviews in ruling on this motion.[1]

IE cannot plead other key elements of its claims as well—including that any consumer saw the ads at issue, relied upon them, was deceived, or thus chose not to buy Diveroli's book. Nor can IE plead causation.  To the contrary, IE admits that the *2016* ad campaign it challenges occurred *after* potential Hollywood buyers declined to purchase Diveroli's story in 2014.

In short, while Diveroli might dislike *War Dogs*, wish he controlled its contents, or wish he was paid to make it, that does not give rise to a Lanham Act or Florida state law claim.  To the contrary, IE's latest SLAPP complaint, which chills speech, should be dismissed with prejudice.

## II.     Factual and Procedural Background

For purposes of this motion, Warner assumes the well-pleaded facts in IE's complaint are true, *see Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1057 (11th Cir. 2007), but does not accept "unwarranted deductions of fact or legal conclusions," or facts refuted by the sources cited in IE's complaint, *Moseley v. Carnival Corp.*, 593 F. App'x 890, 892 (11th Cir. 2014). Because this is now a false advertising case, the Court "must" be especially careful to review the alleged false statements at issue in "full context"—as to do otherwise would be akin to trying to

---

[1] *See infra* 2-3, 10-11.  In a Request filed herewith ("RJN"), Warner furnishes the Court with underlying copies of the statements that IE challenges.  As noted in the Request, the Court may also take notice of records like the court order affirming Diveroli's conviction, news sources relevant to the First Amendment analysis, and the DVD copy of *War Dogs* and Diveroli's memoir.  *E.g.*, *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 & n.4 (11th Cir. 2015).

judge a "face" based on the "eyes, nose, [or] mouth separately and in isolation." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1248 (11th Cir. 2002).

**A.    The Afghan Arms Deal and Efraim Diveroli's Criminal Prosecution**

In 2006, the United States sought to arm Afghan security forces to help fight the Taliban. The United States opened for bid a contract to supply these munitions, and in 2007, it awarded AEY, Inc. ("AEY") a $298 million supply contract. Diveroli, a Miami man in his early twenties, ran AEY with help from several colleagues, including David Packouz. FAC ¶¶ 12, 14, 15. While attempting to fulfill the Afghan contract (which required sourcing millions of rounds of AK-47 ammunition), AEY bought embargoed Chinese-made ammunition from Eastern Europe, and AEY, Diveroli, and Packouz conspired to defraud the United States about the origin of the rounds. *See id.* ¶¶ 14-16; RJN Ex. B (*Diveroli v. U.S.*, 803 F.3d 1258, 1261 (11th Cir. 2015)).

The *New York Times* ran a front-page story in 2008 concerning AEY's Afghan deal. RJN Ex. C. In the story's wake, the United States suspended AEY's contract, and it indicted Diveroli, Packouz, and others on 80 counts of criminal fraud. *See* FAC ¶ 16; *Diveroli*, 803 F.3d at 1261. A congressional committee condemned the episode "as a case study in what is wrong with the procurement process." RJN Ex. D at 1. It pointedly asked: "Why did [our] government award a military contract worth $300 million to a company run by an inexperienced 21-year-old?" *Id.*

Diveroli pled guilty to conspiracy. RJN Exs. E-H. In 2011, Judge Lenard sentenced him to four years in prison, FAC ¶¶ 17, 18, finding: "Diveroli and others lied to obtain the contract -- they lied about their prior experience. They lied about their references. They lied about AEY." RJN Ex. I at 52:2-54:22. The media widely covered Diveroli's downfall. *E.g.*, Dkt. No. 40 at 4.

**B.    The 2011 *Rolling Stone* Article and Motion Picture Contract**

While Diveroli was in prison, journalist Guy Lawson published an article in *Rolling Stone* about Packouz and Diveroli. FAC ¶ 21; RJN Ex. N (*The Stoner Arms Dealers: How Two*

*American Kids Became Big-Time Weapons Traders*, ROLLING STONE (2011)).  The feature is told largely from Packouz's perspective and quotes him extensively.  *See id.*  Shortly after the *Rolling Stone* article appeared, Warner secured rights from Lawson to make a motion picture based on his article.  FAC ¶¶ 23-24.  Numerous media outlets reported this deal in July 2011, *e.g.*, Dkt. No. 1 ("Compl.") ¶¶ 39-40, and noted that Todd Phillips was set "to produce and possibly direct *Arms and Dudes*, an adaption of a *Rolling Stone* article," *id.* Ex. 17 at 25.

### C.       Diveroli's Effort to Profit from His Story and Partnership with Ross Reback

In November 2013, Diveroli and Ross Reback formed IE "for the purpose of monetizing Diveroli's story."  *Id.* ¶ 28.  In mid-2014—*after* Phillips had completed a script for *War Dogs*, Dkt. No. 40 at 7; Compl. Ex. 26 at 59—Reback contacted Warner and other "Hollywood based groups," trying to sell Diveroli's story, and Warner declined.  FAC ¶¶ 31-34, 73 & Exs. A-D.

IE fails to identify any specific producer that "expressed interest" in Diveroli's project.  *Cf.* FAC ¶ 73.  And while IE generically alleges that it tried to sell the project in 2014 and failed, *id.* ¶¶ 31-35 & Exs. A-D, the alleged false promotions it challenges began in *2016*, *see* FAC ¶¶ 31-35—years *after* IE's alleged Hollywood marketing efforts failed.

### D.       The Initial Promotions of *War Dogs*, This Lawsuit, and Diveroli's Memoir

Warner began promoting *War Dogs* in 2016.  The movie's trailers, Facebook page, and website all said that the movie was "Based On A True Story."  FAC ¶¶ 51-53.  As this marketing campaign began—and three months before *War Dogs* premiered on August 19, 2016—IE filed this lawsuit.  *See* Dkt. No. 1.  In the suit, IE proclaimed that Diveroli had nothing to do with the *War Dogs* movie.  Compl. ¶ 101.

Days after filing suit, IE published Diveroli's memoir, *Once a Gun Runner ... The Real Story*.  FAC ¶¶ 5, 109, 115.  The first-person memoir recounts his life story—his childhood in Miami, his intimate family relationships, his time in Los Angeles learning the arms trade, his

4

relationship with his longtime girlfriend, his work as an arms dealer, and eventually his arrest, conviction, and early days in prison.  *See* Dkt. No. 84 ("*Gun Runner*").  The book contains exhaustive confessions about the copious amounts of illegal drugs that Diveroli consumed, lies he told and documents he forged to secure business, how he impersonated and bribed U.S. and foreign officials, how he did business while "stoned, drunk, coked up," and his many disputes with associates.  *See* Portnoi Decl. Ex. A (collecting verbatim excerpts from *Gun Runner*).

In the book, Diveroli describes himself as a "monster," *Gun Runner* at 222, recounts how his family called him worse, *id*. at 245, 216, and explains how his arms dealing fueled an "ever-increasing desire for more -- more excitement, more alcohol, more drugs, more money." *Id.* at 111.  Diveroli admits violently attacking, with paintball guns at close range, a security guard who had annoyed him, *id*. at 19-20, and he talks about how he and Packouz cut ties and fought over money:  "'You better pay me, bro!' yelled Packouz….. 'Fuck you!' I replied.  'I was about to give you more money then you've ever seen in your life and then you got us all fucked up…. You ain't gettin' shit!'  Packouz is still waiting for that check." *Id.* at 223.

Despite claiming lost book sales, IE offers no book sales data for *Gun Runner*, and fails to cite any consumers who declined to buy the book because of promotions they saw for *War Dogs*.  Nor does IE explain how its self-published book even competed with the movie.

### E.     *War Dogs* **and Its Release**

*War Dogs* was released in theaters in August 2016—months after this lawsuit was filed and Diveroli's memoir was published.  Before *War Dogs*' release, the director, screenwriters, and principal actors granted press interviews.  FAC ¶¶ 59, 62, 65-70.  In the interviews—from only a few of which IE selectively quotes, *e.g.*, *id*. ¶ 65—director Todd Phillips explained that, while "it was the true story [of *War Dogs*] that appealed to him" and he "tried to follow what happened as closely as possible," "we weren't making a documentary," and parts of the movie

"didn't happen." https://www.youtube.com/watch?v=kRnhlO7g1YE. As Phillips also explained, the movie was written and told through Packouz's perspective, so "we're watching the movie through [David's] eyes" and it "reflects [his] interpretation" of the story. *Id.*

Neither Warner nor the *War Dogs* cast ever stated that Diveroli or IE endorsed the movie or attested to its "unadulterated truth." FAC ¶ 2. To the contrary, the actor who played Diveroli told interviewers that he never spoke to Diveroli. Compl. ¶ 102. And screenwriter Stephen Chin explained that he added plotlines from his own life to create an entertaining film. RJN Ex. O.

Packouz and Lawson served as consultants for the movie and mentioned it on their Facebook pages. FAC ¶¶ 55, 60, 63. IE pleads no specifics to sustain a claim that the postings were authorized by Warner or influenced any consumer's behavior. Indeed, one of the cited Lawson postings promoted a *book* that *he* published in 2015, *not* Warner's movie. *Id.* ¶ 55.

*War Dogs* itself is a dark, comedic look, told through Packouz's eyes, at how Packouz—down on his luck in business, and recently having gotten his girlfriend pregnant—is lured into the arms business by his childhood friend Diveroli. The movie depicts how they achieve initial success, but ultimately part ways over business disputes and are convicted of crimes. The movie begins by saying it is merely "Based On A True Story," and ends with the prominent disclaimer:

> This film is based on actual historical events contained in 'Arms and the Dudes,' a *Rolling Stone* article by Guy Lawson. For purposes of dramatization, dialogue and certain characters were created or composited, and a number of events, scenes, and time sequences were fictionalized.

Dkt. No. 88 ("DVD") at 00:45, 01:51; *see also Tyne v. Time Warner Entm't Co.*, 336 F.3d 1286, 1288-89 (11th Cir. 2003) (similar disclaimer approvingly cited). Unlike *Once a Gun Runner*, the movie does *not* track Diveroli's life or delve into his family. Rather, like the trailer cited by IE,

*see* FAC ¶ 51 (https://www.youtube.com/watch?v=KWs5qnZnhfo), the movie follows Packouz's

story and offers broad commentary about "Dick Cheney's America" during wartime.

> ### F.      The FAC

In its new complaint, IE no longer asserts that Warner stole Diveroli's story and it does

not challenge that the movie is *based on* true events.  Rather, IE asserts that *War Dogs* is not

"true" in every respect, FAC ¶¶ 80-83, and it objects to a few sequences in the movie.  IE

disputes a scene in which Diveroli tears up his contract with Packouz, a scene in which Diveroli

shoots a gun in public, and the sequence in which Diveroli and Packouz brave the "triangle of

death" to deliver arms to the U.S. Army.  *Id.*  IE, of course, neglects to disclose that two of these

"fictionalized" scenes finds a basis in actual events.  According to public court records, Packouz

and others filed suit against Diveroli for not honoring his contracts.  RJN Exs. J-K.  Moreover,

Diveroli admitted, in his book, to lying to business associates, doctoring documents to deceive

them, and engaging in acts of physical violence involving guns in public.  *Gun Runner* at 19-20,

124, 189; Portnoi Decl. Ex. A.  As for the third scene, *War Dogs* writer Stephen Chin disclosed

in public interviews that he fictionalized the "triangle of death" scenes.  *Infra* at 15-16.

In the FAC, IE asserts four causes of action under the Lanham Act and Florida law for

false advertising.  Each claim pivots on the premise that Warner marketed *War Dogs* as the

"unadulterated truth."  FAC ¶ 2.  As shown below, this straw-man attack on something that

Warner *never* said has no merit, and the FAC should be dismissed with prejudice.

## III.     The FAC Should Be Dismissed with Prejudice Because IE Cannot State a Claim.

Three pleading requirements govern this Rule 12 motion.  *First*, "only a complaint that

states a plausible claim for relief survives a motion to dismiss."  *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009).  Conclusory or speculative allegations do not suffice, *see id.*, and allegations need

not be assumed true if there are "obvious alternative explanation[s] [for plaintiff's harm], which

suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010).

*Second*, if a Lanham Act claim is "grounded in fraud," Rule 9(b)'s heightened pleading requirements apply. *EcoDisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1085 (C.D. Cal. 2010). While Warner has identified no decision of this District on the question, the majority of courts apply Rule 9(b) to claims filed under Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), which has the same elements in this case.[2]

*Third*, Florida enacted its "anti-SLAPP statute" to grant procedural protections to creators and distributors of First Amendment works—explicitly including "movies." FLA. STAT. ANN. § 768.295(2)(a). Florida prioritizes the "expeditious resolution" of legal claims challenging such works and entitles defendants to their fees and costs if they prevail in fending off such suits. *Id.* § 768.295(4). Movies enjoy broad First Amendment protection, whether purely fictional or based on real-life events. *See, e.g.*, *Tyne v. Time Warner Entm't Co.*, 901 So. 2d 802, 810 (Fla. 2005); *Tyne v. Time Warner Entm't Co.*, 204 F. Supp. 2d 1338, 1342 (M.D. Fla. 2002). "Advertising for constitutionally protected expressive media shares the constitutional immunity of the media use itself." 2 J. McCarthy, THE RIGHTS OF PUBLICITY & PRIVACY § 8.69 (2016).

### A.    IE's Claims All Run Afoul of the First Amendment.

Neither the Lanham Act nor Florida law, under which IE asserts claims, may regulate the statements at issue here promoting *War Dogs*. By Congress's design, the Lanham Act regulates *only* "commercial speech," as that term is defined in the First Amendment case law. *See Gordon*

---

[2] *See, e.g.*, *Stires v. Carnival Corp.*, 243 F. Supp. 2d 1313, 1322 (M.D. Fla. 2002) (applying Rule 9(b) test); *Fla. Digital Network, Inc. v. N. Telecom, Inc.*, 2006 WL 2523163, at *5 (M.D. Fla. Aug. 30, 2006) (same); *WrestleReunion, LLC v. Live Nation Television Holdings, Inc.*, 2008 WL 3048859, at *3 (M.D. Fla. Aug. 4, 2008) (same); *Global Tech LED, LLC v. Hilumz Int'l Corp.*, 2016 WL 3059390, at *3 (M.D. Fla. May 31, 2016) (same elements when fraud alleged).

& *Breach Sci. Publ'rs S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1533 (S.D.N.Y. 1994);

*Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012) (adopting the

analysis in *Gordon*); *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1277 (11th

Cir. 2012) (Lanham Act must "be read narrowly to avoid impinging on [protected] speech").[3]

Commercial speech is narrowly construed as speech that "does *no more than* propose a

commercial transaction," or which is "related *solely* to the economic interests of the speaker and

its audience." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 421-22 (1993)

(italics added). When commercial and noncommercial speech are "intertwined," the speech as a

whole must be shielded, as any other rule would create "uncertainty" and chill speech. *Riley v.*

*Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 794-96 (1988); *see Bolger v. Youngs Drug*

*Prods. Corp.*, 463 U.S. 60, 66 (1983) (commercial speech must be "examined carefully to ensure

that speech deserving of greater constitutional protection is not inadvertently suppressed").

When speakers "have purposes beyond the solely commercial"—*e.g.*, a political point of

view they want to express, or "the product they advertise is a constitutionally protected one"—

that speech is *noncommercial* and thus outside the scope of the Lanham Act and any state-law

analogue. *Gordon*, 859 F. Supp. at 1540. IE bears the burden of showing that the statements it

challenges are each solely commercial and "undeserving of full First Amendment protection."

*Id*.

IE cannot make that showing. Each statement it challenges promotes a movie or a *book*

(*i.e.*, constitutionally protected works), excerpts parts of the movie's contents to promote it,

and/or discusses the creative process, artistic vision, political motivation behind the movie's

---

[3] Courts similarly interpret the FDUTPA and Florida's unfair competition law. *See, e.g.*, *Gorran v. Atkins Nutritionals, Inc.*, 279 F. App'x 40, 41 (2d Cir. 2008) (FDUTPA); *Tobinick v. Novella*, 142 F. Supp. 3d 1275, 1283 (S.D. Fla. 2015) (state-law unfair competition).

making.  Such speech cannot be regulated, and if IE objects to the statements challenged in the

FAC, its remedy is to engage in more speech, not to pursue a lawsuit.

> **B.      IE's Claims Also All Fail Because It Has Not Pled and Cannot Plead a Single False or Misleading Statement.**

All four counts in IE's complaint also share the common element that it must allege that

Warner made *a false or misleading statement* in a commercial promotion.[4]  IE cannot meet this

threshold element for each of its claims for two main reasons:  (i) IE's conclusory attacks on

what it perceives Warner to have said are irrelevant—it is Warner's specific statements that

matter; and (ii) when one examines the 18 specific statements that IE targets, none is actionable.

Before delving into the 18 specific statements that IE cites, it must be noted that IE's

claims that Warner "engaged in a media blitz" or had a "chief marketing mantra" to sell *War

Dogs* as Diveroli's "true story," FAC ¶¶ 50, 58, are irrelevant.  Such conclusory allegations do

not meet *Iqbal*'s or Rule 9's specificity tests.  *See supra* at 7-8.

Nor are false-advertising claims judged at some gestalt level of what a plaintiff argues an

advertising campaign conveyed.  Courts "must consider each representation individually, as

opposed to grouping them as an overall advertising campaign."  *Ameritox, Ltd. v. Millennium

Labs., Inc.*, 889 F. Supp. 2d 1304, 1312 (M.D. Fla. 2012); *Johnson*, 299 F.3d at 1248 & n.4

(Eleventh Circuit reversing district court that took gestalt approach).  Moreover, in looking at

---

[4] The elements of IE's Count I require (1) a false or misleading statement; (2) that actually deceived consumers or had the tendency to deceive a substantial portion of the targeted audience; (3) materially deceived or was likely to influence purchasing decisions; (4) where defendant's products traveled in interstate commerce; and (5) the plaintiff has been or is likely to be injured by causally related declining sales or loss of goodwill.  *Ameritox, Ltd. v. Millennium Labs., Inc.*, 2012 WL 33155, at *2 (M.D. Fla. Jan. 6, 2012).  The elements of IE's Count III (Lanham Act - Damages) differ only insofar as it must allege an *actual* injury resulting from *actual* consumer deception.  *See Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989). The elements of IE's Counts II and IV (FDUTPA - Injunctive Relief and Unfair Competition) are the same as their Lanham Act analogues.  *See Suntree*, 693 F.3d at 1345; *infra* at 22-23.

any one specific promotion, courts must study its entire context, not just snippets that plaintiff chose to quote.  *See id.*; *Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1311 (11th Cir. 2010).

As shown below, none of the 18 statements that IE challenges survives these tests:

*1. The* War Dogs *Trailers.*  In the section of the FAC titled "False Advertising"—in which IE complains that Warner engaged in a "media blitz to promote War Dogs as a true story"—IE cites the *War Dogs* trailers, and alleges that in one trailer a nameplate bearing Diveroli's name appears in one shot sitting atop a desk.  FAC ¶¶ 50, 51, 53.

There is nothing actionable in the trailers.  To begin, while a movie trailer helps sell a movie, "it is protected under the First Amendment as it is a part of a protected expressive work." *Esch v. Universal Pictures Co.*, 2010 WL 5600989, at *6 (N.D. Ala. Nov. 2, 2010) (trailer is expressive work that cannot be regulated under state law); *Montgomery v. Montgomery*, 60 S.W.3d 524, 529 (Ky. 2001) (same; music video used to promote album).

Even if one could assert a claim based on the trailers' content (and IE cannot, *see id.*), they are not misleading.  They say the movie is "Based On A True Story," *see* FAC ¶ 51 (links to trailers), and courts have held that such language signifies that a movie is obviously fictionalized in part.  *See, e.g.*, *Tyne*, 901 So. 2d at 810; *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 513 (1991); *Partington v. Bugliosi*, 56 F.3d 1147, 1155 (9th Cir. 1995); *Greenspan v. Random House, Inc.*, 859 F. Supp. 2d 206, 220 (D. Mass. 2012).[5]  IE makes the conclusory claim that the "trailers represent[] to consumers that *War Dogs* is true," FAC ¶ 53, but IE tellingly cannot cite any specific place where the trailers (or Warner) made this unqualified claim.

---

[5] *See also* https://www.google.com/search?q=based+on+true+story+movies&ie=UTF-8&oe=UTF-8&hl=en-us&client=safari; http://www.historyvshollywood.com/ (websites with lists of movies "based on" true stories).

As for the "Efraim Diveroli" nameplate on the desk, *id.*—which appears for a fleeting moment in one trailer—no one owns historical facts like names, and it has long been held that using a real person's name to promote a movie based on his life is not a commercial activity, but rather constitutionally protected speech. *See Tyne*, 204 F. Supp. 2d at 1341; *Tyne*, 425 F.3d at 1364; *Seale v. Gramercy Pictures*, 949 F. Supp. 331, 337 (E.D. Pa. 1996); Dkt. No. 40 at 16-19.

*2 & 3.  The* War Dogs *Facebook Page and Website.*  Other than citing these two media sources and the number of followers that the Facebook page had, *see* FAC ¶ 52, IE challenges no specifics.  Nor can it fairly.  Both the Facebook page and website make plain that *War Dogs* is "Based on a true story," *e.g.*, http://www.wardogsthemovie.com/story/, and there are no representations that the movie is entirely true or endorsed by Diveroli.

*4.  Diveroli's Picture.*  IE pastes a page from a *Rolling Stone* website, which includes pictures of the real Diveroli and Packouz, to suggest Warner used Diveroli's image to promote its movie.  FAC ¶ 54.  Yet IE does not and cannot allege that Warner controls the content of *Rolling Stone*.  The excerpted article also makes plain that the movie is "based on a true story," *id.*—and no more.  And in any event, even had Warner published Diveroli's image, courts have held that "use of a person's … likeness to advertise a … motion picture concerning that individual is not actionable" but rather is protected as free speech.  *Seale*, 949 F. Supp. at 336.

*5.  The* War Dogs *Movie Poster.*  IE complains that the *War Dogs* movie poster lifted the cliché "An American Dream" from Diveroli's book and IE's promotional materials.  FAC ¶ 56.  Not only are movie posters protected speech, *see Whitehurst v. Showtime Networks, Inc.*, 2009 WL 3052663, at *8 (E.D. Tex. Sept. 22, 2009) (packaging of DVD), and are clichés not copyrightable, *see Greenspan*, 859 F. Supp. 2d at 216, but IE concedes it is dropping this claim, given that the tagline appears in Lawson's *Rolling Stone* article, which predated Diveroli's book

publication by *five years*.  RJN Ex. N at 19.  The reference to "An American Dream" is not

actionable, in any event.  "The Lanham Act regulates *only* representations of fact—statements

that are 'capable of being proven false.'"  *Ameritox*, 889 F. Supp. 2d at 1317 (italics added).  It

does not regulate clichés.

 *6-8.  Lawson & Packouz Facebook Posts.*  IE complains that Lawson invited readers in

March 2016 to "[c]heck out the book that inspired the movie."  FAC ¶ 55.  To be actionable,

however, the statement must be "for the purpose of influencing consumers to buy *defendant's*

goods or services."  *Suntree*, 693 F.3d at 1349 (italics added).  Lawson asks readers to buy *his*

*book*, not to see Warner's movie, and thus Warner cannot be held liable based on this post.

Furthermore, Lawson's measured statement that his book "inspired" the movie is not a claim that

the movie is true in all respects—just the opposite.  *E.g.*, *Muzikowski v. Paramount Pictures*

*Corp.*, 477 F.3d 899, 908 (7th Cir. 2007) (district court held phrase "inspired by a true story" is

literally true even if resulting work is not a true account of plaintiff's story).  Finally, other than

making the conclusory assertion that Lawson acted as Warner's "agent" in making this Facebook

post, IE offers no specific facts to support this agency claim, meaning it "fails" under *Iqbal*.

*Azure, LLC v. Figueras Seating U.S.A., Inc.*, 2013 WL 12093811, at *3 (S.D. Fla. July 18, 2013).

 IE's other complaints about Lawson's and Packouz's Facebook posts fail for similar

reasons.  FAC ¶¶ 60, 63.  Both are posts on Lawson's and Packouz's *personal* Facebooks.  To be

actionable, the statements had to be made by Warner, for the purposes of influencing consumers,

and had to be "disseminated sufficiently to the relevant purchasing public."  *Suntree*, 693 F.3d at

1349.  IE pleads no specifics to establish that statements posted on the men's personal Facebooks

were made as Warner's agents, *cf. Azure*, 2013 WL 12093811, at *3, or for the purpose of

advertising to the public generally rather than to communicate with their 1,000 or so Facebook

friends.  Such limited posting does not give rise to a claim, especially when one compares IE's

claim that the official *War Dogs* Facebook page had 200,000 followers and the *War Dogs* trailers

were seen 13.5 million times, FAC ¶¶ 51-52, to images in the FAC showing that Lawson's post

garnered 89 "reactions," and had only 14 comments, *id*. ¶¶ 60, 63; RJN Exs. R, T.

> As for Lawson's stated opinion that the film is "[f]ast, funny, and amazingly close to the

real truth of the story," FAC ¶ 60, "[s]tatements of opinion are generally not actionable,"

*Osmose*, 612 F.3d at 1311, and nor is "puffery," *Intertape Polymer Corp. v. Inspired Techs., Inc.*,

725 F. Supp. 2d 1319, 1333 (M.D. Fla. 2010).  Packouz's 25-word note comparing his life to the

movie's trailer and opinions about how close the movie tracks his story, FAC ¶ 63, is likewise

not actionable.  Packouz also qualifies this boast in a comment on the thread, explaining the

"true" story could be found in the 2015 *book* that Guy Lawson wrote about him, *not* the *War

Dogs* movie.  RJN Ex. T.

> *9.  The Changed Lawson Book Title.*  IE complains that Lawson changed the name of his

book from *Arms and the Dudes* to *War Dogs* in June 2016.  FAC ¶ 61.  Of course, the title of a

book is protected speech, and authors have "significant First Amendment interest in choosing an

appropriate title for his or her work."  *Twin Peaks Prods., Inc. v. Publ'ns Int'l, Ltd.*, 996 F.2d

1366, 1379 (2d Cir. 1993).  Even if IE could hold Warner liable for Lawson's artistic choice (and

it cannot), IE's claim misses the mark.  While IE complains that Lawson sold his *book* as the

"true story" and made reference to Warner's movie in doing so, the book's new cover makes

plain that the story that Lawson recounts merely "Inspired The Movie."  FAC ¶ 61.  Nowhere

does it or Lawson say that the movie is true in all respects.  And as the movie's disclaimer makes

clear, while the movie was "based on" Lawson's *Rolling Stone* article, it "fictionalized … events,

scenes, and time sequences" and "created and composited" dialogue and characters.  *Supra* at 6.

*10.  Argentinian Facebook Post.*  IE cites a September 2016 Facebook post by Warner Bros. Pictures Argentina, which IE translated from Spanish using Facebook's auto-translate tool. *See* FAC ¶ 64 ("Rate this translation").  The translation is nonsensical ("Meet the history of efraim diveroli and David Packouz in #amigosdearmas"), and not actionable as a statement of fact.  In any event, historical facts, including the use of real names quoted above, are fair game when promoting a movie.  *Supra* at 12, 13.  Lastly, the "Lanham Act applies extraterritorially if and only if there is a substantial effect on [U.S.] commerce," *NewMarkets Partners LLC v. Oppenheim*, 638 F. Supp. 2d 394, 406 (S.D.N.Y. 2009), none of which IE properly alleges.

*11-18.  Filmmaker Interviews.*  Lastly, IE excerpts eight statements from the director, writers, and two actors in *War Dogs*—out of hundreds they made—to accuse Warner of falsely advertising *War Dogs*.  Where possible, Warner has provided the Court with the underlying sources from which IE appears to have pulled these statements.  *See* RJN at 2-3 & Exs. O-Q.

None is actionable under the Lanham Act or Florida law.  First, Warner did not author the statements and many were edited by media outlets, which made First Amendment protected judgments about the selection, quantity, and arrangement of the interview segments chosen for inclusion.  These decisions are not attributable to Warner.  The interviews also delve into the creative processes of the director, writers, and actors.  This means that none of the interviews can be regulated by the Lanham Act or Florida law.  Again, the statutes regulate only "commercial speech"—or "expression related *solely to the economic interests* of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980) (italics added); *Riley*, 487 U.S. at 796 (speech that "inextricably intertwine[s]" both noncommercial and commercial elements is "fully protected expression"); *Parks v. LaFace Records*, 329 F.3d 437, 449 (6th Cir. 2003); *Gordon*, 859 F. Supp. at 1540.

None of the creator interviews that IE challenges—either the statements these artists made, or the journalistic judgments that led to their editing—is purely "commercial speech," and thus none can be the subject of a Lanham Act or state-law claim.  *Id*.  That should begin and end the inquiry on these final eight challenged statements, but if the Court wishes to delve into the specifics of each of the eight cited interviews, none is actionable under any theory, in any event:

• IE begins by attacking an interview that Stephen Chin (one of the screenwriters) gave in which he said he was "very interested in finding the real story" when writing *War Dogs* and wanted to be "deeply true" to the story.  FAC ¶ 62.  What IE omits from the FAC is the rest of the interview.  In it, Chin talks openly about how he added stories from his own life—including his trip through the "triangle of death," which Diveroli and Packouz never made—to tell a more compelling story, "about the war[,] the economics of war, [and] the giant military industrial complex."  RJN Ex. O.  Such context is key to any false advertising claim, *supra* at 2-3, 10-11, and IE cannot omit it, in asserting that *War Dogs* was sold as "unadulterated truth," FAC ¶ 2.

• IE quotes Todd Phillips (the director and writer) four times, as saying that "truth is stranger than fiction"; "it was really the reality, the idea that it was a true story that appealed to me"; filmmakers "stick to the facts as much as we can"; and audiences are attracted to the fact that *War Dogs* "was based on a real story."  FAC ¶¶ 65-66, 68, 70.  Again, IE omits from the FAC Phillips' further comments in these interviews.  He said repeatedly that *War Dogs* "is not a documentary," that parts of it "didn't happen," and that, in making the movie, he had to "present information in a particular way—you have to dumb it down or entertainment it up—just to get people to understand."  RJN Ex. Q; https://www.youtube.com/watch?v=kRnhlO7g1YE.  He also said he loves "when you take the seeds of the truth or the seeds of something real and build on it"—making clear the movie is part fiction.  https://www.youtube.com/watch?v=NXX8Ip3khf8.

16

• IE quotes Miles Teller (who played Packouz) twice as saying "these are real people" who "are still alive," and that he "loves the words 'based on a true story.'"  FAC ¶¶ 59, 69.  The former statement is true, and the latter expresses an artistic opinion.  Neither is actionable.

• Jonah Hill (who plays Diveroli) is quoted as describing *War Dogs* as "a story that's so crazy you can't believe it actually happened," and "one of the craziest movies I've ever been in – in a great way.  And it's all true."  FAC ¶ 67.  Statements that a movie is "so crazy" and "one of the craziest" an actor worked in are non-actionable opinion and puffery.  *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993) ("Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language.").  The "it's all true" comment, which follows puffery, appears at the end of a two-paragraph Film Takeout post on Facebook from January 2, 2016—four months before Diveroli released his book, and seven months before the movie was released.  *See* Compl. ¶ 102; RJN Ex. U.  There is no indication that any specific consumer saw the post, and, if anyone did see it, the post also notes that the movie is "Based on" the *Rolling Stone* article, and that Diveroli was not involved in the movie's making.  *Id.*  Unlike commercial speech, which "does no more than propose a commercial transaction," *Bolger*, 463 U.S. at 66, Hill's brief artistic commentary is non-actionable opinion and cannot be so regulated.

### C.    IE's Claims Fail Because It Cannot Meet Several Other Required Elements.

*1.  The 18 Statements Did Not Materially Deceive Consumers.*  To sustain its damages claims (in Count II and IV), IE must plead both the existence of a deception and the fact that the deception had a "material effect" on purchasing decisions.  *Johnson*, 299 F.3d at 1247.  IE does not identify a single consumer who made a purchasing decision, much less in the implausible manner that IE theorizes—*i.e.*, that the consumer was poised to see *War Dogs* or buy *Once a Gun Runner* (even though the two are very different media and were released months apart from each other); that the consumer (based on an unidentified false statement among the 18)

17

mistakenly believed that *War Dogs* was Diveroli's "true" story (even though the cover of

Diveroli's book and Author's Note both say that *his* book, *and not the movie*, are the "Real

Story"); and none of the other obvious innocent factors (*e.g.*, a great writer and director for *War

Dogs*, the cast, or vivid cinematography and an appealing soundtrack) drove the consumer's

buying decision.  Accounting for these specifics is required under *Iqbal*, and pursuant to the

Lanham Act and Florida law, *see supra* at 7-8, 10 & n.4, yet IE fails to plead any of them.

 Indeed, to seek damages, IE "must" establish this materiality element even if Warner's

ads were "literally false."  *Johnson*, 299 F.3d at 1251; *see Swatch S.A. v. New City, Inc.*, 454 F.

Supp. 2d 1245, 1251-52 (S.D. Fla. 2006) ("not all deceptions affect consumer decisions");

5 McCarthy, *supra*, §§ 27:36, 27:42.  Because the Court cannot assume that consumers viewed

"the ad campaign as a whole," *Johnson*, 299 F.3d at 1248, to survive this motion, IE must thus

identify specific statements—*e.g.*, one of the interviews, a Facebook post, or a trailer—and show

how the statement actually deceived specific consumers.  IE does not and cannot plead this.

 IE's injunction claims (Counts I and III) are not only asserted months too late, but to

sustain such claims, IE had to plead enough specifics to show how "reasonable" consumers

would be deceived by Warner's promotions.  *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*,

653 F.3d 241, 253 (3d Cir. 2011).  This theory of materiality is also implausible.  Warner said

the movie was "*Based On* A True Story," and its creators said it was fictionalized in part and

"not a documentary."  *Supra* at 11-12, 16.  In addition, even if such disclaimers had *not* been

made (and they were), courts recognize that reasonable consumers of movies "are aware … that

parts of such programs are more fiction than fact."  *Partington*, 56 F.3d at 1155.  Movies have to

compress time; use actors to play real people; and, unlike documentaries, do not use historical

footage or witness interviews to represent "verifiable fact."  *Id.*  This reasonable understanding

that movies are part fiction—essential to a free marketplace of ideas—extends across media and

countries. *See. e.g.*, *Greenspan*, 859 F. Supp. 2d at 220 (advertising book as "nonfiction" "only

means that the literature is based on true stories or events, not that every statement is in fact

demonstrably true"); *Masson*, 501 U.S. at 513; Bundesverfassungsgericht [BVerfG] [Federal

Constitutional Court] Jun. 13, 2007, 84 (Ger.) (recognizing that consumers of movies based on

true events are aware that they do not present events as they actually occurred) (translation at

https://www.bundesverfassungsgericht.de/SharedDocs/Entscheidungen/EN/2007/06/rs20070613

_1bvr178305en.html).

IE's claims fail to meet the materiality test for yet a further reason.  IE complains of two

core untruths in the two-hour *War Dogs* movie, both relating to Diveroli's character.  First, it

complains that the film portrays Diveroli as "an unethical business-person" and shows him as

tearing up a written contract with Packouz.  FAC ¶ 80.  Yet IE fails to explain how this

dramatization is sufficiently material, such that it would persuade consumers to go see *War Dogs*

instead of purchasing Diveroli's book.  This scene was not included in the advertisements for

*War Dogs*, so IE cannot allege that it influenced purchasing decisions.  Moreover, in Diveroli's

own biography, he concedes a long list of unethical misdeeds.  The list includes his defrauding

the United States (for which he was convicted); repeatedly lying to business counterparts about

his religion, identity, existence of his family, and the terms of contracts; altering and creating

documents to mislead counterparts; and not paying Packouz or an Albanian box manufacturer

Kosta Trebicka.  *Compare* FAC ¶ 82, *with Gun Runner* at 32, 38, 46, 83, 117, 124, 189; Portnoi

Decl. Ex. A.  IE also omits that Packouz and other associates sued Diveroli and testified under

oath that he cheated them.  RJN Exs. L at 111:21-112:3, M at 98:10-22, 153:7-154:13.  And IE

ignores that Judge Lenard, in sentencing Diveroli—at a hearing packed with reporters, *see Gun*

*Runner* at 246—expressly found that he "lied to obtain the [Afghan] contract," and "lied" about his experience, references, and company.  RJN Ex. I at 52:2-54:22.

Second, IE asserts that *War Dogs* includes misleading scenes "in which Diveroli engages in exceedingly reckless and deadly behavior."  FAC ¶ 83.  Again, IE fails to show how the scene it complains about—Diveroli shooting a gun in the air in Miami—misled consumers, altered their buying decisions, or rendered the *War Dogs* promotions actionable.  Nor could IE plead such a theory in any way that would meet the plausibility test required by *Iqbal*.  *Supra* at 7-8.

Diveroli's autobiography exhaustively chronicles his violent, reckless conduct.  He boasts about brutally ambushing a security guard in a close-range paintball-gun attack, which he describes as "incredibly reckless."  *Gun Runner* at 19-20.  He details his repeated drunk driving, fist fights, a violent confrontation with a girlfriend, rampant drug and alcohol abuse, and chronic infidelity to his girlfriends and extensive use of prostitutes.  Portnoi Decl. Ex. A.  Diveroli refers to himself becoming "more and more reckless" and his mother describes him as a "reckless train."  *Gun Runner* at 209, 250.  And the book also includes numerous pictures of Diveroli with guns and the admission that Diveroli violated his parole by possessing a gun.  *See id*. at 240.

Indeed, Diveroli concedes his reckless behavior was so well-known and publicly documented that when people with whom he tried to associate ran a quick Google search on him, they were stunned.  *See Gun Runner* at 212-13, 236.  "When I sat down, the med student was staring at her iPhone with her mouth open, not slightly ajar—this chick could have caught flies. 'Everything okay?' I asked, and she held her cell out … so I could see my DUI mug shot. Fucking Google!  'Who are you?' she asked, in an extremely snobbish tone, and then looked at her iPhone.  'A restraining order, battery, domestic violence, two DUIs … and … international gun running???"  *Id*. at 213.  In light of such overwhelming public admissions of misconduct

proffered by Diveroli himself, it is implausible that consumers were materially misled by *War Dogs* or its promotion.

    *2. IE's Lanham Act Claims Also Fail the* Lexmark *Zone-of-Interests and Proximate Causation Tests.*  To state a Lanham Act claim, IE's claims must "'fall within the zone of interests protected by the'" Act, which in a "false advertising" case requires that it "must allege an injury to a commercial interest in reputation or sales."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1388, 1390 (2014).  To establish such an injury, IE must plead a plausible theory of proximate causation—running from the asserted false ads to direct, tangible, non-speculative harms.  *Id.* at 1391 & n.6.  Such causation "must be adequately alleged at the pleading stage in order for the case to proceed," *id.*, and "[n]either an anticompetitive purpose nor consumer deception establishes injury," *Global Tech*, 2016 WL 3059390, at *3; *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F.3d 1248, 1277 (11th Cir. 2015).

    IE hints at three injuries, but each fails the *Lexmark* test.  *First*, it suggests its "goodwill" was harmed, FAC ¶ 113, but it alleges no specifics.  IE is the plaintiff here (not Diveroli), and yet IE pleads nothing about *its* reputation, other than to note that it was created to "monetize[ ] Diveroli's story."  *Id.* ¶ 28; *cf. Black Diamond Land Mgmt., LLC v. Twin Pines Coal Co.*, 2016 WL 3617974, at *14 (N.D. Ala. July 6, 2016) (complaint for lost business reputation dismissed for failure to show company's commercial activity).  There is also no allegation that Warner "disparaged" IE—meaning this goodwill theory is inapt.  *Lexmark*, 134 S. Ct. at 1394.

    *Second*, as discussed above, IE intimates that it lost book sales, FAC ¶ 75, but it does not detail how its sales (if there were ever any of substance) declined in response to any allegedly misleading ad.  Its speculation that its sales were hurt "stretch[es] proximate causation" too far, *Lexmark*, 134 S. Ct. at 1394 (need "something close to a 1:1 relationship" between false ads and

lost sales), and fails to account for obvious plausible "alternative" causes and effects, *Am. Dental*, 605 F.3d at 1290.  These alternative causes include the equally (if not more) likely reality that the expansive promotion of *War Dogs* actually *heightened* awareness of Diveroli, which in turn would have *increased* interest in his book and, thus, *generated* sales.  It also ignores the basic sequence of events.  IE released Diveroli's book (and his version of events) *four* months before Warner released *War Dogs*.  If anything, IE preempted Warner, and capitalized on the movie.

*Third*, IE contends that several "Hollywood based groups" who expressed an interest in Diveroli's book "declined to move forward due to the Warner Bros. launch of *War Dogs*."  FAC ¶ 73.  IE fails to allege the identity of any of these "groups," when and how they allegedly communicated their decisions, or how an ad campaign that ran in *2016* interfered with a project that IE *unsuccessfully* pitched in *2014*.  Indeed, in its first complaint, filed in April 2016, IE conceded away any plausible chain of causation.  In the complaint, IE alleged that its Hollywood sources had *already rejected IE's Diveroli project*, *see* Compl. ¶ 103, months before Warner made many of the promotional statements that IE now challenges, *see*, *e.g.*, FAC ¶¶ 60-65, 68.

IE also fails to account for "obvious alternative explanation[s]" for its alleged harm.  *Am. Dental*, 605 F.3d at 1290.  Among the many innocent, obvious reasons that those in Hollywood would pass on doing business with IE are that Diveroli is a convicted fraudster, and in his book, he calls himself a "monster," who was so unlikeable, that his friends abandoned him.  *Gun Runner* at 222.  The book itself would also give many producers pause were any in Hollywood ever to read it:  It exposes Diveroli's dark views about women and other cultures, and it makes a series of personal attacks on Diveroli's family, doctors, lawyers, friends, and colleagues.  *Id*. at 16, 28, 55, 57-58, 78-79, 89, 99, 109, 205-06, 218; Portnoi Decl. Ex. A.

*3.  IE's Florida Law Claims Are Derivative of the Lanham Act Claims and Must Be Dismissed.*  IE's Florida state law claims merely recycle its Lanham Act claims; they add no new facts; and they fail for the same reasons that IE's Lanham Act claims fail.  "The Eleventh Circuit has held that [t]he success of [a plaintiff's] FDUTPA claims is tied to the federal Lanham Act claims for [] false advertising," *Global Tech*, 2016 WL 3059390, at *3, and "based on the [ ] conclusion above that [IE] failed to state a plausible claim under the Lanham Act, its" parallel state law claims can be dismissed, *Ameritox*, 2012 WL 33155, at *5; *Suntree*, 693 F.3d at 1345.

## IV.    Warner Is Entitled to Its Fees and Costs.

Florida recently amended its anti-SLAPP statute, recognizing the need to protect "free speech in connection with public issues."  FLA. STAT. ANN. § 768.295(1).  The statute defines "[f]ree speech in connection with public issues" as "any written or oral statement" made "in connection with [a] movie"—protecting both "movies" themselves and promotions made "in connection with them."  *Id.* § 768.295(2)(a); *see* Samuel Morley, *Florida's Expanded Anti-SLAPP Law: More Protection for Targeted Speakers*, 90 FLA. B.J. 17, 18 (2016).

Florida prioritizes the "expeditious resolution" of anti-SLAPP motions and instructs that "[t]he court *shall award* the prevailing party reasonable attorney fees and costs incurred," FLA. STAT. ANN. § 768.295(4) (italics added).  "Effective anti-SLAPP statutes" exist to "make it easier and cheaper to terminate such lawsuits at early stages," and courts should recognize "the mere filing and pendency of [such a lawsuit] chills speech."  *Morley*, *supra*, at 17.

IE's complaint falls squarely within the anti-SLAPP statute.  Its claims are without merit (as shown above), and they are aimed directly at First Amendment-protected activities—*i.e.*, making and promoting a movie.  IE also seeks to chill speech on matters of significant public concern—*e.g.*, war profiteering, government mismanagement, and criminal misconduct.  *See Sarver v. Chartier*, 813 F.3d 891, 902, 905 (9th Cir. 2016) (movie *The Hurt Locker* "fully

23

protected under the First Amendment"; its "focus on the conduct of the Iraq War" was plainly "of public concern").  Indeed, it is hard to imagine a case more worthy of anti-SLAPP protection. *See, e.g.*, *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 144-45 (2011) ("creative process must be unfettered"; SLAPPing claims challenging contents and promotion of TV show).

If and when the Court grants this Motion, Warner will file a motion for an award of (and submit to the Court for review) its full fees and costs.  *See Blackburn v. ABC Legal Servs., Inc.*, 2012 WL 1067632, at *3 (N.D. Cal. Feb. 24, 2012).  These fees and costs are substantial, given that IE initially pursued one invalid theory of the case and extensive discovery in aid of it— which Warner had to move to dismiss and seek to stay on behalf of itself and many other defendants. IE's new counsel has focused on a new theory of the case, but it is equally barred by the First Amendment and other legal principles.

For the anti-SLAPP statute and *Iqbal* to work, courts must enforce their procedural safeguards—which include not permitting serial amendments, preventing invasive discovery, and awarding fees and costs.  *See Morley*, *supra*, at 24 (if courts are unwilling to strike SLAPP suits quickly, defendants will become "entangled in burdensome litigation, defeating the law's central purpose"); *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("Forcing [defendants] to defend inappropriate suits through expensive discovery proceedings," based on a complaint that fails to meet *Iqbal*, "would constrict" those freedoms and "chill free speech.").

This case should be no exception, and IE should be held accountable under Florida's anti-SLAPP law.[6]

---

[6] Warner also reserves its rights to seek its fees and costs under the Lanham Act.  *See* 15 U.S.C. § 1117(a); *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc*., 253 F.3d 1332, 1336 (11th Cir. 2001).  To the extent IE is not capitalized in a way to pay such fees or costs, Warner reserves its rights to seek its fees and costs from IE's principals.

## V.    Conclusion

Warner's Motion should be granted.  The defects in IE's complaint cannot be cured by amendment, and this case should be dismissed with prejudice.

WHEREFORE, Warner Bros. respectfully moves for the entry of an order dismissing the FAC with prejudice, declaring this case an anti-SLAPP suit, and granting such other and further relief as the Court deems just and proper.

Dated:  December 1, 2016

Respectfully submitted,

By: /s/ Matt Kline

Daniel M. Petrocelli (admitted *pro hac vice*)
Matthew T. Kline (admitted *pro hac vice*)
Dimitri Portnoi (admitted *pro hac vice*)
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Telephone:     (310) 246-6840
Email:          mkline@omm.com

Mary Ruth Houston
James J. Hensen
SHUTTS & BOWEN LLP
300 South Orange Avenue, Suite 1000
Orlando, Florida 32801
Telephone:     (407) 835-6939
Email:          mhouston@shutts.com

*Attorneys for Warner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this 1st day of December, 2016, electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will automatically send

e-mail notification of such filing to the following attorneys of record:

Kenneth G. Turkel, Esq.
Florida Bar No. 867233
kturkel@bajocuva.com
Shane B. Vogt, Esq.
Florida Bar No. 257620
svogt@bajocuva.com
Brad F. Barrios, Esq.
Florida Bar No. 0035293
bbarrios@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, FL 33602
Phone: (813) 443-2199
Fax: (813) 443-2193

Richard E. Fee, Esq.
Florida Bar No. 813680
FEE & JEFFRIES, P.A.
1227 N. Franklin Street
Tampa, Florida 33602
(813) 229-8008 - Telephone
(813) 229-0046 - Facsimile
rfee@feejeffries.com

/s/ Matt Kline
Matt Kline

26