# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**INCARCERATED ENTERTAINMENT,**
**LLC,**

                                     **Case No:  8: 16-cv-1302-T-35UA (IGC)**

      **Plaintiff,**

**vs.**

**WARNER BROS. PICTURES, a Division**
**Of WB STUDIOS ENTERPRISES, INC.,**

      **Defendant.**

_____/

## PLAINTIFF'S RESPONSE IN OPPOSITION TO WARNER BROS. PICTURES' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

Kenneth G. Turkel, Esq.,
**Trial Counsel**
Florida Bar No. 867233
kturkel@bajocuva.com
Brad F. Barrios, Esq.
Florida Bar No. 0035293
bbarrios@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Phone:  (813) 443-2199
Fax:  (813) 443-2193

Richard E. Fee, Esq.
Florida Bar No. 813680
FEE & JEFFRIES, P.A.
1227 N. Franklin Street
Tampa, Florida 33602
(813) 229-8008 - Telephone
(813) 229-0046 - Facsimile
rfee@feejeffries.com

*Attorneys for Plaintiffs*

{BC00111272:1}

Plaintiff, Incarcerated Entertainment, LLC ("IE"), files its Response in Opposition to Warner Bros. Pictures' ("Warner") Motion to Dismiss Plaintiff's First Amended Complaint and states:

## Introduction

IE has sued Warner for false advertising and related claims because Warner has and is promoting its movie *War Dogs* as the true story of Efraim Diveroli ("Diveroli"), when admittedly the film is largely a work of fiction. To establish its claims, IE describes Warner's misconduct in great detail, identifies Warner's false promotional materials, quotes several of Warner's assertions that *War Dogs* is true and alleges that these statements mislead consumers about the content of the movie. Warner does ***not*** contend that its advertisements are appropriate because *War Dogs* is actually a true story. Warner openly admits that *War Dogs* is not a true story.[1] Rather, Warner contends that its advertisements are immune from suit under the First Amendment and are not false or misleading for other reasons. As such, the case rests upon the issue of whether Warner's advertising conveys a false message and, if so, whether IE has pled actionable claims. In false advertising cases, courts across the country, including in this Circuit, balance the interest in free expression under the First Amendment against the public's interest in enforcement of the Lanham Act—a test that requires a careful examination of the facts and evidence. As described below, the First Amendment does not bar IE's well-pled claims, and Warner's Motion to Dismiss (the "Motion") should be denied.

## Legal Standards on a Motion to Dismiss

A Rule 12(b)(6) motion to dismiss for failure to state a claim merely tests the sufficiency of the complaint; it does not decide the merits of the case. *Milburn v. United States,* 734 F.2d

---

[1] *See* Motion to Dismiss (Dkt. 89), p. 2. Because the parties agree that *War Dogs* is not a true story, a comparison between Diveroli's real life and the movie is irrelevant.

762, 765 (11th Cir.1984).   To avoid dismissal for failure to state a claim, a complaint must include "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).   Factual allegations must be accepted as true and construed in a light most favorable to the plaintiff.  *Id.; Belanger v. Salvation Army,* 556 F. 3d 1153, 1155 (11th Cir. 2009).

Notice pleading does not require "that the pleader allege a 'specific fact' to cover every element or allege 'with precision' each element of a claim…" *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). Rather, a complaint should include *either* direct *or* inferential allegations of the material elements necessary to state a claim.  *Id.*

IE need not meet Rule 9(b)'s heightened pleading standard. *Third Party Verification, Inc. v. Signaturelink, Inc.,* 492 F. Supp.2d 1314, 1327 (M.D. Fla. 2007) (denying motion to dismiss and finding that false advertising, unfair competition, and FDUTPA claims did not have to meet Rule 9 pleading standards). Nevertheless, it easily does so for each claim. IE alleges many false or misleading statements and includes the identity of the speaker, when the statement was made, and where or to whom the statement was made.[2] These allegations are sufficient to satisfy Rule 9(b).  *See Continent Aircraft Trust v. Diamond Aircraft Indus.,* Case No. 11-61663, 2013 WL 2285539, at *8 (S.D. Fla. May 23, 2013) (denying motion to dismiss fraud claims).

IE agrees that the Court may and should consider the full advertisements and promotional interviews that form the basis of IE's claims. Indeed, IE contemporaneously files the Declaration of Ross Reback, *see* Dkt. 98, which includes multiple attachments located after filing the Amended Complaint, demonstrating Warner's further promotion of *War Dogs* through various cable companies and On Demand outlets as "***the true story***."  Because IE has not conducted discovery, the full extent of Warner's involvement in and the consumer confusion caused by

---

[2] *See* Amended Complaint (Dkt. 78), ¶¶ 49-67.

these summaries remains to be seen.  However, these advertisements demonstrate why this case should not be dismissed and does not violate the First Amendment.  In contrast, the evidence Warner submitted that is unrelated to Warner's advertising and which addresses matters outside the four corners of the Complaint should not be considered, as described in IE's Response to Warner's Motion for Judicial Notice (Dkt. 97).

<u>Argument</u>

This Court should deny Warner's Motion to Dismiss because (a) IE's claims are not barred by the First Amendment; (ii) IE pleads false and misleading statements sufficient to create a question of fact; and (iii) IE pleads the remaining elements of its claims.

**I.      The First Amendment Does Not Bar IE's Claims.**

The protections afforded by the First Amendment are not limitless.  Artistic or expressive works with a commercial purpose, like a book, song, or movie, cannot deceive the public or unfairly compete under the cloak of free speech. Instead, they are subject to a balancing test first employed in *Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989) and adopted by the Eleventh Circuit in *University of Alabama Bd. Of Trustees v. New Life Art, Inc.,* 683 F.3d 1266 (11th Cir. 2012).  Given that an artistic work itself may violate the Lanham Act, Warner's argument that *advertisements* for a commercially-distributed artistic work are fully shielded by the First Amendment and outside the scope of the Lanham Act,[3] defies logic. Not surprisingly, Warner fails to cite a single case holding that the Lanham Act is inapplicable to advertising of expressive or artistic works.[4]

---

[3] *See* Dkt. 89, pp. 8-9.
[4] Indeed, Warner cites several cases that analyze Lanham Act false advertising claims relating to creative works. *See, e.g., University of Alabama,* 683 F.3d at 1276-78; *Parks v. LaFace Records,* 329 F.3d 437 (6th Cir. 2003).

Although Warner concedes its advertisements are hybrid in nature—commercial speech intertwined with noncommercial speech[5]—it nevertheless contends that, because they promote an expressive work, they must be treated as noncommercial and cannot be regulated.  Warner has scant authority for its position,[6] and the case on which it most heavily relies, *Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. Of Physics,* 859 F. Supp. 1521, 1533 (S.D.N.Y. 1994), says the opposite: "Of course, the fact that an advertisement promotes a good or service protected by the First Amendment does not serve by itself to remove the ad from the realm of commercial speech…" *Gordon,* 859 F. Supp. At 1541, n.8.  The issue of whether Warner's ads should be ***treated*** as commercial speech is itself a fact question.  *See O'Grady v. Twentieth Century Fox Film Corp.,* No. 5:02CV173, 2003 WL 24174616, *15 (E.D. Tex. Dec. 19, 2003) (finding "a fact issue whether this is a case about commercial speech...").[7]  And, if Warner's ads are noncommercial speech, the *Rogers* balancing test applies and raises additional factual questions inappropriate for disposition on a motion to dismiss.  *Id.*

### A.    IE Alleges Warner's Advertisements are Unprotected Commercial Speech.

Warner's contention that speech with ***any*** artistic or expressive element cannot be commercial and cannot be regulated is simply wrong.[8]  Both ads for expressive works and mixed speech can be treated as commercial speech.  At this stage of the proceeding, without the benefit of discovery, IE has alleged sufficient facts to raise a factual question about whether Warner's speech is commercial.

---

[5] *See* Dkt. 89, pp. 9-10.

[6] Warner only cites 2 J. McCarthy, The Rights of Publicity & Privacy § 8.69 (2016) for the general proposition that advertising for expressive works shares the same immunity as the media use itself. *See* Dkt. 89, p. 8.

[7] *O'Grady* was a Report and Recommendation. The Court advised the parties to assume that it would adopt the Report and Recommendation and the case settled thereafter.  *See* Dkts. 180 and 195.

[8] Dkt. 87, p. 8.

The concept that advertisements for expressive works can independently violate the Lanham Act is not novel. "Doctrines extending noncommercial status from a protected work to advertising for that work are justified *only* to the extent necessary to safeguard the ability to *truthfully* promote protected speech." *Charles v. City of L.A.,* 697 F.3d 1146, 1156 (9th Cir. 2012) (emphasis added). In *Charles*, the court stated: "That the underlying E! News program is itself entitled to full First Amendment protection does not cloak all advertisements for the program with noncommercial status; speech inviting the public to watch E! News is not inherently identical to the speech that constitutes the program itself." *Id.* at 1152.

Not only did the *Charles* court reject Warner's proposed rule that all advertising for movies is beyond the reach of commercial speech regulations, it correctly summarized that such a rule would "radically enlarge the recognized exceptions to the First Amendment's limited protection for advertising," and that "[n]o court has ever suggested that such a broad exception to the commercial speech doctrine is required…" *Id.* at 1156. Here, extending noncommercial status to Warner's advertisements is not necessary to safeguard Warner's ability to promote its protected movie. Warner could and should have promoted *War Dogs* without misleading the public that it is a true story. Thus, Warner's advertisements do not deserve the same protection as its movie.

Warner's assertion that its ads are intertwined speech that must be treated as noncommercial speech and cannot be regulated is equally flawed.[9] Warner relies on *Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. Of Physics,* 859 F. Supp. 1521, 1533 (S.D.N.Y. 1994), *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781 (1988), and *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60 (1983) to support the notion that "when commercial and noncommercial

---

[9] Dkt. 87, p.p 8-10.

speech are 'intertwined,' the speech as a whole must be shielded."[10] However, none of the cases Warner cites adopt the rigid, bright-line standard Warner suggests in its Motion. To the contrary, each court conducts a careful analysis evaluating several factors to determine whether the speech at issue is actually intertwined and should be considered commercial or noncommercial. Thus, even when speech is intertwined, it is not automatically considered noncommercial. Here, IE has sufficiently pled the elements establishing Warner's *War Dogs* advertisements qualify as commercial speech, thus raising an issue of fact that cannot be resolved on a motion to dismiss.

Warner's reliance on *Gordon* to claim that its speech is protected is misplaced. *Gordon* illustrates how several factors must be evaluated to determine whether speech qualifies as noncommercial. Importantly, two factors were paramount to that Court: (1) the non-profit nature of the defendant's business, and (2) the fact that the speech was part of an academic journal. The decision emphasized the importance of these factors by expressly limiting its holding stating "we do not consider whether we would reach a different result if the articles in question were authored by a commercial entity . . . or if they were published in the trade journal of a commercial enterprise or industry." *Gordon,* 859 F.Supp. at 1542, n. 10.

Here, Warner is a for-profit entity, and its speech is not part of some larger educational or academic materials. Rather, Warner's false advertisements and promotions were made to benefit its own economic interests by selling movie tickets to its film—because movies that are "true stories" sell better to the public.[11] Accordingly, Warner's reliance on *Gordon* for the proposition that intertwined speech should automatically be considered noncommercial is improper.

In *Riley,* the pertinent speech included a statement **required** by state law, thus making the speech "inextricably intertwined" with any other statements made by the professional

---

[10] *See* Dkt. 89, p. 9.
[11] Dkt. 78, ¶¶ 68-71.

fundraisers.  Warner's speech was not required by law, and is not so "inextricably intertwined" with fully protected speech so as to require the court to treat it as noncommercial.  *See O'Grady,* 2003 WL 24174616, at *13 ("The Court is also not convinced as a matter of law that the speech is 'hybrid speech' because Defendants' commercial advertisements and promotional materials are not 'inextricably intertwined' with expressive speech.").

*Bolger* supports IE's position and recognizes the difficulty in addressing speech that contained part commercial solicitation and part discussion of public issues.  Ultimately, the court in *Bolger* rejected the use of bright-line tests Warner suggests in its Motion, and instead provided the following guidance:

> The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech.  Similarly, the reference to a specific product does not by itself render the pamphlets commercial speech.  Finally, the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech.  The combination of <u>all</u> these characteristics, however, provides strong support for the . . . conclusion that the informational pamphlets are properly characterized as commercial speech.

*Id.* at 66-67 (citations and footnotes omitted; emphasis in original).    The Court further explained:

> The mailings constitute commercial speech notwithstanding the fact that they contain discussions of important public issues such as venereal disease and family planning.  We have made clear that advertising which links a product to a current public debate is not thereby entitled to the constitutional protection afforded noncommercial speech. . . . Advertisers should not be permitted to immunized false or misleading product information from government regulation simply by including references to public issues.

*Id.* at 67-68.

*Bolger* undermines Warner's blanket proposition that "[w]hen commercial and noncommercial speech are 'intertwined', the speech as a whole must be shielded"[12] and instead

---

[12] *See* Dkt. 89, p. 9.

explains precisely how intertwined speech can still be considered commercial in nature. Just like the speech in *Bolger*, Warner's speech promotes, advertises, and references a product (*War Dogs*), through which Warner obtained an economic benefit. These factors support the conclusion that Warner's advertisements for *War Dogs* are commercial. Warner cannot cloak itself in constitutional protections to avoid claims for false and misleading advertisements by suggesting that its movie advertisements are inextricably intertwined with expressive speech.

Warner's contention that its ads are intertwined speech that should be shielded as a whole is premature. The character and circumstances surrounding the speech in question must be considered and raises issues of fact that cannot be decided at this stage. Ultimately, the allegations in the Amended Complaint are sufficient to support the conclusion that the speech at issue is commercial in nature, thereby leaving it unprotected from Lanham Act claims.

**B.      Intertwined Speech is Regulated by the Lanham Act and Analyzed Under the *Rogers* Balancing Test.**

Although Warner argues for a finding of intertwined speech, it ignores the controlling *Rogers* test. Warner's authorities do nothing to overrule the analysis employed in the many cases applying the Lanham Act to mere *titles* of artistic works—speech that is far less commercial than Warner's advertisements. Accordingly, even if the Court finds Warner's speech to be intertwined and subject to some protection as noncommercial speech, that protection must still be balanced against the interests analyzed in *Rogers* and its progeny. Simply put, the Lanham Act and similar state law claims provide a remedy for false or misleading intertwined speech, and Warner's vague arguments to the contrary are wrong.

In *Rogers*, Ginger Rogers sued the producers and distributors of a movie titled *Ginger and Fred* for a violation of Section 43(a) of the Lanham Act. *Rogers,* 875 F.2d at 997. The trial court granted summary judgment in favor of the defendants, settling on the exact position

Warner advocates in this case, finding that "because the speech at issue here is not primarily intended to serve a commercial purpose, the prohibitions of the Lanham Act do not apply, and the Film is entitled to the full scope of protection under the First Amendment." *Id.*

The Second Circuit *rejected* the trial court's approach because it "unduly narrows the scope of the [Lanham] Act." *Id.* Notably, while recognizing that movies and other works of artistic expression deserve protection, the Second Circuit concluded that Rogers' claim was actionable because movies are sold in the commercial marketplace, where "the danger of consumer deception [is] a legitimate concern that warrants some government protection." *Id.* This need to protect both artistic expression and consumer expectations necessitates a balancing test:

> We believe that in general the Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, ***unless the title explicitly misleads*** as to the source or the content of the work.

*Id.* at 999 (emphasis added). This test applies to intertwined speech that combines artistic expression and commercial promotion, whether its subject is the title of an artistic work or an advertisement for the artistic work. *Id.* at 998; *see also Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group,* 886 F.2d 490, 495 (2d Cir. 1989) (finding *Rogers* test "generally applicable to Lanham Act claims against works of artistic expression").

After considering the evidence—in the form of survey data, anecdotal evidence, and the title of the work itself—the court found no issue of fact to submit to the jury. *Rogers,* 875 F.2d at at 1001. But the court provided examples of situations that may constitute Lanham Act violations, such as titles that are artistically relevant but misleading as to source or content. *Id.* at

999. The court reasoned that use of a celebrity's name combined with representations of truth may warrant Lanham Act protection. "For example, if the characters in the film in this case had published their memoirs under the title "The True Life Story of Ginger and Fred," and if the film-maker had then used that fictitious book title as the title of the film, the Lanham Act could be applicable to such an explicitly misleading description of content." *Id.* at 1000.

The claims at issue in this case are analogous.  Warner's advertisements use Diveroli's real name (as does the entire movie) and false assertions that the movie is true—suggesting that *War Dogs* is more than just "based" on a true story. Beyond using Diveroli's name, the *War Dogs* advertisements use the real name of David Packouz, Diveroli's childhood friend who became an independent contractor for Diveroli's company, AEY, Inc., and AEY, Inc.'s name. The movie trailer includes a realistic scene of a Wolf Blitzer CNN television report and touts the movie as "an unbelievable story of the American dream."[13]  Accordingly, Warner's misleading representations fit the very scenario the *Rogers* court used to exemplify an unprotected expressive work that is actionable under the Lanham Act.

In another similar case, the Sixth Circuit also reversed summary judgment in favor of the defendant on a Lanham Act claim because the use of Rosa Parks' name as a song title and on an album cover raised a disputed issue of fact as to whether that speech was artistically related to the content of the song or whether the use of her name was a misleading advertisement. *Parks,* 329 F.3d at 458. In reaching its decision, the Sixth Circuit concluded that the First Amendment does not grant everyone who cries "artist" *carte blanche* when it comes to advertising its works. *Id.* at 454; *see also Columbus Rose Ltd. v. New Millennium Press,* No. 02Civ2634, 2002 WL 1033560, at *18 (S.D.N.Y. May 10, 2002) (granting injunction and finding likelihood of success of Section 43(a) claim based on misleading book cover); *O'Grady,* 2003 WL 24174616, at *15

---

[13]  Dkt. 78, ¶ 51.

(Dec. 19, 2003) (recommending denial of defendants' motion for summary judgment and finding question of fact about misleading nature of movie advertisements).

Movie studios themselves have relied on the Lanham Act to remedy misleading advertising of movies released by competitor studios.  In *Miramax Films Corp. v. Columbia Pictures Entm't, Inc.,* 996 F. Supp. 294 (S.D.N.Y. 1988), the production company for the movie *Scream* sued its competitor for advertising its movie *Summer* as being "from the creator of *Scream.*"  *Scream* was directed by Wes Craven and promoted as a "Wes Craven product," and Kevin Williamson wrote the original screenplay. *Id.* at 296.  Craven was not involved with *Summer,* but Williamson adapted a novel for the screenplay.  *Id.* Miramax sued for false advertising under the Lanham Act and moved for preliminary injunctive relief to enjoin Columbia's advertising.

Importantly, *Miramax* was "clearly a false advertising case because the misleading words appear in advertisements and promotional materials." *Id.* at 299. As such, and as was the case in *Rogers,* the court reviewed the advertisements and other evidence relating to consumer confusion before granting injunctive relief. *Id.* at 302.

The Lanham Act and analogous state law claims[14] provide a remedy for misrepresentations in advertisements for artistic works.  IE's claims are actionable.  And, at this stage, IE's detailed allegations must be accepted as true and as sufficient to state claims for false advertising.  Evidence cannot be weighed, as would be required to determine whether Warner's speech is protected.

## II.     IE Pleads False and Misleading Statements that Create an Issue of Fact Under the Rogers Balancing Test.

---

[14] Dkt. 89, p. 9, FN 3 and cited cases.

Because Warner's advertisements are subject to the Lanham Act, IE need only allege false or misleading statements. *See Ameritox, Ltd. v. Millennium Labs., Inc.,* 889 F. Supp. 2d 1304, 1312 (M.D. Fla. 2012) (denying motion to dismiss and finding plaintiff stated claims for false advertising and unfair competition).[15] Warner claims that IE has not identified any false or misleading statements based on two general legal propositions which it manipulates into a sort of "test" that IE must pass at the pleading stage.[16] However, Warner's authorities stand only for the proposition that statements must be viewed in the full context of each advertisement, but must not be viewed as an entire campaign. *See id; Johnson and Johnson Vision Care Inc. v. 1-800 Contacts, Inc.,* 299 F.3d 1242, 1248 (11th Cir. 2002).

IE has pleaded several false and misleading statements that do not rely on the entire campaign. As one example, as described above, the movie trailers viewed in their entirety could easily lead a consumer to believe that *War Dogs* is Diveroli's true story. The ads use real names (Diveroli and Packouz), reference a real company (AEY, Inc.), incorporate realistic news reports (Wolf Blitzer's "Breaking News" CNN segment), and tout an "unbelievable story."

IE also alleges multiple false and misleading statements made by Warner's agents in social media interviews to promote the film. Again, these statements could mislead consumers. Warner also publicized its retention of Packouz and another prominent figure the public equates as being intimately familiar with Diveroli's true story, Guy Lawson, to lend credibility to its promotion of the film as "true." Warner even gave Packouz a cameo appearance in the film and credited Lawson as a co-producer. With this knowledge, a consumer would likely apply

---

[15] The court identifies the elements of a section 43(a) Lanham Act false advertising claim as: (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising.

[16] Dkt. 89, p. 11.

additional weight to statements by these individuals. At this stage, although the exact relationship between Warner, Packouz, and Lawson is unknown, IE has sufficiently alleged an agency relationship.[17] *See Continent Aircraft,* 2013 WL 2285539, at \*10 (denying motion to dismiss even though agency allegations were "thin").

Facing these facts, Warner, without engaging in discovery, asks the Court to ignore the power of its advertising campaign and instead argues that a consumer could not be deceived about the truth of the movie because it is "obviously fictionalized," and its director's and actors' statements are not "unqualified" or are mere "puffery."[18] Essentially, Warner attacks IE for alleging its perceptions about the advertisements, but then asserts that its own perceptions about the quotes cited in the Amended Complaint should control. Warner even goes so far as to discredit direct and unequivocal assertions that the film is true by arguing that IE should have to prove the statements were authorized. This is not IE's obligation at the pleading stage.

Even more gaunt than these flawed arguments is Warner's reliance on *War Dogs'* disclaimer, which a consumer could only see ***after*** he purchases his ticket and watches the entire movie.  Warner cannot cure the confusion its advertising created after-the-fact by throwing up a disclaimer after the purchasing decision had already been made.

Warner also incorrectly argues that it is immune because it never explicitly stated *War Dogs* told the unadulterated truth. Motion, p. 7. The *O'Grady* court rejected this very argument. *See O'Grady,* 2003 WL 24174616, at \*4 (focusing on the false and misleading impression created by the promotion). More importantly, IE has alleged that Warner actually *did* tell the public the movie was true.[19]  Warner contends that its false statements were unauthorized or

---

[17] Dkt. 78, ¶¶ 41-45, 50, 55, 61. IE intends to pursue discovery relating to the contractual obligations of the director and actors to promote *War Dogs* through media appearances.
[18] Dkt. 89, ¶¶ 11, 14.
[19] Dkt. 78, ¶¶ 53-67.

canceled out by qualifications and caveats, but IE's alleged facts must be accepted as true and raise a question of fact as to whether Warner created a misleading perception about the movie is a question that must be left to a fact-finder. *See id.*

### III.    IE Pleads the Remaining Elements of its Claims.

IE's Amended Complaint more than adequately alleges materiality and causation. Warner is simply incorrect in asserting that IE failed to "meet several other required elements"[20] for its claims.   First, IE's Amended Complaint sets forth specific allegations regarding the materiality of Warner's false and misleading advertisements and how those advertisements damaged IE.  Second, nothing at the pleading stage requires IE to identify specific persons who were misled by Warner's false and misleading advertisements nor to prove how such persons were misled into acting based on those advertisements.   None of the cases cited by Warner support its arguments that such identification and proof is required at the pleading stage.   For example, IE will have the opportunity to prove these elements through survey evidence, expert opinions, and of course, direct factual evidence obtained during discovery.

### A.    IE's Amended Complaint Sufficiently Alleges Materiality and Causation.

With regard to alleging the materiality of Warner's false advertising asserting that *War Dogs* is the true story, IE even quotes Todd Phillips, the director of *War Dogs* and Miles Teller, one of the principal actors, in its Amended Complaint[21]:

> 68. Warner Bros. placed a substantial importance on representing *War Dogs* as a true story to the public because it knew that such representations induce consumers to go see movies.  In fact, Phillips even stated that **"the idea that this was a true story was for me** *the most interesting part about it***."**

> 69. Similarly, Miles Teller recognized that**: "I love the words 'based on a true story' at the beginning of a film…it buys you so much with an audience."**

---

[20] Dkt. 89 at p. 17.
[21] Dkt. 78, p. 18 (Emphasis Added)

70. In another interview, Phillips relayed the results of test screening the movie, which involve surveying real consumers about their opinions about the film, by stating: **"I think one of the things that really attracts people to it when we test screen the movie, what did you like about the movie, I think one of the main things is that it was based on a real story."**

After incorporating these allegations into each of its counts, IE alleges[22] that Warner's representations are likely to mislead consumers, actually deceived or intended to deceive a substantial number of consumers and were material to their purchasing decisions. IE's Amended Complaint further alleges how Warner's false advertising caused damage to IE,[23] by essentially cutting it out of the competitive marketplace. IE's Amended Complaint incorporates each of the above allegations regarding causation above into each of its counts. In addition, IE further alleges[24] that Warner's representations caused IE to suffer injury and damage.

In light of all of these allegations, Warner does ***not*** and cannot argue that IE failed to allege materiality and causation. Nor can Warner take issue in its Motion with the truth of these allegations.[25] Instead, Warner incorrectly asserts that IE needs to establish *more* at this early stage, while relying on cases that do not support its argument that IE's allegations are in any way deficient. IE has properly pleaded all of the required elements of its claims.

## B.    IE is Not Required to "Establish" Materiality and Causation in its Pleading.

As to the pleading of materiality, Warner faults IE for not addressing the types of details seldom if ever found in a pleading. For example, Warner assails IE for not identifying any specific consumers who were deceived by Warner's false advertising and not disproving that "obvious innocent factors . . . drove the consumer's buying decision."[26] The case Warner relies

---

[22] Dkt. 78, ¶¶ 92, 102, 109, 111 and 117; pp. 21, 23-24.
[23] Dkt. 78, ¶¶ 72, 74 and 75; pp. 18-19.
[24] Dkt. 78, ¶¶ 94, 113, 118 and 119; pp. 22, 24-25
[25] Dkt. 89, p. 2. Warner admits that, for purposes of its Motion "the well-pleaded facts in IE's complaint are true."
[26] Dkt. 89, pp. 1-18.

upon, *Johnson & Johnson*, 299 F.3d 1242, does ***not*** support its assertion that IE's pleading is in any way deficient.  In fact, the *Johnson & Johnson* case did not address pleading at all.  That case dealt with a preliminary injunction, the record evidence, and the plaintiff's burden to prove likelihood of success, ***not*** pleading requirements.  Nor does *Johnson & Johnson* require that "IE 'must' establish this materiality element at the pleading stage by showing "how the statement actually deceived specific consumers".[27]  Quite obviously, the evidence needed to support the grant of a preliminary injunction (as in *Johnson & Johnson*) is substantially different than that needed to adequately plead a cause of action.  Warner conflates this critical distinction.

Warner also wrongly argues that IE is required to "plead enough specifics to show how 'reasonable' consumers would be deceived by Warner's promotions."[28]  First, although not required to do so, IE met the heightened pleading standard suggested by Warner.  IE's Amended Complaint alleges that Todd Phillips publically stated: "I think one of the things that really attracts people to it when we test screen the movie, what did you like about the movie, I think one of the main things is that it was based on a real story."[29]  Second, Warner failed to provide any case support for its dubious elevated pleading standard.  Instead, Warner cites this Court to *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241 (3d Cir. 2011), which merely affirmed the trial court's bench trial decision.  Far from dealing with pleading requirements, *Pernod* is utterly silent on the issue, focusing instead on the evidence presented at trial.

Nor do the other cases cited by Warner aid its argument for a heightened materiality pleading requirement.  In *Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995), the court affirmed grant of summary judgment in a defamation case—***not*** a false advertising case—and did not

---

[27] See Dkt. 89, p. 18.  The other case cited by Warner for this proposition, *Swatch S.A. v. New City Inc.*, 454 F. Supp.2d 1245 (S.D. Fla. 2006), also fails to support it.  *Swatch* denied a plaintiff's motion for summary judgment and did not address pleading requirements.

[28] Dkt. 89, p. 18.

[29] Dkt. 78, p. 18.

address pleading requirements at all. *Greenspan v. Random House, Inc.*, 859 F. Supp. 2d 206 (D. Mass 2012) is also inapposite.  In *Greenspan*, the plaintiff wholly failed to allege that any of the defendants' misrepresentations "influenced, or would likely influence consumer purchasing decisions" or resulting harm to its business. *Id*. at 220. In this case, as shown above, IE expressly alleged both the elements that were entirely absent in the *Greenspan* case.

Warner concludes its materiality pleading argument by spending two pages arguing that Diveroli's past misconduct renders excusable Warner's promotion of the film as true while admitting that the portrayal of him in *War Dogs* is not.[30]  This thinly-veiled attempt to prejudice the Court against Diveroli and IE, by association, fails.  The point of this case is that Warner knowingly and falsely advertised the movie as telling the true story of a rather dramatic period in Diveroli's life.  Warner finds itself before the Court because it chose to lie about the truth rather than tell it.  *War Dogs*' own director freely admits that telling the public that the film is based on a true story attracts an audience.  Warner cannot have it both ways.  It is free to make up stories for the sake of entertainment.  But, if Warner chooses to do so, it cannot misrepresent its made-up story as "true" to attract larger audiences as it so clearly did here.

In short, Warner utterly failed to present this Court with anything other than a naked argument to support its position that IE's Amended Complaint failed to sufficiently allege that Warner's false advertising claims were material.   IE specifically identified numerous false advertising statements attributable to Warner and its agents and expressly alleged such false statements "deceive or are likely to deceive consumers",[31] are "deceptive and unfair and likely to

---

[30] Because the parties agree that *War Dogs* is not a true story, a comparison between Diveroli's real life and the *War Dogs* movie is irrelevant.
[31] Dkt. 78 at p. 21, para 92; p. 24, ¶ 111.

mislead consumers",[32] and "actually deceived or tended to deceive a substantial number of consumers and were material to consumers' purchasing decisions."[33]

Similarly, IE's Amended Complaint sufficiently alleges that it has been, and continues to be, harmed by Warner's false advertising. IE agrees with Warner that it "must allege an injury to a commercial interest in reputation or sales."[34] Without question, IE has done so. IE's Amended Complaint specifically alleges that Warner's false advertising statements: "have caused and are likely to continue causing Incarcerated competitive or commercial injury",[35] "have caused and are likely to continue causing Incarcerated competitive or commercial injury, including, but not limited to, loss of goodwill and loss of sales",[36] "were intended to cause and did in fact cause deception of the public, misleading prospective purchasers as to the truth of the story presented in *War Dogs*",[37] and that, as a result of Warner's false advertising statements, IE "has suffered damages, including, but not limited to, loss of goodwill and loss of sales."[38]

Warner, however, argues that IE is required to do more at the pleading stage. Warner is wrong and the cases it cites do not support its position. Although Warner relies on *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014) in arguing that IE failed to adequately allege proximate causation,[39] *Lexmark* actually establishes the sufficiency of IE's pleading. In discussing the pleading of proximate causation, the Supreme Court stated, in the same footnote cited by Warner:

> ***If a plaintiff's allegations, taken as true***, are insufficient to establish proximate causation, then the complaint must be dismissed; if they ***are sufficient, then the plaintiff is entitled to an opportunity to prove them.*** (Emphasis added).

---

[32] *Id.*, at p. 23, ¶ 102.
[33] *Id.*, at p. 24, ¶ 117.
[34] *See* Dkt. 89, p. 21.
[35] Dkt. 78, p. 22, ¶ 94;
[36] *Id.*, p. 24, ¶ 113.
[37] *Id.*, p. 25, ¶ 118.
[38] *Id.*, p. 25, ¶ 119.
[39] *See* Dkt. 89, p. 21.

*Id*. at p. 1391, n. 6.  Here, as shown above, IE expressly alleged proximate causation and those allegations must be taken as true.  As such, under *Lexmark*, IE "is entitled to an opportunity to prove" those allegations.  *See Id*.

Nor does *Global Tech LED, LLC v. Hilumz Int'l Corp.*, 2016 U.S. Dist. LEXIS 70584 (M.D. Fla. May 31, 2016) support Warner's argument.  In *Global Tech*, the court found that the counterclaims asserting false advertising entirely lacked causation and damages allegations:

> The counterclaims contain **no allegations of commercial or reputational injury**, nor plead a causal link between the misrepresentation and the injury.  In fact, **nothing in Defendant's pleading indicates that Defendants have ever been injured**.

*Id*. at *8-9.  Conversely, IE's Amended Complaint expressly and specifically alleged both commercial and reputational injury caused by Warner's false advertising statements.[40]

Warner is also wrong in asserting that IE failed to adequately allege its injuries and arguing that IE merely "hints at three injuries".[41]  In fact, IE expressly alleged (not merely hinted) that it has suffered "competitive or commercial injury"[42] and "loss of goodwill and loss of sales".[43]  IE is ***not*** required at the pleading stage, as Warner argues, to specifically allege how its goodwill was injured or "detail how its sales . . . declined in response to any allegedly misleading ad."[44]  Nor is IE required in its Amended Complaint to "account for obvious plausible 'alternative' causes and effects."[45]  Nothing in the case law cited by Warner requires the pleading of such allegations.  *See Lexmark*, 134 S. Ct. at 1393-1395 (determining that false advertising claim was adequately pled); *Black Diamond Land Mgmt., LLC v. Twin Pines Coal Co.*, 2016

---

[40] *See* Dkt. 78, p. 22, ¶ 94; p. 24, ¶ 113; p. 25, ¶¶ 118, 119.
[41] Dkt. 89, p. 22.
[42] Dkt. 78, p. 22, ¶ 94; p. 24, ¶ 113.
[43] *Id*., p. 24, ¶ 113; p. 25, ¶ 119.
[44] Dkt. 87, p. 21.
[45] *Id*., p. 22.

U.S. Dist. LEXIS 87022 *45-46 (N.D. Ala. July 6, 2016)(plaintiff failed to allege "contents of any advertisements by Defendants"); *American Dental Association v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010)(RICO case, ***not*** false advertising, noting that where proximate cause not expressly alleged—as here—court may make inferences).

IE's express allegations that Warner's false advertising caused IE harm is far from implausible.  Rather, IE has alleged that it is selling a competitive product—a book detailing the true story of Diveroli's adventures—and that Warner is causing it harm by falsely advertising the War Dogs movie as the true story of those same adventures.  It is certainly likely, and not implausible, that Warner has inflicted commercial harm on IE based on Warner flooding the market with its false proclamations that *War Dogs* tells the true story of Diveroli.

## IV.    The Court Should Ignore Warner's SLAPP References.

Warner states that it will file a motion for an award of fees and costs pursuant to Florida's anti-SLAPP statute, section 768.295, Florida Statutes, *if* the Court grants the Motion to Dismiss. Because the Court should deny the Motion, Warner's anti-SLAPP arguments are irrelevant and not ripe. If the Court decides to consider Warner's anti-SLAPP arguments, then IE requests an opportunity to respond by separate brief to raise all of its responsive arguments, including the Eleventh Circuit's decision in *Royalty Network, Inc. v. Harris,* 756 F.3d 1351 (11th Cir. 2014) finding that Georgia's anti-SLAPP statute did not apply in federal court.

### Conclusion

For the reasons set forth above, this Court should deny the Motion to Dismiss.

### Request for Oral Argument

Pursuant to Local Rule 3.01(j), IE respectfully requests the Court to schedule oral argument on the Motion to Dismiss and related filings, which IE estimates should take one hour.

Respectfully submitted,

*/s/ Brad F. Barrios*
Kenneth G. Turkel, Esq.,
**Trial Counsel**
Florida Bar No. 867233
kturkel@bajocuva.com
Brad F. Barrios, Esq.
Florida Bar No. 0035293
bbarrios@bajocuva.com
BAJO | CUVA | COHEN | TURKEL
100 North Tampa Street, Suite 1900
Tampa, FL  33602
Phone:  (813) 443-2199
Fax:  (813) 443-2193

Richard E. Fee, Esq.
Florida Bar No. 813680
FEE & JEFFRIES, P.A.
1227 N. Franklin Street
Tampa, Florida 33602
(813) 229-8008 - Telephone
(813) 229-0046 - Facsimile
rfee@feejeffries.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 23, 2016, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF filing system.

*/s/ Brad F. Barrios*
Attorney