UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INCARCERATED ENTERTAINMENT,
LLC,

    Plaintiff,

v.                                                          Case No: 8:16-cv-1302-T-35AAS

WARNER BROS. PICTURES,
a division of WB Studio Enterprises,
Inc.,

    Defendant.
_____/

## ORDER

**THIS CAUSE** comes before the Court for consideration of Defendant Warner Bros. Picture's Motion to Dismiss (Dkt. 89), to which Plaintiff Incarcerated Entertainment, LLC has responded in opposition (Dkt. 99).  Defendant submits twenty-two exhibits in support of its motion to dismiss (Dkts. 90, 91), to which Plaintiff has filed a response in partial opposition (Dkt. 97).  Plaintiff submits four exhibits in support of its response in opposition (Dkt. 98), to which Defendant objects (Dkt. 100).  Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **DENIES** the motion to dismiss.

**I.    BACKGROUND**

According to the Amended Complaint, Plaintiff Incarcerated Entertainment, LLC owns the rights to the life story of Efraim Diveroli.  (Dkt. 78 at ¶ 3)  In this action, Plaintiff sues Defendant Warner Bros. Pictures ("Warner") for false advertising and unfair competition, based on Warner's promotion of the movie *War Dogs* as the "true story" of Diveroli's path to becoming an international arms dealer.

1

As alleged, at age 18, Diveroli started a small business specializing in arms, ammunition trading, and bidding on U.S. Government defense contracts. (Id. at ¶ 12) By 2007, Diveroli's company, AEY, Inc., outbid established defense contractors Northrop Grumman and Lockheed Martin and was awarded a $298 million contract to supply arms and ammunition to support the United States' war effort in Afghanistan. (Id. at ¶¶ 14-15) Diveroli relied on select lower-level employees to assist his business, including David Packouz, a neighborhood acquaintance. (Id. at ¶ 15)

In March 2008, the U.S. Government suspended AEY Inc.'s contracts based on allegations that the company had violated pre-existing arms embargos. (Id. at ¶ 16) At age 22, Diveroli was indicted by a federal grand jury in Miami and ultimately accepted a four-year plea deal. (Id. at ¶¶ 16-17) Diveroli's associate, Packouz, was sentenced to house arrest. (Id. at ¶ 22)

During his incarceration, Diveroli was contacted by Guy Lawson, a well-known journalist and author who wanted to write an article about Diveroli's story. (Id. at ¶ 19) In March 2011, *Rolling Stone* magazine published Lawson's article, *The Stoner Arms Dealers: How Two American Kids Became Big-Time Weapons Traders*. (Id. at ¶ 22) The article featured accounts by both Diveroli and Packouz. (Id.) In August 2011, Lawson optioned the movie rights for the article to Warner. (Id. at ¶¶ 23-24) Lawson later expanded the article into a book, *Arms and the Dudes*. (Id. at ¶ 42)

By February 2014, Diveroli's own manuscript, *Once a Gun Runner*, was sufficiently complete for Plaintiff to market the movie rights. (Id. at ¶¶ 29-30) Diveroli's business partner, Ross Reback, contacted a number of producers and studios, including Warner. (Id. at ¶¶ 31-33) Although Warner considered the proposal, Warner eventually declined

to pursue a consulting arrangement with Diveroli. (Id. at ¶¶ 34-35) Instead, Warner retained David Packouz as a consultant and enlisted Guy Lawson as a producer. (Id. at ¶¶ 41-44)

The gravamen of the Amended Complaint is that Warner grossed more than $85 million by promoting *War Dogs* as Diveroli's "true story" when it was not the true story. (Id. at ¶¶ 1-2, 78) As the owner of the rights to Diveroli's story, Plaintiff alleges that it has been effectively shut out of the marketplace because consumers are more likely to purchase a ticket to *War Dogs* than to purchase Diveroli's memoir, *Once a Gun Runner*. (Id. at ¶¶ 3, 72, 75)

The Amended Complaint identifies a number of allegedly false advertisements, including statements in movie trailers, social media posts, and promotional interviews with *War Dogs*' director, Todd Phillips, screenwriter Stephen Chin, and stars Jonah Hill, Miles Teller, and Bradley Cooper. (Id. at ¶¶ 49-70) For instance, Jonah Hill stated that *War Dogs* is "one of the craziest movies I've ever been in – in a great way. And it's all true." (Id. at ¶ 67) Miles Teller told interviewers on multiple occasions, "these are real people" and "real guys who are still alive." (Id. at ¶ 59) Stephen Chin stated that he wanted to be "deeply true to their story." (Id. at ¶ 62) Todd Phillips explained that "we certainly tried to follow what happened as closely as possible I think. If you know the story at all, we pretty much stick to the facts as much as we can." (Id. at ¶ 65)

In Counts I and III of the Amended Complaint, Plaintiff asserts violations of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), which creates a civil cause of action against "[a]ny person who . . . uses in commerce any . . . false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature,

characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." In Counts II and IV, Plaintiff brings state-law claims for unfair competition pursuant to Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Fla. Stat. § 501.204(1), which prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

In the instant motion to dismiss, Warner argues that the challenged statements are not actionable because they include protected artistic or political speech under the First Amendment. In the alternative, Warner argues that the Amended Complaint fails to allege the necessary facts in support of Plaintiff's claims. With the limited exceptions outlined below, the Court holds that Plaintiff states plausible claims for relief.

## II.   STANDARD

The threshold for surviving a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) is a low one. Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A., et al., 711 F.2d 989, 995 (11th Cir. 1983). A plaintiff must plead only sufficient facts to state a claim for relief that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-62 (2007). Although a complaint challenged by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff is still obligated to provide the "grounds" for his entitlement to relief. Berry v. Budget Rent A Car Sys., Inc., 497 F. Supp. 2d 1361, 1364 (S.D. Fla. 2007) (quoting Twombly, 550 U.S. at 555). In evaluating the sufficiency of a complaint in light of a motion to dismiss, the well-pleaded facts must be accepted as true and construed in the light most favorable to the plaintiff. Quality Foods, 711 F.2d at 994-95.

Warner briefly asserts that Plaintiff's claims must be pleaded with specificity under Fed. R. Civ. P. 9(b) because the claims are "grounded in fraud." (Dkt. 89 at 9). In the Eleventh Circuit, the weight of authority holds that a Lanham Act claim for false advertising and a state-law claim for unfair competition need not be pleaded with specificity. USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC, No. 15-CIV-80352-BLOOM/Valle, 2016 WL 4254257, at *2 (S.D. Fla. Feb. 16, 2016); Wika Instrument I, LP v. Ashcroft, Inc., No. 1:13-CV-43-CAP, 2013 WL 12061904, at *2 (N.D. Ga. July 3, 2013); Third Party Verification, Inc. v. Signaturelink, Inc., 492 F. Supp. 2d 1314, 1327 (M.D. Fla. 2007). Consistent with this authority, the Court declines to impose a heightened pleading requirement.

Courts are split on the question of whether a FDUTPA claim must meet Rule 9(b) pleading requirements. See Finerman v. Marriott Vacations Worldwide Corp., No. 3:14-CV-1154–J–32MCR, 2015 WL 5440611, at *2 (M.D. Fla. Sept. 15, 2015). Even assuming that Rule 9(b) applies, the Amended Complaint adequately alerts Warner to the "precise misconduct with which [it is] charged." Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) (internal quotation marks omitted). Indeed, in connection with the motion to dismiss, Warner has compiled and submitted to the Court the original sources for the challenged statements. (Dkts. 90, 91)  The Court therefore assesses the Amended Complaint under a notice-pleading standard.

### III. DISCUSSION

The parties analyze the Lanham Act claims and state-law claims under the same rubric, consistent with Eleventh Circuit law. (Dkt. 89 at 11 n.4, 23; Dkt. 99); Sovereign Military Hospitaller Order v. Fla. Priory of Knights Hospitallers, 702 F.3d 1279, 1296 (11th Cir. 2012) (noting that the success of state-law unfair competition and FDUTPA claims

5

was tied to Lanham Act claim for false advertising); Nat'l Answers, Inc. v. SmithKline Beecham Corp., 529 F.3d 1325, 1333 (11th Cir. 2008).  Accordingly, for purposes of the instant motion, the Court applies the framework of the Lanham Act.

### A. Commercial Speech

The Lanham Act prohibits false advertising in connection with "*commercial advertising or promotion*."  15 U.S.C. § 1125(a)(1)(B) (emphasis added).  The Eleventh Circuit defines "commercial advertising or promotion" as encompassing four elements:

> (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) the representations . . . must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry.

Edward Lewis Tobinick, MD v. Novella, 848 F.3d 935, 950 (11th Cir. 2017) (internal quotation marks and brackets omitted).[1]  The parties dispute whether Plaintiff sufficiently alleges the first element of "commercial speech," which is a threshold requirement for liability under the Lanham Act.  See Porous Media Corp. v. Pall Corp., 173 F.3d 1109, 1120 (8th Cir. 1999).

The concept of commercial speech under the Lanham Act mirrors the commercial speech doctrine under the First Amendment.  Proctor & Gamble Co. v. Haugen, 222 F.3d 1262, 1274 (10th Cir. 2000); see also Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1323 (11th Cir. 2010).  The "core notion" of commercial speech encompasses "speech that propose[s] a commercial transaction."  Edward Lewis Tobinick, MD, 848 F.3d at 950.

---

[1] In Tobinick, the district court questioned whether the second prong of this test remains good law, in light of the Supreme Court's decision in Lexmark International, Inc. v. Static Control Components, Inc., 134 S.Ct. 1377 (2014), which held that a downstream supplier is authorized to sue under 15 U.S.C. § 1125(a)(1)(B).  See Tobinick v. Novella, No. 9:14-CV-80781, 2015 WL 1191267, at *5 n.10 (S.D. Fla. Mar. 16, 2015).  The application of Lexmark is discussed in Section B.3 below.

Even if a communication falls outside "core" commercial speech, the Supreme Court clarified in Bolger v. Youngs Drug Products Corp. that the communication may still be considered commercial if: (1) the communication is an advertisement, (2) the communication makes reference to a specific product, and (3) the speaker has an economic motivation for the communication. 463 U.S. 60, 66-67 (1983).

In a recent decision, the Eleventh Circuit applied the Bolger factors to assess whether challenged communications were "commercial speech" for the purposes of a false-advertising claim under the Lanham Act. Edward Lewis Tobinick, MD, 848 F.3d at 950-51 (addressing issue at summary judgment). Consistent with Bolger, the Eleventh Circuit explained that no single factor is dispositive, but the presence of all factors "provides strong support for the . . . conclusion that the [material is] properly characterized as commercial speech." Id. at 950 (quoting Bolger, 463 U.S. at 62, 67).

Applying the Bolger factors here, the Amended Complaint plausibly alleges that the challenged communications are "commercial speech." As to the first factor, the Amended Complaint alleges—and Warner concedes in the motion to dismiss (Dkt. 89 at 10-11)—that the challenged statements were used for promotional purposes. (See Dkt. 78 at ¶ 50) As to the second factor, the Amended Complaint alleges that the challenged communications refer to a specific product, the movie *War Dogs*. (Id. at ¶¶ 51, 59, 60, 62, 63, 65-70; Dkts. 91-15, 91-16, 91-17, 91-18, 91-20, 91-21) With respect to the third factor, the Amended Complaint alleges that Warner possessed an economic motivation for making the statements: Warner knew that representing the story as "true" would induce consumers to see *War Dogs*. (Id. at ¶¶ 68-71)

Perhaps recognizing that its challenge fails under the Bolger test, Warner omits discussion of the relevant factors. (See Dkt. 89 at 9-11) Instead, Warner proposes two bright-line rules. First, Warner contends that the promotions are "intertwined" with non-commercial speech, including political and artistic commentary, and therefore qualify as non-commercial speech. Second, Warner asserts that because the promotions relate to a movie, which is a protected expressive work, the communications are themselves protected.

Warner's second theory is unavailing. Although movies are works of artistic expression and must be protected, "they are also sold in the commercial marketplace like other more utilitarian products, making the danger of consumer deception a legitimate concern that warrants some government regulation." Rogers v. Grimaldi, 875 F.2d 994, 997 (2d Cir. 1989). Thus, the fact that an underlying work "is itself entitled to full First Amendment protection does not cloak all advertisements for the [work] with noncommercial status." Charles v. City of Los Angeles, 697 F.3d 1146, 1152 (9th Cir. 2012) (holding that a billboard advertising a television program was subject to the Lanham Act); see also Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 859 F. Supp. 1521, 1541 n.8 (S.D.N.Y. 1994) ("Of course, the fact that an advertisement promotes a good or service protected by the First Amendment does not serve by itself to remove the ad from the realm of commercial speech . . . ."). Tellingly, Warner cites no authority in support of its request for blanket protection for its speech.

Warner's primary theory is not amenable to resolution on this motion to dismiss. Warner asserts that because some of the promotions, such as interviews with the cast and crew of *War Dogs*, are "intertwined" with political or artistic commentary, the entire

8

promotion is exempt from regulation. In response, Plaintiff correctly points out that the case law requires a more nuanced analysis.

In Rogers, the Second Circuit addressed whether a Lanham Act claim could be based on a movie title, which the court observed "may be both an integral element of the filmmaker's expression as well as a significant means of marketing the film to the public," such that the artistic and commercial elements are "inextricably intertwined." 875 F.2d at 998. As a result, consumers "have a dual interest: They have an interest in not being misled and they also have an interest in enjoying the results of the author's freedom of expression." Id. In order to protect both interests, the Second Circuit adopted the following balancing test:

> We believe that in general the [Lanham] Act should be construed to apply to artistic works only where the public interest in avoiding consumer confusion outweighs the public interest in free expression. In the context of allegedly misleading titles using a celebrity's name, that balance will normally not support application of the Act unless the title has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work.

Id. at 999.

Courts typically apply the Rogers balancing test only to titles or to other expressive works. See Facenda v. N.F.L. Films, Inc. 542 F.3d 1007, 1015-16 (3d Cir. 2008) (citing cases); Cliffs Notes, Inc. v. Bantam Doubleday Dell Pub. Grp., Inc., 886 F.2d 490, 495 (2d Cir. 1989) (holding "that the Rogers balancing approach is generally applicable to Lanham Act claims against works of artistic expression"). Accordingly, in Facenda, the Third Circuit declined to apply the Rogers test to a "making of" documentary about a videogame. The Third Circuit explained that unlike a movie title or an expressive work, the documentary was intended "to promote another creative work, the video game."

9

Facenda, 542 F.3d at 1018.  Because the documentary constituted "commercial speech" under the Bolger factors, the Third Circuit held that the documentary was actionable under the Lanham Act.  Id.

Warner does not address whether the Rogers balancing test applies to the challenged movie trailers, social media posts, and interviews.  For instance, Warner does not contend that the challenged communications are themselves artistic works, and the Amended Complaint at least plausibly alleges that, similar to the documentary in Facenda, the communications are separate promotions for *War Dogs*.  As explained above, the Amended Complaint also plausibly alleges that the promotions are "commercial speech" under the Bolger factors.

Absent a more focused challenge and at this early stage in the litigation, Warner fails to call into question the plausibility of Plaintiff's allegations related to the threshold element of "commercial speech."[2]  Warner may renew its arguments at a later stage.

### B.   False Advertising

Warner next argues that the Amended Complaint fails to allege facts necessary to state a false advertising claim under the Lanham Act.  To prevail on a claim for false advertising, a plaintiff must demonstrate that:

> (1) the advertisements of the opposing party were false or misleading; (2) the advertisements deceived, or had the capacity to deceive, consumers; (3) the deception had a material effect on purchasing decisions; (4) the misrepresented product or service affects interstate commerce; and (5) the movant has been—or is likely to be—injured as a result of the false advertising.

---

[2] Warner requested leave to file a reply to Plaintiff's response in opposition, arguing that it devoted only two pages of its brief to the First Amendment issues, while Plaintiff devoted ten pages to the subject.  (Dkt. 100 at 2)  The omissions in Warner's motion to dismiss cannot be cured by a reply.

Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004). Warner does not currently dispute the fourth element, interstate commerce. Warner's arguments regarding the remaining elements are addressed below.

### 1. False or misleading statement

The Lanham Act applies to two types of advertisements: (1) a statement that is "literally false as a factual matter" and (2) a "misleading" statement that may be literally true or ambiguous, but that "implicitly convey[s] a false impression, [is] misleading in context, or [is] likely to deceive consumers." Id. at 1261 (quoting United Industries Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998)); see also Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1247 (11th Cir. 2002). To determine whether an advertisement is false or misleading, a court "must analyze the message conveyed in full context, and must view the face of the statement in its entirety." Osmose, Inc., 612 F.3d at 1308 (internal quotation marks omitted). The court may not, however, consider multiple advertisements in an advertising campaign as a whole, as that approach assumes that consumers will be exposed to each advertisement. Johnson & Johnson Vision Care, Inc., 299 F.3d at 1248 & n.4

The majority of Warner's arguments are not well-suited to a motion to dismiss. With respect to the movie trailers, Warner contends that the phrase "based on a true story" is not actionable because it conveys that the movie "is obviously fictionalized in part." (Dkt. 89 at 12) The cases cited by Warner do not support such a clear-cut rule;[3]

---

[3] See Tyne v. Time Warner Entm't Co., L.P., 901 So. 2d 802, 810 (Fla. 2005) (holding that the term "commercial purpose" in Florida's commercial-misappropriation statute does not apply to motion pictures); Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 513 (1991) (in libel case, holding that factual issue existed as to whether a reasonable reader would understand quotations were a rhetorical device); Partington v. Bugliosi, 56 F.3d 1147, 1156 (9th Cir. 1995) (in libel case, explaining that a court must look at the specific content of statements to determine whether "a

11

but more notably, Warner fails to consider the entire trailer in context, including a realistic news report by Wolf Blitzer, a well-known CNN anchor. (Dkt. 78 at ¶ 51) (citing https://www.youtube.com/watch?v=Rwh9c_E3dJk and https://www.youtube.com/watch?v=KWs5qnZnhfo).  The Eleventh Circuit is clear that "the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other." Johnson & Johnson Vision Care, Inc., 299 F.3d at 1248 (quoting Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 946 (3rd Cir. 1993)).

With respect to interviews by Jonah Hill, Miles Teller, Todd Phillips, and Stephen Chin, Warner accurately insists that the challenged statements must be read in their full context.  (Dkt. 89 at 17-18; see Dkt. 78 at ¶¶ 59, 62, 65-70)  But apart from advancing that argument, Warner neglects to address the relevant question: whether the statements, read in their full context, falsely or misleadingly portray *War Dogs* as a true story.  Warner implies that they do not, but that conclusion calls for a fact-intensive inquiry and that the Court draw inferences in Warner's favor, neither of which is appropriate on a motion to dismiss.

With respect to statements by journalist Guy Lawson and Diveroli's former associate, David Packouz, Warner first argues that the Amended Complaint does not establish that they made statements as agents of Warner. (Dkt. 89 at 14-15); see Procter & Gamble Co. v. Haugen, 317 F.3d 1121, 1126 (10th Cir. 2003) (recognizing that the Lanham Act incorporates common-law concepts of agency, apparent authority, and vicarious liability).  In pressing this argument, Warner fails to acknowledge that the

---

particular statement of opinion may imply a false assertion of objective fact"); Greenspan v. Random House, Inc., 859 F. Supp. 2d 206, 220 (D. Mass. 2012) (holding that book's designation as "non-fiction" did not support a Lanham Act claim).

12

Amended Complaint alleges that Lawson was a producer of the movie, that Packouz was retained as a consultant and had a cameo in the movie, and that Lawson and Packouz made their statements as agents of Warner.  (Dkt. 78 at ¶¶ 41, 43, 55, 79, 85-86)  Given Packouz's status as a consultant and actor, and Lawson's status as a producer, an agency relationship with Warner may be plausibly inferred.

Warner further argues that statements by Packouz and Lawson are opinion or puffery.  (Dkt. 89)   Although "[s]tatements of opinion are generally not actionable under the Lanham Act," an opinion may be actionable "if it fairly implies a factual basis."  Duty Free Americas, Inc. v. Estee Lauder Cos., Inc., 797 F.3d 1248, 1277 (11th Cir. 2015) (internal quotation marks and brackets omitted).  According to the Amended Complaint, Lawson stated on his Facebook page that *War Dogs* was "amazingly close to the real truth of the story." (Dkt. 78 at ¶ 60)  Lawson also previously announced on his Facebook page that *War Dogs* was inspired by his own book.  (Id. at ¶ 55).  Based on these allegations, a reasonable person could infer that Lawson knew the true story and his characterization of *War Dogs* "fairly implie[d] a factual basis."  Duty Free Americas, Inc., 797 F.3d at 1277.  Similarly, because Packouz identified himself as the subject of the movie, his statement that "this is exactly how it happened" at least arguably implies a factual basis.  (Dkt. 78 at ¶ 63).

Warner more successfully challenges other discrete allegations in the Amended Complaint.  Warner observes that allegations regarding the *War Dogs* website and the *War Dogs* Facebook page do not allege any false or misleading statement.  (Dkt. 89 at 13, 16; see Dkt. 78 at ¶ 52)  Warner contends that the publication of Diveroli's photograph in *Rolling Stone* is not actionable, absent some allegation that Warner controlled *Rolling*

13

*Stone.* (Dkt. 89 at 13; see Dkt. 78 at ¶ 54)  Warner argues that a loosely-translated Argentinian Facebook post is not actionable.  (Dkt. 89 at 16; see Dkt. 78 at ¶ 64).  Warner maintains that Guy Lawson's statements promoting his own book are not actionable because they do not promote *War Dogs*.  (Dkt. 89 at 14; see Dkt. ¶¶ 55, 61)  And Warner reports that Plaintiff has conceded to dropping a claim based on the *War Dogs* movie poster.  (Dkt. 89 at 13-14; see Dkt. 78 at ¶ 56)

Plaintiff disputes none of these points.  (See generally Dkt. 99 at 13-15)  Accordingly, the Court finds that the allegations in Paragraphs 52, 54, 55, 56, 61, and 64 of the Amended Complaint are not, in and of themselves, actionable.  This finding, however, does not warrant the granting of a motion to dismiss.  With respect to the remaining statements, Warner may renew its arguments in a proper dispositive motion.

### 2. Consumer deception and materiality

In order to establish consumer deception and materiality, in addition to alleging a false or misleading advertisement, Plaintiff must allege that "the advertisements deceived, or had the capacity to deceive, consumers" and that "the deception had a material effect on purchasing decisions."  Hickson Corp., 357 F.3d at 1260.

With respect to the element of "deception," Warner contends that Plaintiff can only survive the motion to dismiss by identifying specific statements and showing how the statements actually deceived specific consumers.  (Dkt. 89 at 18-19)  In support of that argument, Warner relies on case law addressing Lanham Act claims on the merits, rather than on a motion to dismiss.  (Dkt. 89 at 19-20); see Johnson & Johnson Vision Care, Inc., 299 F.3d at 1247-51 (addressing likelihood of success for preliminary injunction); Swatch S.A. v. New City, Inc., 454 F. Supp. 2d 1245, 1252-53 (S.D. Fla. 2006) (summary

judgment); Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc., 653 F.3d 241, 247 (3d Cir. 2011) (bench trial).  Warner cites no authority to suggest that factual evidence of consumer deception is required at the pleading stage, and the Court declines to impose such an evidentiary burden.  See Ameritox, Ltd. v. Millennium Labs., Inc., 889 F. Supp. 2d 1304, 1316 (M.D. Fla. 2012) ("[A]lthough a party must support allegations of misleading advertisements with evidence of consumer deception at later stages of litigation, that burden does not exist at the pleading stage.").

A plaintiff may plead the "materiality" element by alleging that "the defendants misrepresented an inherent quality or characteristic of the product."  Johnson & Johnson Vision Care, Inc., 299 F.3d at 1250 (quoting Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997)).  Plaintiff pleads sufficient facts to support an inference that the truthfulness of *War Dogs* is an "inherent quality or characteristic."  The Amended Complaint alleges that consumers are drawn to true stories and that a test screening for *War Dogs* revealed that one of the main things people liked was that it was based on a real story.  (Dkt. 78 at ¶¶ 68, 70)  Consistent with these allegations, Miles Teller stated, "I love the words 'based on a true story' at the beginning of a film . . . it buys you so much with an audience," and Todd Phillips stated "the idea that this was a true story was for me the most interesting part about it."  (Id. at ¶¶ 68-69)

Warner also argues that Plaintiff fails to allege materiality because the movie accurately represents Diveroli as unethical and dangerous.  (Dkt. 89 at 20-22)   As an initial matter, Warner's argument that *War Dogs* is a truthful portrayal is at least somewhat at odds with Warner's earlier insistence that the movie is a fictionalized account.  (Dkt. 89 at 3, 7, 12)  In any event, because Plaintiff is not alleging that scenes from the movie itself

15

were false or misleading, the accuracy of the movie is not relevant to the issue of materiality.

### 3. Zone of interests and proximate causation

Warner next argues that the Amended Complaint omits the necessary allegations of injury and causation. (Dkt. 89 at 22-23) In Lexmark International, Inc. v. Static Control Components, Inc., the Supreme Court held that, in order to state a false-advertising claim under the Lanham Act, a plaintiff "ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising . . . ." 134 S. Ct. 1377, 1391 (2014). With respect to injury, the Amended Complaint alleges that Warner's advertising has caused "loss of goodwill" and "loss of sales." (Dkt. 78 at ¶ 113) Those allegations are similar to the allegations in Lexmark, and Warner cites no authority to support its contention that Plaintiff must allege in "detail" how its goodwill was damaged or how its sales declined. (Dkt. 89 at 22); Lexmark, 134 S. Ct. at 1393 (explaining that the counterclaimant's "alleged injuries – lost sales and damage to its business reputation – are injuries to precisely the sorts of commercial interests the [Lanham] Act protects"). Warner may instead seek discovery on the nature and extent of Plaintiff's damages.

With respect to causation, Lexmark instructs that the necessary showing is present when "deception of consumers causes them to withhold trade from the plaintiff." Lexmark, 134 S. Ct. at 1391. In contrast to the facts at issue in Lexmark, which involved a claim by a downstream supplier, Plaintiff alleges that it is a direct victim of Warner's advertising because *War Dogs* diverted book sales from Plaintiff. In particular, the Amended Complaint alleges that "consumers who desire to learn the true story are most likely to purchase a ticket to the movie, after being bombarded with promotional material, rather

than purchasing Diveroli's memoir." (Dkt. 78 at ¶ 75) Accordingly, Plaintiff plausibly alleges that its injuries "flow[ ] directly" from Warner's advertising. Lexmark, 134 S. Ct. at 1393. Again, whether Plaintiff will actually be able to prove its theory is a separate question that is not appropriate for resolution on a motion to dismiss.

### C. Florida's Anti-SLAPP Statute

At the conclusion of the motion to dismiss, Warner asserts that Plaintiff's complaint falls within Florida's anti-SLAPP (Strategic Lawsuits Against Public Participation) statute, Fla. Stat. § 768.295. (Dkt. 89 at 24-25) As a result, Warner contends that "if and when" the Court grants its motion to dismiss, Warner will file a motion for an award of fees and costs. (Id. at 25); see Fla. Stat. § 768.295(4) ("The court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section.").

Currently, Warner does not appear to ask for any relief under the anti-SLAPP statute. For instance, Warner does not contend that resolution of this motion is evaluated under a summary-judgment standard and it does not request an expedited hearing. See Fla. Stat. § 768.295(4) (providing that a defendant may file a motion for summary judgment seeking a determination that the anti-SLAPP statute has been violated). The Court therefore declines to address the application of Fla. Stat. § 768.295 at this juncture. Compare Royalty Network, Inc. v. Harris, 756 F.3d 1351, 1357-62 (11th Cir. 2014) (holding that verification requirement imposed by Georgia's anti-SLAPP statute did not apply in a diversity case), and Abbas v. Foreign Policy Grp., LLC, 783 F.3d 1328, 1337 n.5 (D.C. Cir. 2015) (holding that attorney's fees were not available under Washington D.C.'s anti-SLAPP statute), with Edward Lewis Tobinick, MD, 848 F.3d at 944-45 & n.8

17

(applying California's anti-SLAPP statute, which allowed a special motion to strike, where the appellants waived their challenge to its application in the district court), and Adelson v. Harris, 774 F.3d 803, 809 (2d Cir. 2014) (holding that mandatory fee shifting provision in Nevada's anti-SLAPP scheme applied in federal court).

### D.     Consideration of Exhibits

Warner filed a separate request for the Court to consider twenty-two exhibits in support of its motion to dismiss, which are designated as Exhibits A through V. (Dkts. 90, 91)  After the parties conferred, Warner withdrew its request as to Exhibits F through H, and Plaintiff stipulated to the Court's consideration of Exhibits A and N through V (Dkt. 96), which are referred to, excerpted in, or attached to the Amended Complaint or original complaint, and which are central to Plaintiff's claims.  (Dkt. 91 at ¶¶ 4, 17-25; Dkt. 78 at ¶¶ 29-30, 55, 60, 62-67, 70); see Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir. 2005) (holding that documents may be considered on a Rule 12(b)(6) motion if they are undisputed and central to the plaintiff's claims).

The remaining exhibits—Exhibits B through E and I through M—include documents from Diveroli's criminal and civil cases, a U.S. Congressional committee report about Diveroli's company, and a related news article.  (See Dkt. 91 at ¶¶ 5-8, 12-16)  Although Warner asserts that these exhibits are relevant to Diveroli's "misconduct and notoriety" (Dkt. 90 at 5), the Court declines to consider the documents because Diveroli's misconduct and notoriety are not relevant to the motion to dismiss.

For its part, Plaintiff submits screenshots from four websites that offer movies on-demand and in which *War Dogs* is described as a "true story." (Dkt. 98)  Plaintiff contends that these descriptions were "located after filing the Amended Complaint," and that they

underscore why its claims should not be dismissed.  (Dkt. 99 at 3-4)  Warner objects to the submission of the screenshots because, among other things, the statements on the websites are not challenged in the Amended Complaint.  (Dkt. 100 at 1)  The Court determines that the screenshot exhibits should not be considered in the resolution of the motion to dismiss.

## IV.   CONCLUSION

Based on the foregoing, it is **ORDERED** that Defendant's Motion to Dismiss (Dkt. 89) is **DENIED.**

**DONE** and **ORDERED** in Tampa, Florida, this 10th day of May, 2017.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel of Record
Any Unrepresented Person